JIMMY MAMOTH, ET. AL.

ASP - RRCC

1752 E. Arica Road

ELOY, AZ  85131

MICHAEL K. JEANES
Clerk of the Superior Court
By Christina Flores, Deputy
Date 03/09/2016 Time 09:31:18
Description 318/10              Amount
-------- CASE# CV2016-091330 --------
CIVIL NEW COMPLAINT              319.00 D
------------------------------------
TOTAL AMOUNT                      0:00
Receipt# 25101569

IN THE SUPERIOR COURT OF THE STATE
OF ARIZONA IN FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| JIMMY MAMOTH, ADAM MILLS, CLAY FACCIO, RONNIE WAYNE CLARK, DAMON MACK, BENJAMIN HOLLEMBEAK, SHAWN BURNS, WALTER JOHN BELCHER, ANDREW FERNICOLA, DAVID BAXTER, RAY MCINTIRE, THOMAS HIEMSTRA, JAMES BUCHANAN, MARK A. MORRIS, ALEX OSUNA, AND REGINALD COLVIN, Plaintiffs, | NO: CV-2016 CV2016-091330 Complaint For Damages |
| VS. | (TORT: NON-MOTOR VEHICLE, GROSS NEGLIGENCE, AND LOSS OF PROPERTY) |
| MANAGEMENT TRAINING CORPORATION, A DELAWARE CORPORATION, PAMELA RIDER, Warden, Kingman Hualapai Unit ("KHU"), HECTOR SANTIAGO, DEPUTY Warden, | |

(1)

OF OPERATIONS, KINGMAN COMPLEX,
SHAHNA FREDRICK, ASSOCIATE
WARDEN, KHU, JAMES WINCKLER,
CHIEF OF SECURITY, KHU, LT.'s
PALMER, JOHNSTON, KHU, AND
KHU OFFICERS RAIN, KEMP,
ELDER, MATTHEWS, LLOYD, PLUS
DANNY GLEASON, STATE OF
ARIZONA, A GOVERNMENT ENTITY;
ARIZONA DEPARTMENT OF CORRECTIONS,
A GOVERNMENTAL AGENCY OF THE
STATE OF ARIZONA, CHARLES L.
RYAN, DIRECTOR OF ARIZONA
DEPARTMENT OF CORRECTIONS ("ADC"),
BETTY BARNES, DEPUTY WARDEN-LEAD
KHU - ADOC MONITOR, JOHN DOE
FREELAND, DEPUTY WARDEN - LEAD ADOC -
KINGMAN COMPLEX MONITOR, TARA
DIAZ, ADOC CONTRACT BEDS
OPERATIONS DIRECTOR,
            DEFENDANTS.

        NOW COMES, THE ABOVE - NAMED PLAINTIFFS,
IN PROPIA PERSONA, AND ALLEGE AND
COMPLAIN AS FOLLOWS:

        PRELIMINARY   ALLEGATIONS
                    ( 2 )

1. Plaintiffs are currently imprisoned in Pinal County Arizona. Plaintiffs were imprisoned at MTC - Hualapai Unit on July 2-4, 2015, and bring forth this action on their own behalf.

2. Defendant Management Training (hereinafter "MTC") is a Delaware Corporation, doing business in the state of Arizona with CT Corporate System in Maricopa County serving as their statutory agent.

3. At all times material hereto, the Defendant MTC, was and is a Delaware Corporation in the business of owning and operating private prisons for profit in the United States.

4. On July 2nd through 4th, 2015, Defendant MTC owned and operated the Kingman - Hualapai unit.

5. MTC - Hualapai Unit is located in Golden Valley, Az.

6. In order to increase profits from housing prisoners as plaintiffs, Defendant MTC has a national policy and practice of cutting costs by building prisons in remote areas to take advantage of cheap non-union labor.

7. Then understaffing and providing inadequate training to its guards and administration.

8. At all times material hereto, Defendant MTC's National policies, practices and procedures were utilized in its operation at MTC Kingman-Halapai Unit.

9. Upon information and belief, Defendant ADOC is a governmental agency of the State of Arizona.

10. Upon information and belief, Defendant Charles L. Ryan resides in Pinal County, Arizona.

11. At all times relevant herein, Defendant Charles L. Ryan was the Director of ADOC, and was within the course and scope of his employment therein.

12. Pursuant to a contract with Defendant Arizona Department of Corrections (hereinafter "ADC"), Defendant MTC operated, oversees and maintains the Arizona State Prison Kingman Complex in Mohave County, Golden Valley, AZ.

13. Upon information and belief, Defendants Santiago, Rider, Frederick, Winckler, Palmer, Johnston, Rain, Lloyd, Matthews, Elder, Kemp and Gleason were employees of Defendant MTC.

14. And were within the course and scope of their employment therein.

15. Upon information and belief, Defendants were employees and/or agents of Defendant MTC and ADC acting under the direction and control of Defendants MTC and ADC or the State of Arizona and acting within the course and scope of their employment and/or agency. All tortious conduct of individual Defendants hereinafter alleged is imputed to Defendants MTC and ADC as a matter of law.

16. AT all Times material hereto, and on July 2-4, 2015 the Plaintiffs were inmates incarcerated at MTC, a designated Level III or medium custody security Facility with an offender capacity of 1,500 disbursed throughout 5 dormitory style Buildings.

17. Each of the Plaintiffs seek damages for physical and mental injuries, gross negligence, loss of property sustained as the result of a Riot which occurred at MTC-H on July 2-4, 2015.

18. Plaintiffs claims are based on State common law Torts. Equally, Plaintiffs claims are based upon prison conditions under the United States Federal & AZ constitutions and statutory provisions.

19. Plaintiffs claims are based upon common law gross negligence, common law tort for outrageous conduct, civil conspiracy under 42 U.S.C. $^3$ 1983, common law tort for loss of property, plus based upon violations of the First, Fourth, Eighth and Fourteenth Amendments to the United States Constitution and Article II, Subsections 3, 4, 13 and 32 of the Arizona Constitution.

20. None of the Plaintiffs were actively involved in the Riot, which was the result of Defendants gross negligence and the conduct of other inmates.

# History of Significant Events at MTC-H

## The Contracts

21. In 2002, Def. MTC was awarded the first of many contracts with Def. A.D.C To construct and operate a 1,400 bed min./med. security prison facility located in Kingman, AZ... The assigned inmates were there per Def.'s A.D.C Classification staff, and where all events arising To this complaint occurred.

22. On or about 3-22-2004, Def. ADC awarded a contract to Def. MTC To operate the MTC prison, designed and constructed for 1,100 minimum security and 300 medium security inmates To house DUI inmates.

23. The Defs., State of Arizona, A.D.C and MTC Entered into a contract - Solicitation N.O, AD-9-010-A3, on 11-21-07, A.D.O.C 13-029745 on 8-9-2012 which expired 2-14-2028

24. Def., MTC Has a long history of Lawsuits, in fact 27 for The proceeding 12 months from the publication of the solicitation (11-21-2007).

25. Subsequent, To The escapes on July 30, 2010, Def. ADC's Monitoring of The facility, Discovered from 2005 forward that there were 13 instances of

(6)

Large groups of inmates refusing directives and/or chasing Def MTC staff off the yard.

26. Def. Ryan informs Def. MTC This is unacceptable Behavior and a reaction by hundreds of inmates to dissatisfaction with Def. MTC's operations, endemic idleness or other Triggers.

27. Per the Contract entered in between Defs. State of Arizona, MTC and A.D.C., Below Listed, are some of the contractual obligations violated by Defs. (Solicitation No. ADG-010-A3).

28. Per 2.4.2 Compliance with standards, Def. MTC will comply with Def. A.D.C's written instructions, State Administrative Rules, State Statues and Federal Law.

29. As part of contractual obligations between Defs. ADC and MTC under 2.6.8, Def. ADC's Administrative Responsibilities - Def. ADC administered inmate classification for the time frames per contract.

30. Per 2.6.10 - Compliance Monitoring MTC understands and will cooperate fully with ADC in the performance of monitoring activities to determine compliance and performance with all contract provisions and applicable policies and standards.

31. MTC understands that monitoring activities will be conducted by ADC staff.

32. To include, but are not limited to security operations, health services, mental health, substance abuse, food service, safety, sanitation and finance.

33. And that during the term of the contract, ADC shall conduct security audits, inspections and searches in accordance with applicable ADC policy.

34. Per 2.7 Performance, Per 2.7.1 Monitoring.

35. MTC understands that ADC will monitor MTC's performance at the facility to ensure compliance with all contract provisions and applicable written instructions including compliance with statutes, Administrative Rules and Department Orders.

36. Per 2.7.2. Information.

37. MTC understands that in accordance with A.R.S. § 41-1609.01, L and upon receipt of the first inmate by MTC.

38. The ADC will direct the gathering of information

(8)

related to the performance of MTC.

39. Per 2.8 CONTRACTOR'S / SUBCONTRACTOR'S Qualifications.

40. Per 2.8.1 Management and Training Corporation Qualifications.

41. MTC has provided the following information to demonstrate our experience in the operation of secure correctional facilities in accordance with A.R.S. § 41-1609.01.

42. Per 2.8.1.1 Organizational Qualifications and Experience.

43. Since 1987, MTC has acquired contracts with several local, state and federal governmental agencies in the U.S., Australia, and Canada, to manage correctional facilities and provide a variety of academic education, vocational training, and other programming. MTC currently operates 13 prison facilities . . . . MTC is responsible for providing the full range of management and administration of all aspects of facility operation, including security, inmate safety programs, human resources, and financial administration, inmate programming, inmate records, management, health services, food service . . . .

(9.)

44. Per 2.9.3.1 SECURITY OPERATIONS

The plan will include procedure that covers all aspects of facility security, including use of force, to maintain control of the inmate population and to prevent their escape, under both normal and emergency circumstances.

45. Per 2.9.3.1.1 CRITICAL INCIDENT RESPONSE PLAN

These agreements will also include a comprehensive plan of action should the facility become uninhabitable due to natural causes or a disturbance. The evacuation plan will describe how inmates will be transported and where inmates will be housed and secured whenever a situation requires a partial or total evacuation of the facility.

46. Per 2.9.7 CRITICAL INCIDENT RESPONSE PLAN

MTC recognizes that all prison managers and staff must be prepared for any type of emergency situation that may occur in a prison and have plans in place to effectively manage them. Using an approved Incident Command System model, MTC will develop emergency plans, each in the format of a separate procedure for all situations which pose a direct threat to the security and safety of the public, MTC employees, ADC employees and inmates. MTC will comply fully with the requirements of section 2.9.7 through 2.9.7.3.4 of the RFP and provide the critical incident response plans to the ADC 90 days prior to acceptance of the first inmate. The plans will be developed in full coordination with the Department, Federal, State and Local support agencies during the developmental phase of the project.

THE ESCAPE

(10)

47. On 7-30-2010 three convicted murderers escaped the MTC HUALAPAI facility.

48. The three escaped prisoners and one civilian killed two innocent citizens, by brutally shooting them, in their own camping trailer and intentionally setting fire to their trailer in a remote location.

49. The family of the two victims sued Def. MTC and settlement was reached in an out-of-court settlement hearing. Def. MTC accepted full responsibility.

50. The negligent and reckless management procedures in the prison security known then and found by ADC, via the Nakamoto Group's Report conducted on 12-15 through 17, 2010, after the escape were numerous and disturbing, and will be fully proven at trial, to still exist some five years later.

51. Def. Ryan due to the uncorrective actions of Def. MTC after the escape, specified 31 areas of deficiencies at Kingman, of the 31 areas, 9 remained outstanding and uncorrected and 24 had additional deficiencies. (hereinafter "Cure Letter") After a lot of communication, emailing and briefings between Def's. Ryan and MTC, corrective actions had not in fact, taken place.

52. Def. Ryan in his "Cure Letter," acknowledges following the escape that ADC contract monitors and his administrators were not performing their duties adequately.

53. Def. Ryan informs Def. MTC that he has repeatedly raised concerns about the extremely high level of inmate idleness, which is a precursor to inmate management problems leading to grouping and disturbances.

54. Def. Ryan informs Def. MTC that they have not effected sustained

(11)

Systemic operational improvements.

55. In fact 3 separate letters dated 9-4-2010, 11-1-2010 and 11-15-2010 from Def. Ryan to Def. MTC, advised Def. MTC of what to correct remained incompletely addressed, unaddressed or uncorrected.

56. In the "Cure Letter" dated 12-29-2010, Def. Ryan details the 31 areas and each deficiency by Def. MTC. In the Assessment Team Report almost 5 years later, repeat findings were discovered in 11 of the 31 areas and, resurfaced as deficiencies at Def. MTC - Kingman, which contributed to the riots of July 2-4, 2015.

57. A review of the lax procedures and incompetent management of the facility made it clear that circumstances surrounding the escape were shoking and egregious.

58. Plaintiffs assert these same lax procedures and incompetent management of the facility, plus other areas of deficiencies were clear circumstances surrounding, and greatly contributed to the Riot some 5 years later and are still shoking and egregious.


59.            THE BIENNIAL REPORT FY 2010-2011


60. Per A.R.S. § 41-1609.01 (K) and (M), ADOC Submitted their Biennial Report for Fiscal Year (hereinafter "FY") Some of the areas of comparison between private versus public Provision of Services, which are related to the instant complaint are as follows:

        1. Security · Inmate Groupings
        2. Inmate Management and Control
        3. Staff Training          . . .

61. ADOC, retains full responsibility for the provision of certain essential functions that cannot be delegated to the contracted private prisons (A.R.S. § 41-1609.01 (P)) and is responsible for managing private prison contracts, monitoring, evaluating, and correcting private prison operations and performance.

62. ADOC retains control of the following services over private prisons, inmate classifications, custody/housing assignments, contract compliance monitoring, auditing and contract development.

63. Def. MTC had the highest number of staff assaults of all private vs. public prisons compared for F4 2011 (17).

64. Def. MTC had the second highest inmate assaults @ 19, highest inmate assaults on staff @ 9, and highest number of staff assaulted @ 9 in F4 2010.

65. Def. MTC had the highest number of confiscated cell phones or devices of F4 2011, @ 44, 3rd highest use of force incidents @ 14, 2nd highest drugs @ 15, 2nd highest weapons found @ 18, and most number of keys lost @ 5.

66. Def. MTC in F4 2011, had the 2nd highest inmate assaults, highest inmate assaults on staff and highest number of staff assaulted @ 17.

67. Def. MTC in F4 2010 had the highest number of property grievances @ 70.

68. Def. MTC in F4 2011 had the highest number of property grievances again @ 88, and highest number of food grievances @ 2.

69. Def. MTC had the 2nd lowest COII Average Score @ 76-20 for 2010.

70. Def. MTC had the 2nd highest C.O. turnover rate @ 25.6% in F4 2011, and 2nd lowest COII Average Score @ 82.64

71. Def. MTC in F42011 had the highest number of inmates with a mental Health Score 2 @ 417/28%, on a scale of 1-5, 4 and 5 not applicable to Def. MTC-Kingman.

72. Def. MTC in F4 2010 had the 3rd highest minor ticket violations @ 637, and highest major ticket violations @ 446.

73. Def. MTC in F4 2011 had the 2nd highest minor ticket violations @ 553, and once again highest major ticket violations @ 616 and highest totals for any unit comparisons @ 1,169.

74. The Report showed the higher incidences of cell phone and drugs in F4 2011 @ Def. MTC, which demonstrate a quality of service significantly below the state units service level.

75. The Report showed that Def. MTC Administration service level @ Hualapai was below the comparison state unit. The unit had a greater number of grievances in F4 2010-2011.

76. The Report showed Def. MTC was below state comparisons in personnel practices and training, a higher turnover vacancy rates in F4 2010-2011, plus lower care competency test scores in all categories for both fiscal years.

77. The Report showed inmate discipline was below state comparisons and a significantly higher number of minor-major violations in F4 2011.

78. The Report showed that of the (9) service areas, Hualapai was below the state level in (4) areas.

79. The Report stating of particular concern the "escape" and security findings and identified serious operational and security deficiencies.

80. Per Report ADOC's – Department's Offender Operations Division oversaw prison operations of the State's Contracted private prisons.

(14)

81. Def. ADOC annual audit of MTC-Kingman conducted in March 2010, 4 months prior to the escape, did not report any of the security issues that contributed to the escapes and were identified during the subsequent investigation.

82. In Jan. 2011, DOC implemented a new inspection program and revised its annual audit procedures, it is called Green Amber Red Inspection Program (hereinafter "GAR")
This program is a monitoring checklist consisting of 220 performance measures grouped under 16 operational areas called "competencies."

83. Def. DOC's Monitoring Staff, in the escape indicated a lack of training contributed to the contract's monitors failure to perform his duties as required.

84. Def. DOC implements a new training program to help ensure contract monitoring staff effectively perform their duties, starting in 9-2011.

## GENERAL ALLEGATIONS

85. On 7-2-2015, at approximately 2022 hours Dorm 4 control room officer Elder activated the Incident Command System (ICS) at the Horseshoe Unit in Dorm 4.

86. Defs. Officer Kemp and Rain were the two floor officers. Tragically, after the riot Officer Kemp committed suicide over the events he triggered.

87. Inmates were returning to the Dorm from observance of Ramadan, a religious service.

88. Def. Officer Kemp pepper sprayed an inmate in the hallway of Dorm 4, for all inmates in Pods A, B, and C to observe. The pepper spray also hit another inmate.

89. Def. Officers Kemp and Rain placed one inmate in handcuffs.

90. Def. Officer Kemp reported inmates in Dorm 4-A Pod began breaking glass from the Pod window.

91. Def. Officer Kemp said that once the glass broke, he and all responding officers exited the Dorm or abandoned their post, leaving one inmate in the horseshoe area of the Dorm.

92. Def. Officer Rain was assigned as the 2nd floor officer in Dorm 4 and was present when Officer Kemp used force on an inmate.

93. Upon interview by ADC Criminal Investigations Unit, Def. Rain reported that officer Kemp was already angry with these two inmates because of an earlier argument.

94. Def. Rain said the inmates did not appear non-threatening to him, nor did he hear Kemp give any commands.

95. Def. Rain saw Kemp deploy and empty his entire can of pepper spray and a fog of spray in the air.

96. Def. Rain reported Kemp did not handle the situation correctly.

97. Def. Lt. Palmer responded and assumed command of the incident.

98. Def. Lt. Palmer gave instructions for all staff to evacuate the building, and for the front slider door to be secured.

99. Def. Lt. Palmer activated the Hualapai Designated Armed Response Team.

100. Def. TSU Commander Lt. John Doe deployed a diversionary device in Dorm 4. Equally, deploying a CS Grenade in the horseshoe. Another MTC Officer went on the roof and deployed a CS Grenade into F-Pod.

101. Plaintiffs Mamoth, Hollembeak, Faccio, Burns, and Clark were effectively locked in a riotous dorm, with dispersed chemical agents, with rioters and no security by Def. MTC.

102. These plaintiffs were in Dorm 4, with complete chaos from 2022 hours on July 2 to 0734 hours on July 3, 2015.

103. Def. Captain Winkler assumed command at 2116 hours.

(16)

104. Approximately 2130 hours inmates in Dorm 3, E and F Pods, and Dorm 5, A and B Pods, began breaking the outer Pod windows.

105. ASPC-Winslow TSU were deployed to Dorm 5 and placed flex cuffs on the inmates and placed them face down in the recreation yard.

106. Plaintiff OSUNA was in Dorm 3 and subjected to Defendants tortuous actions.

107. Def. Complex Administrator Shaw was notified and he responded to the unit. Equally, Defs Warden Rider and ADW Fredrick were notified and they responded to the unit.

108. Def. ADC Lead Monitor Deputy Warden Freeland responded to the unit.

109. Approximately 2206 hours Dorm 1 Officer in the control room made a notification that glass had been broken out of the rear doors of B and C Pods.

110. All horseshoe glass were broken out in Dorm 1.

111. Approximately 2222 hours all MTC staff evacuated from Dorm 1.

112. Approximately 2243 hours inmates in Dorm 1 were able to break Pod doors, enter the horseshoe and break all cameras.

113. Defs Lt. Johnston and Officers Lloyd and Matthews were deployed behind Dorm 1 with shotguns and less than lethal rounds.

114. At 2245 hours, inmates in Dorm 1 B-Pod broke out of the rear door to the pod.

115. Defs Lloyd and Matthews ran toward the door and began shooting rounds at one inmate.

116. Def. Lt. Johnston stated at 2303, nine inmates attempted to exit the rear of the dorm by using mattresses to block them.

117. Def. Lt. Johnston fired 15 rounds of sting balls at the inmates and 8 inmates went back in B-Pod.

17.

118. Def. Rain was posted on the tower with a 37mm munitions launcher, and deployed 3 rounds of CS Gas to the rear of Dorm 1 B-Pod.

119. Def. Winkler reported 1 round of the CS Gas landed on top of the inmates who broke out of Dorm 1 B-Pod.

120. Tactical Support Unit (TSU) Officers reported all Hualapai perimeters were secure.

121. At approximately 2230 hours a 3-way call between CA Shaw, acting ADC Offender Operations Division Director Joe Profiri, and Def. Ryan.

122. CA Shaw was told by Def. Ryan that after 20 hours and the unit was not under control, "For him to get control of the Unit ASAP."

123. Defs Ryan and Profiri stated they gave specific instructions to CA Shaw to stage an assault and retake control of the prison.

124. CA Shaw was not comfortable with this and reported to them He did not have enough resources on-site to safely retake control.

125. MTC TSU Commander and the Incident Commander, Def. Rider had a discussion about assaulting the building and taking control back.

126. MTC Commander said his people were exhausted and wanted an hour to rest them and regroup.

127. Def. Rider told Winslow TSU Commander to stand down.

128. Upon post-interview, Def. Rider stated her thought process was two teams are better than one, and why she did not take the counsel of Winslow TSU Commander.

129. Def. Rider shrugged her shoulders and provided no answer.

130. Def. Rider assumed command from Captain Winkler.

131. Both MTC TSU and Winslow TSU made entry through the broken door of Dorm 1 B-Pod.

132. Chemical agents were dispersed and inmates were restrained.

133. TSU Officers went Pod by Pod in Dorm 1 and re-established control.

18.

134. By 0429 hours, all inmates from Dorm 1 had been restrained and secured on the recreation yard.

135. Approximately 8 hours elapsed from the activation of the ICS to regain control of Dorm 1.

136. Plaintiffs Mills, Belcher, Mack, Fernicola and Baxter were housed in Dorm 1.

137. A tactical plan was created for re-establishing control over Dorm 4.

138. At 0734 hours, Dorm 4 was cleared of all inmates.

139. Plaintiff Hinson who was in Dorm 3 was moved back into the Dorm from the east dining hall at approximately 0825 hours.

140. Based on the damage assessment, it was declared that Dorms 1 and 4 were damaged to the point of being uninhabitable.

141. Approximately 700 inmates from Dorms 1 and 4 were temporarily housed in the construction trades education room, the Chapel, and dining hall.

142. Def. Ryan arrived on-site at approximately 0926 hours of 7-3-2015.

143. On 7-4-2015 Def. Captain Winkler was assigned as Operations Section Chief.

144. On 7-4-2015 inmates from Dorms 1 and 4 were put on buses for transportation to other facilities.

145. Def. Diaz coordinated movement plans to relocate the prisoners to other prisons and county jails.

146. On 7-4-15, inmates in Dorm 5 B-Pod were refusing to return to their beds for count.

147. Inmates in Dorm 5 needed breakfast and toilet paper.

148. Inmates in Dorm 2 became agitated and visibly angry. Def. Rider spoke with them.

149. Dorm 2 inmates complained of the heat, food, lack of cold water, and how long it took to receive their meals.

19.

150. The time was 1300 hours and the inmates in Dorm 2 had not eaten breakfast yet.

151. Dorm 2 inmates barricaded themselves in their Pods.

152. Def. Diaz made a plan to assault the pods to prevent them from breaching any door or control room.

153. The assault team was authorized to use minimal force necessary towards violent or armed inmates.

154. Pepper spray, flash bangs and sting ball grenades would be used after CS Gas deployment.

155. An MK-9 pepper spray fogger was deployed into D-Pod through the windows. A diversion device and sting ball grenades were deployed to create more space.

156. Due to rioting an ADC TSU Commander told his officers to fire 6 rubber fin stabilizer rounds into the Pods.

157. MTC Staff were needed with shot guns on the back doors to secure the perimeter.

158. TSU then deployed diversion devices and sting balls.

159. Plaintiffs McIntire, Buchanan and Hiemstra, plus Colvin & Morris were housed in Dorm 2.

160. At 1350 hours, inmates in Dorm 3 started to break the windows and breached the Pod doors and barricaded the front door.

161. MTC Staff had already evacuated.

162. TSU was directed to assault the front area with foggers, diversion devices, sting balls and pepper balls.

163. TSU Staff then responded to the dining hall where inmates from Dorm 1 were being held and addressed concerns from the inmates that they were hot and did not want to be involved in the riot.

164. Due to the sheer number of inmates contained in the dining hall

20.

combined with poor air flow and unsanitary conditions, all contributed to a very tense environment.

165. Plaintiffs Mills, [illegible], Mack, Baxter, Belcher and Fernicola were housed in Dorm 1.

166. TSU Staff broke the windows with their baton to improve greater air circulation in the dining hall.

167. These actions prevented the inmates in the dining hall from actively participating in the riot and they remained compliant with staff instructions.

168. At 1420 hours, inmates in Dorm 5 started to break windows and were attempting to breech doors.

169. TSU deployed pepper spray foggers, diversion devices, pepper balls and sting balls grenades.

170. All munitions were depleted, and only 12 guage bird shot was available.

171. In Dorm 3 TSU Staff deployed CS Gas.

172. In Dorm 5 A-Pod, one sting ball grenade, diversionary grenades, MK-60 pepper spray and CS Gas grenades were deployed.

173. All windows were broken out and TSU deployed diversionary devices, sting ball grenades and CS Gas grenades.

174. Def. Diaz was contacted and advised by the TSU Commander that they were out of ammunitions, so they would deploy 12 guage steel shot for the lower extremities, and Def. Diaz acknowledged the need for these measures.

175. The damage inflicted on the physical plant by inmates left all dorms but Dorm 2 and CDU Unit 5 uninhabitable.

176. At 1700 hours all Dorms reported that they were secure.

177. Inmates were restrained with flex cuffs behind their backs and

laying face down on the recreation field, exposed to the heat.

178. Def. Winkler was advised by TSU to provide inmates with water, and provide medical staff. As with the delivery of meals earlier that day, the water provisions were delayed.

179. TSU Commander reported that there was no sense of urgency by MTC staff to provide it.

180. Inmates began to complain again about conditions, especially a lack of water.

181. Def. Diaz reported that she could not see a sense of urgency with MTC staff.

182. Def MTC were slow moving and there was no leadership present to help effect the moves of the inmates, and to give direction to MTC Staff.

183. A damage assessment team found notable issues such as lack of communication, failure to take appropriate action, and disorganization of the Kingman Staff resulted in the inmate population being in control and unsupervised in their housing units for extensive periods of time.

184. THE ASSESSMENT TEAM FOUND: *HUALAPAI

185. · Excessive use of force by Officer Kemp — inmate was witnessed covered in OC spray — in view of inmates in Dorm 4. This action incited inmates to begin breaking windows. [ Violation of DO 804, Inmate Behavior Control]

186. · MTC Officers evacuated the building before inmates had breached the horseshoe or the control room. [Violation of General Post Order; operational concern, sound correctional practices]

22.

187. Outside resources were called for with no Unified Command Established.

[Violation of FEMA / NIMS protocols]

188. Defendant MTC Fredrick on site for 20 minutes without ICS assignment.

[Violation of FEMA / NIMS protocols]

189. ADC Emergency Operations Center was not Activated, even after the arrival of a second ADC Complex Tactical Support Unit and Deputy Director.

[Violation of FEMA / NIMS protocols]

190. The Assessment Team was tasked to scrutinize the response of MTC to each incident.

191. Consider any written plans or procedures, and decipher the command decision making through the events.

23.

192. In Addition The Assessment Team Listed Key Findings In (7) Objective, They are (Hualapai Only)

193. Key Findings, Objective 1: Detailed Riots Assessment

194. • Excessive use of force by Officer Kemp-inmate was witnessed covered in OC spray-in view of inmates in Dorm 4. This action incited inmates to begin breaking windows.[ Violation of DO 804, Inmate Behavior Control]

195. • MTC Officers evacuated the building before inmates had breached the horseshoe or the control room. [ Violation of General Post Order; operational concern, sound correctional practices]

196. • Outside resources were called for with no Unified Command established.[ Violation of FEMA/NIMS protocols]

197. • MTC ADW Fredrick on site for 20 minutes without ICS assignment. [ Violation of FEMA/NIMS protocols]

198. • ADC Emergency Operations Center was not activated, even after the arrival of a second ADC complex Tactical Support Unit and Deputy Director.[Violation of FEMA/NIMS protocols]

199. Key Findings, Objective 2: Assessment of MTC Operational Response

Case 2:16-cv-02917-GMS--BSB   Document 1-2   Filed 08/30/16   Page 25 of 196

200. • Excessive use of force by Officer Kemp-inmate was witnessed covered in OC spray-in view of inmates in Dorm 4. This action incited inmates to began breaking windows. [Violation of DO 804, Inmate Behavior Control, identified in Objective #1]

201. • Outside resources were called with no Unified Command established. [Violation of FEMA/NIMS protocols, identified in Objective #1]

202. • MTC TSU did not respond to Hualapai with appropriate munitions. They had no OC foggers with them when they entered Dorm 4 and took minimal action to get the inmates "to keep their heads down" rather than to quell the riot. [Operational concern, sound correctional practices]

203. • MTC in inmate - controlled dorms. MTC Emergency Response Plans (aka Critical Incident Response Plans) contained no detail on when to evacuate staff, or how to address inmate disturbances. A copy of the ERP could not be located at the Cerbat unit. [Violation of Contract Section 2.9.7 et seq, Critical Incident Response Plan, operational concern, sound correctional practices] ERP was also lacking contact information for local authorities. [Operational concern, sound correctional practices]

204. • ICS command structure not fully implemented based on scale of incident. Unified Command never established, despite involvement of outside agencies. [Violation of

25.

FEMA / NIMS protcols] Web EOC was under-utilized as a communications and resource-management tool by MTC and ADC. [Operational concern, sound correctional practices, identified in Objective #1]

205. • MTC AOW Fredrick on site for 20 minutes without ICS assignment. [Violation of FEMA/NIMS protocols, identified in Objective #1]

206. • Providing inmates with water was not perceived as an operational urgency. [Violation of DO 704, Inmate Regulations]

207. • MTC TSU team lacked training, leadership, and confidence. They were poorly equipped. There was not an adequate inventory of munitions on hand. MTC TSU has had training cancelled or members unavailable to attend due to staffing issues. [Violation of DO 509, Employee Training and Education, and DO 716, Armory Procedures]

208. Key Findings, Objective 3: Assessment of MTC Leadership and Staff

209. • MTC line staff perception is that MTC administration does not value them, and does not spend enough time on the yard. MTC staff expressed that they do not feel appreciated or valued by MTC administration. They reported burnout due to amount of overtime being mandated and the manner in which it is managed. [Operational concern, sound correctional practices and leadership concerns]

210. • ICS command structure not fully implemented based on scale of incident; incorrect transfer of command. [Violation of FEMA/NIMS protocols, identified in Objectives #1 and #2]

211. • Complete breakdown in ensuring MTC staff accountability at Cerbat. [Violation of DO 706, Incident Management (Tactical Priority)]

212. • Separate incident command posts established at Cerbat and Hualapai, despite limited resources [Operational concern, sound correctional practices]

213. • MTC Emergency Response Plans were either not available to Command and General Staff during the incident, or were not followed. MTC Emergency Response Plans contained no contact information for local jurisdiction authorities. [Operational concern, sound correctional practices, identified in Objective #2]

214. • Contradictory reports exist on whether MTC ISU had Rules of Engagement established. [Operational concern, sound correctional practices]

215. • MTC lacks an effective Field Training Officer program. [Violation of DO 509, Employee Training and Education]

216. • Cerbat and Hualapai Units operate as two completely distinct units, with substantially different management

27.

styles, minimal cooperation, and little-unit communication,

217. [Operational concern, sound correctional practices and leadership concerns]

218. • MTC staff overtime is inconsistently applied and creating burnout. Mandatory overtime is applied with limits at Cerbat and no overtime limits at Hualapai. Some staff is mandated frequently to work overtime; others are not mandated. [Operational concern, sound leadership correctional practices]

219. • Wardens Sullivan and Rider were unaware of correct DART procedures, ICS training topics, staff training completion rates, and overtime usage. [Violations of DART training lesson plans and DO 706, Incident Management]

220. • MTC line staff perception of favoritism and claim often working alone in an area requiring two officers. [Operational concern, sound correctional practices and leadership concerns]

221. • MTC Case Managers (COIIIs) are not available to the inmate population on a consistent basis. [Violation of DO 811, Individual Inmate Assessments and Reviews]

222. • No MTC supervisors had attended mandatory DART for Supervisors course; this course has been an annual ADC requirement since this contract went into effect. [Violation of Contract ADC-010-A3 Section 2.11.12. et seq. In-Service Training, and DO 509, Employee Training and Education]

28.

223. • Warden Rider did not complete annual in-service training, and did not ensure subordinates completed annual in-service training. [Violation of Contract AD9-010-A3 Section 2.11.12 et seq, In-Service Training, and DO 509, Employee Training and Education; sound correctional practices and leadership concerns]

224. • Warden Rider reports no limit on allowable overtime for Hualapai line staff. [Operational concern, sound correctional practices and leadership concerns]

225. • Security devices (specifically, windows and security cameras) are not repaired/replaced in a timely fashion. [Violation of DO 703, Security/Facility Inspections]

226. • Hualapai Associate Deputy Warden Fredrick on site for 20 minutes without ICS assignment. [Violation of FEMA/NIMS protocols, identified in Objectives #1 & #2]

227. • Unprofessional comments attributed to Hualapai Associate Deputy Warden Fredrick via social media. [Violation of DO 501, Attachment A, Code of Ethics]

228. • Captain Winckler on site for about two hours without ICS assignment. [Violation of FEMA/NIMS protocols]

229. • MTC Deputy Warden of Operations Santiago unaware of magnitude of overtime usage. [Operational concern, sound correctional practices and leadership concerns]

29.

230. • MTC Deputy Warden of Operations Santiago failed to ensure appropriate pre-service and in-service training completion, and TSU readiness. [Violation of Contract AD9-010-A3 and DO 509, Employee Training and Education; sound correctional practices and leadership concerns]

231. • MTC administration is not interacting effectively with supervisors, line staff, or inmates. Communication is intermittent, and sometimes contradictory or incomplete. [Operational concern, sound correctional practices and leadership concerns]

232. • Cerbat Warden Sullivan and Hualapai Warden Rider previously worked for ADC and should be knowledgeable of ADC policies and procedures regarding DART deployment. [Violation of DART Training lesson plans; operational concern, sound correctional practices and leadership concerns]

233. • Captain Winckler did not know what munitions MTC TSU responded to Hualapai with. He later learned that they had a 37mm gas gun, a pepper ball launcher, and a mighty mite grenade. [Violations of DO 706, Incident Management, DO 716, Armory Procedures, and FEMA/NIMS protocols]

234. • For the Hualapai Riot 2- Captain Winckler was assigned to Operations and CA Shaw was the IC. He stated there were too many chiefs on the yard and that radio traffic was all jammed up. He said good decisions were made but command was compromised. He said that he himself had no

30.

business being out in front of the buildings. [Violations of DO 706, Incident Management, and FEMA/Nims protocols]

235. • Captain Winckler acknowledged that there were no procedures in place for officers to ███████. [Violations of General Post Order and Emergency Response Plan]

236. • Captain Winckler is the Senior Firearms Instructor for MTC. He acknowledged that as of July 4, 2015 no MTC supervisors had received DART for Supervisors training. (CPT Winckler attended DART and Supervisor Train-the-Trainer on July 3, 2014) [Operational concern, sound correctional practices and leadership concerns]

237. • Captain Winckler leaves the management of rosters, attendance, and over time to the lieutenants. He was not aware of high rate of call-ins by Hualapai officers. He acknowledged that there are no limits on the amount of over time an officer can work. [Operational concern, sound correctional practices and leadership concerns]

238. • Captain Winckler has not held a supervisor's meeting since November of 2014. [Violations of DO 112, Department Meetings, and Post Order 08, Correctional Captain; sound correctional practices and leadership concerns]

239. • Captain Winckler acknowledges that he failed to monitor Hualapai's training completions this year and that he had not completed his required training. [Violations of Contract

31.

Section 2.11.12 et seq., In-Service Training, DO 509, Employee Education and Training, and Post Order 08, Correctional Captain; sound correctional practices and leadership concerns]

240. • Captain Winckler acknowledges that his management style has a tendency to scare staff because he is stern and direct. He says he is changing his management style. The majority of staff interviewed said the Winckler does not tour enough and that he lacks people skills. [Operational concern, sound correctional practices and leadership concerns]

241. • MTC staff and inmates report that there are a number of officers who are identified as "badge heavy." Staff and MTC staff identified and the assessment team observed those who are disengaged and who do not actively perform their jobs. [Violation of DO 501, Employee Professionalism, Ethics and Conduct, operational concern, sound correctional practices and leadership concerns]

242. • MTC Administrators' monthly DO 703 reports differ significantly from the ADC Monitor's DO 703 reports. They are less detailed and often rate the units as excellent with no supporting documentation. [Violations of DO 703, Security/Facility Inspections, and operational concern, sound correctional practices]

243. Key Findings, Objective 4: Inmate Management, Supervision and Communication

244. • Case Managers not appropriately supervising structured

32.

recreational programs. [Violation of DO 906, Inmate Recreation/Arts & Crafts]

245. • MTC programs supervisors are not interacting effectively with line staff or inmates, and do not make themselves available to the inmate population. Communication is intermittent, and sometimes contradictory or incomplete. [Operational concern, sound correctional practices]

246. • MTC staff reports a high turnover rate for Case Managers. Cerbat and Hualapai each had two actual case manager vacancies. A review of both units revealed that there are limited numbers of case managers seeing inmates each day. MTC Case Managers ((CO IIIs) are not available to the inmate population on a consistent basis. [Violation of DO 811, Individual Inmate Assessments and Reviews]

247. • Inmate perception that MTC staff is unprofessional, has no supervisory presence, and fails to communicate with the population. [Operational concern, sound correctional practices]

248. • MTC doesn't have a dedicated full-time Special Security Unit in their authorized staffing pattern. MTC staff has an inadequate understanding of prison politics, security threat group, and intelligence-gathering mechanisms. [Operational concern, sound correctional practices]

249. • A practice exists of allowing groupings of inmates to approach and intimidate individual staff, without

33.

repercussion. [Violations of DOC 105, Information Reporting DO 706, Incident Management, and DO 803, Inmate Disciplinary Procedure, identified in Objective #3]

250. •MTC Hualapai unit had a somewhat higher number (8.6%) of disciplinary reports written in June 2015 when compared to a similar ADC unit (Florence-East). However, the number of those disciplinary reports that were for major violations was much higher (177 versus 139) for June and was consistently higher for the last quarter. [Operational concern]

251. • Inmates reported that staff unprofessionalism (use of profanity, badge heavy) is an issue that has created unrest. [Violations of DO 501, Employee Professionalism, Ethics and Conduct, DO 509, Employee Training and Education; operational concern, identified in Objective #3]

252. •Key Findings, Objective 5: Review of Pre-Service, In-Service Training

253. •MTC failed to deliver numerous pre-service and in-service training classes, and in other cases, made unauthorized reductions in classroom hours to existing courses. Overall, staff in-service training completion rates were unsatisfactory, with supervisors having the lowest completion rates. [Violation of Contract A09-010-A3, Sections 2.11.7 through 2.11.15, Staff Training, and DO 509, Employee Training and Education]

34.

254.  • MTC TSU staff report not having adequate tactical equipment. [Violation of DO 716, Armory Procedures]

255.  • MTC TSU staff report not having enough familiarization with specialty weapons and/or munitions. [Operational concern, sound correctional practices]

256.  • MTC staff assigned to Dact is not compliant with DART tactics. [Violation of DART Training lesson plans, identified in Objectives #1, #2, and #3]

257.  • No MTC supervisors had attended mandatory DART for Supervisors course; this course has been an annual ADC requirement since this contract went into effect. (Exception two staff, CPT Winckler and SGT Ciafalo, have attended Train-the-Trainer). [Violation of Contract AD9-010-A3 Section 2.11.12 et seq, In-Service Training, and DO 509, Employee Training and Education, identified in Objective #3]

258.  • The primary instructor for MTC's equivalent to ADC Correctional Officer Training Academy had not attended ADC instructor certification, and taught classes without ADC lesson plans. Numerous classes were taught without instructors attending the respective Train-the-Trainer courses. [Violations of Contract AD9-010-A3 Section 2.11.7 through 2.11.15, Staff Training, and DO 509, Employee Training and Education]

259. • MTC academy cadets do not spend any time in the institution interacting with inmates during their academy, as ADC COTA cadets do. [Operational concern, sound correctional practices]

260. • COTA cadets receive 16 hours of crisis intervention training; MTC academy cadets receive 1½ hours. This is noncompliant with COTA curriculum. [Violations of Contract AD9-010-A3 Section 2.11.8 et seq, Pre-Service Training, and DO 509, Employee Training and Education; operational concern, sound correctional practices]

261. • Many MTC staff have not completed basic NIMS/ICS courses, as mandated. [Violation of Contract AD9-010-A3 Section 2.11.12 et seq, In-Service Training, and DO 509, Employee Training and Education]

262. • Some MTC line staff report being untrained to complete Information Reports, Inmate Disciplinary Reports, and Correctional Service Journals. [Violations of DO 105, Information Reporting, DO 803, Inmate Disciplinary Procedure, and DO 703, Security/Facility Inspections]

263. • MTC lacks an effective Field Training Officer program. [Violation of DO 509, Employee Training and Education, identified in Objective #3]

264. • Numerous MTC staff have expired weapons qualifications. [Violation of DO 510, Firearms Qualification/Firearms

Instructor Certification #3]

265. • MTC DART refresher training supposed to be conducted at annual firearms training. However, staff interviews (to include the DWOP) indicate this is not being conducted. [Violation of Contract Section 2.11.12 et seq, In-Service Training, and DO 509 Employee Training and Education, identified in Objective #2]

266. • MTC TSU has 22 active members with 10 vacant positions. [Operational concern, sound correctional practices]

267. • MTC TSU training is frequently cancelled, with only five trainings verified in the past 12 months. [Violation of Contract Section 2.11.12 et seq, In-Service Training, and DO509, Employee Training and Education]

268. • MTC has conducted accelerated academies (12 hours per day, 5 days per week). [Violation of Contract Section 2.11.8 et seq, Pre-Service Training, and DO 509, Employee Training and Education]

269. Key Findings, Objective 6: ADC Monitor Team Assessment

270. • The team does not assess or evaluate the facility culture. [Operational concerns, sound correctional practices]

271. • The team interacts with MTC staff only in a formal/ inspection-type relationship. [Operational concerns, sound correctional practices and leadership concerns]

37.

272. • MTC staff does not seek interaction with the ADC monitoring team, and are reportedly encouraged not to do so. [Operational concerns, sound correctional practices and leadership concerns]

273. • Chronic vacancies/absences in the ADC ASP-Kingman monitoring team reduced their effectiveness. [Operational concerns, sound correctional practices]

274. • The number of inmates at ASP-Kingman (3500) creates a volume of paperwork that limits the team's ability to assess Kingman in greater detail than the fundamental policy/contractual requirements. [Operational concerns, sound correctional practices]

275. Key Finding, Objective 7: 2010 Cure Notice vs. 2015 Findings

276. • Repeat findings were discovered in eleven (11) of the thirty-one (31) areas of non-compliance initially addressed in the 2010 Notice. These eleven (11) matters have resurfaced as deficiencies for MTC at ASP-Kingman.

277. The Conclusion: The Assessment Team Found

278. Based upon the observations and reviews of available materials, inmate interviews, staff contacts and interviews, the Assessment Team concluded that the inmate population at ASP-Kingman was dissatisfied with their conditions of confinement. Thus, they rebelled by way

of rioting. Though singular events on the days of the disturbances can be identified as inciting the actions of the inmates on July 1 through July 4, 2015, identified operational issues cannot be discounted as contributing factors.

279. As evidenced in all housing units there was a lack of destruction / damage to inmate personal property.

280. The Assessment Team's collective experience dictates that inmates feuding with one another will take the opportunity in situations to destroy one another's property / living space or to attack one another.

281. This did not occur.

282. Rather, the violence and destruction was against prison personnel, common items / areas and security device / operations specifically.

283. Thus, the scene speaks to the insurrection more likely being a violent protest against the prison system, prison personnel, and/or conditions of confinement, not against one another.

SYNOPSIS OF PLAINTIFFS:

DORM 1

1. WALTER JOHN Belcher      #278500
2. David Baxter             #120854
3. Adam Mills               #251754
4. ANdrew FerNicola         #198176
5. DAMON MACK               #180378

DORM 2

1. Ray McIntire             #148743
2. JAMES BuchaNaN           #256819
3. Thomas Hiemstra          #215637
4. Mark A. Morris           #098247
5. ReginAld ColviN          #260737

DORM 3

1. Alex OsuNa               #256039

Dorm 4

1. Jimmy Mamoth             #257290
2. BeNjamin Hollembeak      #215787
3. Shawn BurNs              #186086
4. Clay Faccio              #114962
5. RonNie WayNe Clark       #256820

WALTER J. BELCHER #278500

284. PLAINTIFF BELCHER is a 64 year old male, who suffers from CHRONIC PRE-EXISTING, MULTIPLE MEDICAL issues, PHysical, mental HEALTH, AND Vietnam VETERAN.

285. WHICH ARE CERVICAL, AND LUMBAR DEGENERATIVE DISK DISEASE, SENSORY RADICULOPATHY and also.

286. PTSD DEPRESSIVE DISORDER, DYSTHYmia, CARPA TUNNEL SYNDROME, HEP C, PAREATHESIA, ABNORMAL LIVER, INJURY TO NECK (LATERAL AND POSTERIOR MUSCLES, POLYNEUROPATHY, LOW BACK PAIN, ANXIETY DISORDER, HYDROCELE, NUEROLOGICAL DISABILITY, in HIS NECK, HANDS, FEET AND KNEES.

287. PLAINTIFF is 40% SERVICE CONNECTED, 70% NON-SERVICE CONNECTED. FINDINGS INDICATE 100% DISABILITY CAUSED BY SERVICE CONNECTED, AND PRESCRIBED MULTIPLE MEDICATIONS (26).

288. PLAINTIFF, DURING THE RIOT SUFFERED FROM BREATHING PROBLEMS DUE TO GAS BEING SHOT, PEPPER SPRAY, LASER BEAMS IN EYES, CONCUSSION GRENADES, GLASS BEING BLOWN APART.

289. LONG TERM EFFECTS ARE PLAINTIFF WANTED TO RUN AND HIDE, CRAWL UNDER BED, VISIONS OF FRIENDS BEING KILLED, MAIMED, HE COULD NOT BREATHE, BODY NOT RESPONDING TO BRAIN FUNCTIONS.

290. PLAINTIFF LAID ON THE FLOOR IN HIS CUBICLE IN CONTAMINATED WATER FROM CHEMICAL AGENTS, FIBERGLASS CEILING TILES AND GLASS.

(41)

291. Plaintiff thought he was going to die, chairs, locks, elect. wiring, bars ripped apart, things being burned, weapons being made and people brandishing them, he could not function.

292. T.S.U wearing camos came in with rifles, lasers, assortment of weapontry being pointed, point blank range, was told to get on knees, hands on top of head, then thrown to ground face first, hands streched out in front, was made to crawl 20 feet towards door.

293. T.E.U - with knees in my back and neck, arms thrown behind my back and zip tied, dragged to the door because plaintiff could not walk.

294. Dragged approx. 110 feet through glass, chemical agents, water infested trash, feces to outside of dorm and thrown into the dirt and rocks face down with CO's feet on buttocks and head which re-aggravated hydrocele.

295. Plaintiff was in this position approx. 3 hours and suffered excruciating pain in scrotum.

296. Zip ties were so tight, cut off circulation and bruised wrist and hands.

297. Plaintiff was then picked up and dragged to front

(42)

OF REC. YARD APPROX. 80 FEET AND THEN MEDICAL WAS THEN CALLED.

298. PLAINTIFF WAS TAKEN TO MEDICAL ON STRECTHER, PUT INTO CELL AND NO MEDICAL ATTENTION WAS GIVEN.

299. APPROX. 8:00 AM PLAINTIFF WAS TAKEN IN WHEELCHAIR TO CHOW HALL AND PUT THERE WITH APPROX. 300 INMATES,

300. TRASH WAS STREWN EVERYWHERE, NO WHERE TO LAY DOWN, SLEEP, NO WATER, USE OF TOILET, BOLOGNA SANDWICHES THROWN IN EVERY 7 + HOURS.

301. INMATES PEEING IN TRASH CANS, FLOOR, CO'S TOOK BILLY CLUBS, BUSTED WINDOWS OUT W/ GLASS SHARDS EVERYWHERE, FLOORS, TABLES, MANY PRISONERS DID NOT EAT. NO SHOWERS OR CHANGE OF CLOTHES.

302. PEOPLE WERE FIGHTING EACH OTHER AND READY TO REVOLT, CONDITIONS WERE DEPLORABLE, TEMPERATURE INSIDE WERE 90° + CO'S HAD TURNED AIR OFF, INMATES WERE RIPPING CEILING TILES DOWN TO GET TO AIR DUCTS.

303. PLAINTIFFS HANDS, FEET, BODY WERE SWOLLEN AND BRUISED.

304. PLAINTIFF LOST A LOT OF PROPERTY (PERSONAL) LEGAL AND MEDICAL DOCUMENTS. PLAINTIFF WAS PRESCRIBED (1) MEDICATION WHILE AT M.T.C.        (43)

305. Plaintiff feels off and on, on numerous occasions that Plaintiff cannot function to the point where Plaintiff wants to completely give up.

306. Plaintiff is in constant pain now with trembling hands.

307. Plaintiff cannot focus his vision or concentrate on issues.

308. Plaintiff has more health problems than before the riot.

309. Plaintiff suffers from daily anxiety attacks and in 24/7 pain in body, feet, hands, back, neck, severe headaches, no self esteem, no will to go on, loud noise, bangs, people walking too close, paranoia, am always depressed.

310. Plaintiff feels where there was hope before, Plaintiff does not feel that, Plaintiff feels nothing but negativity, with his physical and mental well-being.

311. Plaintiff, and clothes were covered in chemical agents that had been disbursed by T.S.U inside of dorms.

312. Upon arrival to Red Rock/CCA, Plaintiff had to be taken off bus by wheel chair and taken to cell where Plaintiff could not eat for approx. 13 days.

(44)

313. Plaintiff had lost 16 pounds, Plaintiff is on controlled protein diet which he still cannot eat except 3 to 4 meals a week, which he did not receive during the riot.

314. Plaintiff, since arrival at Red Rock/CCA has had several procedures for Hydrocele, medical transport to Casa Grande, medical transport to V.A. hospital in Prescott.

315. Knee supports, foot supports, ear infections, severe headaches, insomnia, by-weekly B-12 shots, phyicological meetings, breathing inhalers, medicines to go to the restroom, vision problems, swelling of hands and feet, neck and back spasms.

316. The incidents at Kingman (Hualapai) has given me a false sense of security of ever making it out of here. Plaintiff feels fearful every time a guard passes or stops me.

317. Plaintiff continues to have anxiety attacks and frequent visits to medical for numerous ailments.

318. Plaintiff is on (6) prescribed medications post-riot plus material aids to function as normally as possible.

319. Plaintiff personally packed his property and placed it on his bed during the riots.

(95)

Plaintiff David B.T. Baxter #120854

320. Plaintiff, is a 55 year old male, who suffers from chronic prexisting conditions, of high blood pressure, Heart Disease, fluid retention hands & feet, High Chloresterol, Lipodemia/High Trygliceries, over weight, Emphysema, Sleep Apnea and has had lower back Surgery.

321. Plaintiff was moved to Kingman Hu/Appia Unit first week of July 2011 and stayed until the riot of July 1st, 2015.

322. Plaintiff did not Participate in the Riot and in dorm 1-A Plaintiff experienced severe breathing problems due to extreme amounts of gas in the air, Pepper Spray, Asbestos everywhere.

323. Also went through Anxiety Attacks and fear from the chaos of Prisoners running around in masks, wielding weapons, destroying the place, smoke, banging, this went on for hours.

324. When the TSU officers came busting in, firing more gas, bullets, pepperballs, flashbangs, Plaintiff was on the floor in fear of getting shot, barely able to breathe, felt like his lungs had collapsed.

(46)

325. Plaintiff was ziptied with his hands behind his back drug outside and thrown face down in the dirt.

326. Plaintiff could not breathe. If not for another prisoner screaming at the guard, telling him the plaintiff could not breathe. Plaintiff believes he could have died.

327. Plaintiff and his clothes were covered in chemical agents that had been disbursed by TSU inside the dorm. Plaintiff was sat up which helped but still in pain with his hands ziptied behind his back and still having breathing difficulty.

328. This went on for hours. Finally Plaintiff was stood up and taken from the back of housing unit, to the front in the Rec Yard where prisoners were forced to sit in the dirt and sun, still ziptied and no water for hours as further punishment.

329. Plaintiff describes pain from the zipties digging into his wrists as tantamount to torture. Plaintiff suffers from fluid buildup in hands and feet, due to heart disease. The combination of the zipties and the fluid buildup caused extreme pain and possibly

(47)

permanent damage to Plaintiffs hands and wrists.

330. When prisoners were finally moved off the REC yard, to one of the chowhalls and were cutting the zipties off with Leatherman like tools, they were unable to use those tools on Plaintiff because of how tight the zipties were. Plaintiffs hands were so swollen when they did remove the zipties he could not see the knuckles on his hands and was in extreme Pain. These issues are still ongoing. Hands swelling, pain in hands and tingling and numbness.

331. During the following three days Plaintiff was locked in the chow hall with approximately 300 prisoners. Plaintiff was subjected to hazardous and unsafe conditions. No Cooling, No Toilets, No running water, No sanitation, Tension was extremely high.

332. Plaintiff was denied Medications, Denied Medically prescribed Diet, and forced to sleep on concrete floor with no matress or bedding of any kind.

333. Prisoners were using the toilet in trash cans, plastic bags, corners. The heat was unbearable, prisoners were fighting, ready to revolt because of the extreme temprature inside the chowhall. So a TSU officer smashed out the windows with his billyclub. Spraying the prisoners with glass. This let some fresh Air In.

(48)

334. During the Riot and in the chowhall plaintiff suffered severe headaches due to blood pressure spiking from denial of medications, stress and lack of sleep.

335. Plaintiff equally experienced severe pain in his back and hips from sleeping on bare concrete. Plaintiff also developed severe swelling and pain in his right knee which is still an ongoing issue.

336. Plaintiff still suffers from physical and mental problems, as a result of the riots.

337. Plaintiff's ongoing issues of swelling, pain, tingling and numbness in both hands. His right knee is swollen and has a big knot on it and extremely painful. Also lower back and hip pain daily.

338. Plaintiff suffers from anxiety attacks on almost a daily basis, sometimes more than one a day. Often triggered by someone just walking by his cell.

339. Plaintiff experiences bouts of depression that come on for no apparent reason. Feelings of hopelessness and other emotional things are going on that plaintiff didn't experience before the riots.

(49)

340. Plaintiff states the riot and post events has had a negative impact on both his physical and mental health condition.

341. Soon as plaintiff arrived at Red Rock Correction Center, he saw medical staff and was issued blood pressure medication due to extremely high pressure. Staff also put plaintiff on daily blood pressure checks, due to pressure being so high. This was because of not receiving medications for days.

342. Medical Staff at Red Rock Correction Center also checked oxygen levels of plaintiff and the Doctor believes plaintiff suffers from Enphysema. He was prescribed 3 different medications and a wedge pillow to improve breathing. Plaintiff takes 8-10 different medications for numerous chronic conditions.

343. The four years plaintiff was at Kingman Hulapaia Unit, There became a complete disregard and lack of care for the prisoners, which seemed to grow and metastisize over time.

344. Several weeks after arriving at Red Rock Correction Center, Plaintiff was told no more property

(50)

was coming.

345. Plaintiff only received a small portion of his property that he had before leaving Kingman HulaPaia Unit and much of that was damaged. Plaintiff personally packed all his property and placed it on his bed during the Riots.

Adam Mills #251754

346. Plaintiff Mills ("Mills") is a 28 year-old male, who was housed by A.D.O.C., in ASPC Kingman - Hualapai, from August 2011 until July 4, 2015.

347. Mills did not participate in the riot, but was trapped in an unsupervised, abandoned post, riotous dorm,

348. Where chemical agents were dispersed, sinks, toilets, windows, ceilings, and surveillance equipment was destroyed,

349. Where the ground was covered with shattered glass, toxic ceiling tiles, and waste water from demolished bathrooms and plumbing.

350. Mills, who was left abandoned by Defendant MTC's staff evacuation of Dorm 1, was left in a state of chaos and feared for his life,

351. Inside a dorm full of rioters who were ingesting drugs, wearing masks, prying metal from walls and sharpening homemade weapons,

352. Where, once abandoned by MTC staff, rioters were breaking loose lockers bolted to the ground, and using them as battering rams to open locked doors.

(52)

353. After the rear door of Dorm 1 - B Pod was breached, Mills was shot at by MTC / TSU,

354. Even though he was not participating in the riotous activity,

355. Forcing Plaintiff to dive headfirst over a cinderblock wall into metal lockers, sustaining injuries to his head and torso.

356. While taking cover, fearing for his well-being, MTC / TSU continued to shoot pepperballs, grenades, and tear gas at inmates inside Dorm 1 - Pod B.

357. Plaintiff suffered from breathing problems, due to tear gas, pepperballs, shattered glass, and destroyed ceiling tiles.

358. For approximately (4) hours, Plaintiff was in fear for his life, trapped between riotous inmates brandishing weapons while under the influence of drugs, and MTC / TSU officers firing their weapons at him and others.

359. Mills, personally packed and labeled his property.

(53)

360. This property was left untouched by the rioters, and was all intact when Dorm I was cleared of inmates.

361. Defendant MTC lost Plaintiff's property.

362. Plaintiff, was rear-cuffed in a manner that was painful and dangerous, restricting circulation to his hands from unnecessary tightness.

363. Plaintiff, requested officers to loosen the cuffs, but was denied, and told "that's what you get," implying tightness of cuffs was done in retaliation for the riot.

364. Mills was put face-down in the dirt and rocks, rear-cuffed, for at least (1) hour, longer than safety required, since TSU/MTC had Dorm I contained.

365. Plaintiff was left cuffed on the ground in a restricted position, in unnecessary exposure to heat of the sun, without access to water.

366. The temperature in Kingman, AZ that day was approximately 95°.

367. Hot enough for inmates to experience early stages of heat exhaustion, forcing medical personnel to respond multiple times.

368. MTC and TSU officers stood and watched, while drinking from water bottles, taunting inmates requesting water and complaining of dehydration.

369. MTC and TSU officers stood nearby and watched as inmates that were rear-cuffed, blacked-out, and suffered seizures on the ground that required medical attention.

370. Plaintiff was eventually taken to a chow hall with half of Dorm 1, or approximately (180) inmates.

371. Plaintiff was warehoused by Defendant MTC in this chow hall, without his medically prescribed diet, bedding, mattress, hygiene, proper ventilation, a shower, or a change of clothes for more than (2) days.

372. Plaintiff was subject to hazardous and unsafe conditions, where tensions were extremely high and led to numerous assaults and near race-riots.

(55)

373. Defendant MTC failed to provide adequate restrooms for inmates housed in the chow hall.

374. One toilet was available for approximately (180) inmates, resulting in 2-4 hour wait times to use the restroom.

375. Inmates that could not wait several hours to use the restroom, were forced to go in front of approximately (180) people, resulting in humiliation and embarrassment.

376. Inmates took turns urinating in small cups, then in a large trash can until it was completely filled with urine.

377. Finally, a second toilet was made available, to inmates housed in the chow hall.

378. In addition to unsanitary conditions in the chow hall, inmates were defecating, urinating, bleeding, spitting, vomiting, and throwing garbage on the floor.

379. This is the same concrete floor that Plaintiff was forced to sleep on for days.

380. The amount of inmates in the chow hall, the lack of proper ventilation, and summer heat resulted in excessive heat.

381. At one point, MTC/TSU slammed shut the only (2) chow hall doors, inmates flocked towards the front windows to complain about the excessive heat and lack of ventilation.

382. MTC/TSU smashed all (3) windows with a baton, hurling shards of broken glass at Plaintiff; windows broken with enough force to send glass to the far other end of the chow hall.

383. This was all videotaped.

384. Plaintiff was never offered a change of clothes or a shower, thus his clothes were contaminated with chemical agents and hazardous waste materials.

385. On July 4, 2015, Plaintiff was bused to A.S.P.C. Eloy - RRCC.

386. Plaintiff was not allowed to shower for a total of (5) days, nor given his medically prescribed diet as further punishment for the riot.

387. Plaintiff still suffers from anxiety attacks, trust issues with authority figures, nightmares, lack of sleep, and other mental health issues as a result of the riots.

(57)

388.  Equally, Plaintiff has become a recluse, not wanting to associate with others, and defensive around staff and other prison employees.

389.  Plaintiff cannot escape this situation and as a result, suffers on a daily basis.

ANDREW FERNICOLA #198176

390. During the evening of July 2nd 2015, some inmates began breaking windows in the dorm.

391. As soon as the first window was broken, two defendants MTC security staff that were in the control room fled building one.

392. The rioters started breaking toilets, sinks and urinals in the restroom and water started flooding the dorm.

393. Due to the destruction of the building by rioters, it became obvious to plaintiff Fernicola that he would probably end up being moved.

394. The building was so damaged that he and the other inmates would not be able to live there until the building was repaired.

395. No MTC security staff returned to building one for approximately six hours.

396. When defendant MTC security staff finally appeared, they were initially afraid to come into the building.

397. However, they did fire tear gas cannisters and

3      RUBBER BULLETS INTO THE BUILDING, RANDOMLY
       HITTING INMATES AND MAKING IT VERY DIFFICULT TO
       BREATHE.

398.   THESE ACTIONS BY M.T.C SECURITY STAFF CAUSED
       THE RIOTERS TO BECOME AGITATED AGAIN.

399.   A DEFENDANT M.T.C SECURITY STAFF MEMBER FINALLY
       ENTERED THROUGH THE BACK DOOR OF B DORM.

400.   WHICH HAD BEEN KICKED OPEN DURING THE DESTRUCTION OF
       THE BUILDING BY RIOTERS AND BEGAN THE REMOVAL OF THE
       INMATES FROM BUILDING.

401.   DURING THE REMOVAL OF THE INMATES FROM BUILDING ONE,
       NO INMATES RESISTED OR ATTEMPTED TO HARM ANY
       SECURITY STAFF MEMBERS.

402.   HOWEVER, SECURITY STAFF MEMBERS USED EXCESSIVE FORCE,
       ABUSED, ASSAULTED AND INJURED MANY INMATES
       UNNECESSARILY.

403.   PLAINTIFF FERNICOLA SUFFERS FROM SEVERAL CHRONIC
       MEDICAL CONDITIONS. ASTHMA AND KNEE/ANKLE JOINT
       PROBLEMS AS A RESULT OF TWO BROKEN LEGS THAT HE
       SUFFERED DURING A MOTORCYCLE ACCIDENT.

404.   PLAINTIFF FERNICOLA HAD A HARD TIME BREATHING WHEN

(60)

Tear gas canisters were unnessesarily fired into Building one.

405. He felt such a shortness of breath that he became very dizzy and passed out several times.

406. Zip ties were eventually placed on Plaintiff Fernicola's wrist.

407. They were so tight that the skin was broken from being dragged out of the building by the zip ties.

408. Plaintiff Fernicola still suffers carpal pain and numbness in his hands.

409. After being removed from the building by Defendant M.T.C. security staff.

410. They deliberately stepped on Plaintiff Fernicola's back, legs, and feet.

411. To the extent that he now suffers a lot of pain in his knees, legs, and feet as furthe punishment for the riot.

412. Plaintiff Fernicola was eventually placed inside of the Chapel along with approximately 200 other inmates.

(61)

413. AFTER SEVERAL DAYS INSIDE OF THE CHAPEL, THE BUILDING BECAME A HEALTH HAZARD WHERE THERE WAS ONE TOILET AND ONE SINK WITH NO TOILET PAPER OR SOAP.

414. PLAINTIFF FERNICOLA SLEPT AND ATE ON THE UNSANITARY AND HAZARDOUS CONCRETE FLOOR OF THE CHAPEL FOR DAYS.

415. INMATES WERE WALKING IN AND OUT OF THE DISGUSTING BATHROOM, TRACKING SEWAGE WASTE INTO THE CHAPEL.

416. PLAINTIFF FERNICOLA WAS GIVEN 3 BOLOGNA SANDWICHES PER DAY, THE FOOD WAS NOT BEING KEPT COLD AND PLAINTIFF BECAME SICK FROM EATING IT.

417. PLAINTIFF FERNICOLA PACKED ALL OF HIS PROPERTY AND PLACED IT ON TOP OF HIS BED IN HIS ASSIGNED AREA AT M.T.C.

418. AFTER ALL OF THE INMATES WERE REMOVED FROM THE KINGMAN PRISON, SECURITY STAFF WENT INTO THE BUILDINGS TO REMOVE THE INMATES PROPERTY.

419. PLAINTIFF FERNICOLA HAD NEATLY PACKED HIS PROPERTY.

420. HOWEVER, SECURITY STAFF WENT THROUGH EVERYTHING AND REMOVED MANY OF HIS PERSONAL PROPERTY ITEMS.

421. PLAINTIFF FERNICOLA PROPERLY FILED GRIEVANCES REGARDING

(62)

His missing property.

422. THE RESPONSE STATED THAT M.T.C. SECURITY STAFF WERE NOT RESPONSIBLE FOR HIS MISSING PROPERTY BECAUSE THERE HAD BEEN A RIOT.

423. INMATES DURING RIOT DESTROYED CAMERAS, LIGHTING FIXTURES WITH LIVE ELECTRICAL WIRING DANGLING FROM THE CEILING,

424. THE MORNING AFTER THE BUILDING WAS DESTROYED AND WHILE THE INMATES WERE STILL ZIP TIED AND LYING IN THE DIRT.

425. INVESTIGATORS ENTERED THE BUILDINGS AND TOOK MANY PHOTOS, SOME OF WHICH SHOW THAT ALL OF THE INMATES HAD PACKED THEIR PROPERTY.

426. DEFENDANTS SECURITY STAFF, AFTER ALL OF THE INMATES WERE REMOVED FROM KINGMAN, WENT THROUGH INMATES PROPERTY.

427. INCLUDING PLAINTIFFS FERNICOLA'S PROPERTY AND DELIBERATELY REMOVED, DESTROYED, OR STOLE MANY ITEMS OF HIS PERSONAL PROPERTY FROM OVER 1,000 + INMATES.

428. INCLUDING, PLAINTIFF FERNICOLA'S, WHICH IS IN VIOLATION OF TITLE 31 OF THE A.R.S.

429. Defendants security staff in A.D.O.C. and contract facilities routinely take personal property from inmates in violation of state law and the U.S. Constitution.

430. It is clear that security staff in the A.D.O.C. and contract facilities have not been properly trained as to the proper procedures with regard to inmates personal property.

431. The taking of inmates personal property has become so routine that it is clearly out of control and has been for at least (10) years.

432 - 455 Plaintiff withdrew.

(64)

Damon Mack #180378

456. Plaintiff Mack ("Mack") is a 37 year old male, who was housed by A.D.O.C., in ASPC Kingman - Hualapai, from October 2013, until July 2015.

457. Mack did not participate in the riot, but was trapped in an unsupervised, abandoned post, riotous dorm,

458. Where chemical agents were dispersed, sinks, toilets, windows, ceilings, and surveillance equipment was destroyed.

459. where the ground was covered with shattered glass, toxic ceiling tiles, and waste water.

460. Mack, who was left abandoned by Defendant MTC's staff, was left in a state of chaos and feared for his life.

461. Inside Dorm 1 full of rioters wearing masks, prying metal from walls and making weapons,

462. Where, once abandoned by MTC staff, rioters were breaking loose lockers and using them as battering rams to open locked doors.

463. After the rear door of Dorm 1-B pod was breached Mack was shot at by MTC/TSU.

(65.)

464. Even though Mack was not participating in the riotus behavior.

465. Forcing Plaintiff to jump under his desk/Bed area causing injury to his back and knee.

466. While hiding, fearing for his well-being, MTC/TSU continued to shoot pepper balls, bombs, teargas indiscriminatly at inmates in Dorm 1 B-pod.

467. Plaintiff sufferd from breathing problem, due to teargas, pepper-balls, shattered glass, and destroyed ceiling tiles.

468. For nearly 4 hours, Mack was in fear for his life, trapped between angry rioters brandishing weapons and MTC/TSU officers shooting blindly at him and others.

469. MTC staff never attempted a peaceful solution, abandoning their post.

470. Mack personally packed and labeled his property.

471. This property was left untouched by rioters, and was intact when Dorm 1 was cleared of all inmates.

472. Defendant MTC lost Plaintiff's property.

473. Plaintiff, was flex-cuffed in a manner that was painful and dangerous, restricting circulation to hands from unnecessary tightness.

474. Plaintiff, requested officers to loosen the cuffs, but was told "Loose some weight Fat-ass and they won't be so tight" implying it was his fault they were cutting into the skin.

475. Mack was thrown face down in the dirt and rocks, rear cuffed, for over(1) hour, longer than safety required, since TSU/MTC had Dorm 1 contained.

476. Plaintiff was left zip-tyed on the ground in restricted position, in unnecessary exposure to heat of the sun and ground, without access to water or shade.

477. The temperature that day was about 95°-97°.

478. Hot enough for inmates experience early stages of heat exhaustion, sun burns, black-outs, seizures.

479. Medical personel responded multiple times.

480. MTC and TSU officers stood watching, taunting, laughing, mocking, while drinking bottled water, and pouring it on the ground.

(67.)

481. MTC and TSU officers denied inmates access to water, instead poured it on the ground saying "Thats all you get" implying further punishment for and retaliation for the riot.

482. Plaintiff was eventually taken to a chow hall with about 180 other inmates.

483. Plaintiff was warehoused by Defendant MTC in this chow hall without bedding, mattress, hygiene, change of clothes, shower, restroom, or proper ventilation for more than 2 days.

484. Plaintiff was subject to hazardous and unsafe conditions, where due to Defendant MTC's staffs actions and conduct tensions were extremely high and led to numerous assaults and near race-riots.

485. Defendant MTC failed to provide adequate restrooms.

486. One toilet was available for about 180 inmates, resulting in a wait of up to 4 hours to use the restroom.

487. Inmates who could not wait were forced to urinate in front of about 180 men, resulting in humiliation and embarrassment.

488. Inmates were forced to urinate in small drinking cups and a trash can.                    (68)

489. In addition to these unsanitary conditions in the chow hall inmates were defecating, urinating, bleeding, spitting, vomiting and throwing garbage on the floor, and broken glass.

490. This is the same concrete floor that Plaintiff was forced to sleep on for days.

491. The amount of inmate in the chow hall, which exceeded the occupancy limit, lack of proper ventilation, and summer heat resulted in excessive heat.

492. When inmates compained about the lack of air and heat TSU smashed all 3 windows with such force as to send shards of glass all the way to the back wall.

493. TSU officers then stated they were otherized lethal weapons, and if inmates stuck other heads out the broken out windows TSU officers would "Blow them off".

494. Plaintiff was never offered a change of clothes or a shower, thus his clothes were contaminated with chemical agent and hazardous waste.

495. On July 4, 2015, Plaintiff was bused to A.S.P.C. Eloy-RRCC.

496. Plaintiff was not allowed to shower for a total of 5 days as further punishment for the riot.

(69.)

497. Mack still suffers from anxiety attacks, trust issues with authority figures, nightmares, lack of sleep, and other mental health issues as a result of the riots.

498. Equally, Plaintiff has become a recluse, not wanting to associate with others, and is defensive around staff and other prison employees.

499. Mack cannot escape this situation and as a result, suffers on a daily basis.

RAY MC INTIRE # 148743

500. PLAINTIFF MCINTIRE IS A 45 YEAR OLD MALE WHO
SUFFERS FROM CHRONIC PREEXISTING HEALTH CONDITIONS
OF HYPERTENSION AND HIGH BLOOD PRESSURE.

501. MC INTIRE WAS MOVED TO KINGMAN HUALAPAI UNIT
ON APRIL 7TH 2010 AND STAYED PRE AND POST ESCAPE,
THROUGH THE RIOTS OF JULY 4TH 2015, UNTIL THE REMAINDER
OF THE GENERAL POPULATION OF INMATES WERE MOVED
DECEMBER 15, 2015. TO CCA (RRCC) ELOY ARIZONA.

502. PLAINTIFF DID NOT PARTICIPATE IN THE RIOT, BUT WAS
IN AN UNSUPERVISED ABONDED POST, RIOTS DORM (2-B)
FOR AN APPROXIMATE TIME OF 36 TO 48 HOURS.

503. TENSIONS WERE ELEVATED IN THE DORM FROM THE MOMENT
THE RIOTS BROKE OUT AT CERBAT ON JULY 1ST, BUT BECAME
CHAOTIC AND RIOTS ON THE EVENING ON JULY 3RD. ON
THE NORTH YARD AND ON THE EAST YARD AND BUILDING
(1) ON THE SOUTH YARD.

504. CHEMICAL AGENTS, TO INCLUDE CS GAS WERE DEPLOYED.
WINDOWS, CEILINGS, AND CAMERAS WERE DESTROYED
THROUGH OUT THE POD.

505. MC INTIRE WAS LEFT ABANDED BY DEFENDANT MTCS STAFF

(71)

EVACUATION OF DORM (2) IN A STATE OF CHAOS
AND FEAR FOR HIS LIFE, INSIDE A DORM FULL OF
RIOTERS WHO HAD BEEN TAKING DRUGS FOR DAYS, WITH
MASKS ON, AND ARMED WITH WEAPONS.

506. MCINTIRE PERSONALLY PACKED HIS PROPERTY AND
THIS PROPERTY WAS LEFT UNTOUCHED BY THE RIOTERS,
UPON EXITING THE BUILDING.

507. DEFENDANTS (ADOC) AND/OR (MTC) STAFF LOST OR
DESTROYED PLAINTIFFS PROPERTY.

508. ON JULY 4TH EARLY AFTERNOON THE (TSU) ENTERED BUILDING
(2) B-POD WITH FLASH BANGS, RUBBER BULLETS, CS GAS,
PEPPER SPRAY, AND ATTACK DOGS (K9S).

509. (TSU) OFFICERS BEGAN TO FIRE INTO (B-POD) FROM THE
FRONT OF THE HORSESHOE WINDOWS WITH RUBBER PELLETS
AND CS GAS CANISTERS, AND FLASH BANGS WERE DEPLOYED
FROM THE EXTERIOR WINDOWS AND ROOFTOPS.

510. FLASH BANG CONCUSSION GRENADES WENT OFF INDISCRIMINANTLY
ALONG WITH THE FIRE ALARM AND FLYING RUBBER BULLETS
CREATING AN ATMOSPHERE OF PANIC AND PANDEMONIUM
SIMILIAR TO A WARZONE.

(72)

511. DURING THIS TIME THE DORM OF APPROXIMATELY (59) INMATES WAS IN TOTAL CHAOS AND TURMOIL.

512. HEAVY CLOUDS OF CS GAS AND PEPPER SPRAY MADE IT EXTREMELY DIFFICULT TO BREATHE AND SEE. (TSU) STAFF LINED UP FROM BUNKS 50 TO 59 WHILE PLAINTIFF WAS IN FLEX CUFFS, (TSU) BEGAN TO ASSAULT WITH FIST, TASERS, AND RUBBER BULLETS WHILE EXITING THE BUILDING.

513. PLAINTIFF, WAS FORCED FACE DOWN WHILE IN FLEX CUFFS AND COVERED IN CS GAS AND PEPPERED SPRAY TO SIT OUTSIDE IN 90° PLUS WEATHER, AND EXPOSED TO THE SUN FOR APPROXIMATELY (5) HOURS WITH NO FOOD OR WATER. WHERE HE RECIEVED SEVERE SUNBURNS AND EXPERIENCED THE FIRST SIGNS OF HEAT STROKE.

514. THIS CAN BE DESCRIBED AS FORCED TO WALKING THROUGH A GAUNTLET OF (TSU) OFFICERS WHILE EXITING BUILDING (2).

515. THE FIRST OFFICER PUNCHED MCINTIRE IN THE RIBS ON THE LEFT SIDE OF HIS BODY.

516. THE SECOND OFFICER TASED MCINTIRE (ON THE LEFT SIDE OF UPPER BUTTOCKS.)

(73)

517. THE 3RD OFFICER HAD (K9) NIPPING ON THE BACK AREA.

518. AFTER APPROXIMATLY 5 TO 8 HRS (TSU) REMOVED THE FLEX CUFFS AND REPLACED HIM WITH INTERTWINE ZIPTIES WITH OUR HANDS IN FRONT.

519. WE WERE ALLOWED A PORT-O- JOHN AND WATER FOUNTAIN. THE TOILET PAPER AND SEAT WERE SATURATED WITH PEPPER SPRAY, AS FURTHER PUNISHMENT FOR THE RIOT.

520. (TSU) ANNOUNCED THAT WE SHOULD "MAKE YOURSELVES COMFORTABLE", AS WE WOULD BE SPENDING THE NIGHT OUTSIDE IN THE DIRT AND GRAVEL OF THE RECREATION YARD, AS FURTHER PUNISHMENT FOR THE RIOT.

521. MCINTIRE WAS FORCED TO SLEEP OUTSIDE, UNCOVERED, ZIPTIED, IN THE DIRT AND GRAVEL, STILL SATURATED IN PEPPER SPRAY AND CS GAS, AS FURTHER PUNISHMENT FOR THE RIOT.

522. PERSPIRATION FROM THE SWELTERING HEAT REACTIVATED THE CHEMICAL AGENT RESIDUE ON PLAINTIFFS CLOTHES AND ON HIS SKIN, AS FURTHER PUNISHMENT FOR THE RIOT.

523. THE NEXT AFTERNOON AND AFTER RECIEVING ONLY (2) BOLOGNA MEALS SACKS IN THE PRIOR (48 HRS). PLAINTIFF,
(74)

WAS TAKEN ALONG WITH APPROXIMATLY 250 INMATES AND PLACED IN THE EAST SIDE CHOW HALL.

524. AT THIS POINT THE ZIP-TIES WERE CUT OFF.

525. STILL (6) MONTHS LATER, NUMBNESS AND TINGLING PERSISTS IN WRISTS AND HANDS OF PLAINTIFF.

526. DURING THE FOLLOWING (48) HRS REMAINED LOCKED IN THE CHOW HALL WITH APPROXIMATLY 250 INMATES. PLAINTIFFS WAS SUBJECTED TO HAZARDOUS AND UNSAFE CONDITIONS.

527. ALONG WITH SWELTERING HEAT, NO COOLING, NO HYGENE (TSU) OFFICERS WERE USING AND THREATNING TO USE PEPPER BALL PALLETS, WHILE COMING IN AND OUT OF THE EAST SIDE CLASS ROOM RESTROOMS.

528. PRISONERS IN THE CHOW HALL WERE FORCED TO URINATE IN A 30 GALLON TRASH CAN IN THE CORNER, WICH WAS FILLED AND DUMPED AT LEAST (4) TIMES BY (TSU) WHILE SPILLING IT ONTO THE FLOOR AND REEKING FROM THE HEAT.

529. THIS WAS THE ONLY OTHER OPTION PRISONERS HAD, SO AS TO NOT BE INTIMIDATED BY (TSU) HOLDING THEIR PEPPER SPRAY CANISTERS WHILE BEING SHOT AT.

(75)

530. (TSU) OFFICERS WOULD THREATIN AND SAYING "HURRY THE FUCK UP YOU DONT HAVE ALL DAY."

531. TENSIONS BEGAN TO ESCALATE INSIDE THE CHOW HALL. DUE TO (TSU) CONTINUING THE ONGOING VERBAL ABUSE AS FURTHER PUNISHMENT FROM THE RIOTS.

532. THE HEAT WAS UNBEARABLE, PRISONERS WERE FIGHTING AND TALKING ABOUT RIOTING AGAIN OVER THE CONDITIONS.

533. A (TSU) OFFICER SMASHED OUT THE EASTSIDE CHOW HALL WINDOWS TO ALLOW FRESH AIR IN. THIS ACT COVERED THE FLOOR AND INMATES WITH BROKEN GLASS.

534. AFTER (48 HRS), MC INTIRE, ALONG WITH THE OTHER PRISONERS WERE MOVED (WBE) WAREHOUSE. HERE THEY JOINED OTHER INMATES FROM BUILDING (3) FOR A TOTAL OF APPROXIMATLY 400 INMATES INSIDE THE WAREHOUSE.

535. PLAINTIFF, WAS WAREHOUSED BY DEFENDANT (DOC) IN THIS PLACE, WITHOUT MEDICATION, BEDDING, HYGENE, MATTRESSES, SANITATION, RUNNING WATER, OR A CHANGE OF CLOTHING FOR 36 TO 48 MORE HOURS.

APPROXIMATLY  36 TO 48 HRS LATER OF BEING HOUSED IN THE WAREHOUSE. (TSU) STOOK A HOSE THROUGH THE FENCE AND ALLOWED INMATES TO RINSE OFF.

536. INMATES DANGEROUSLY CLAMMERED AND SQUEEZE AGAINST THE FENCE WHILE STANDING IN THE MUD FOR A **CHANGE** AT RINSING SOME OF THE FILTH OFF.

537. THIS SCENE WAS VIDEOD BY (TSU) OFFICERS ON THERE CELL PHONES AS THEY LAUGHED AND POINTED AT THE INMATES. THESE VIDEOS WERE LATER POSTED ON SOCIAL MEDIA.

538. PLAINTIFF MC INTIRE, WAS FORCED TO SLOWLY WALK APPROXIMATLY (200 YARDS) ON BLISTERING HOT CONCRETE ON BARE FEET TO MEDICAL. TO RECIEVE HIGH BLOOD PRESSURE MEDS.

539. THE ENTIRE ROUTE WAS LINED BY (TSU) WITH GUNS POINTED AND ATTACK DOGS BARKING.

540. (TSU) WERE SCREAMING, "KEEP YOUR EYES DOWN" AND "CHIN TO CHEST". AND "IF YOU STEP OFF THE CONCRETE YOU WILL BE SHOT". THE SAME INHUMANE ACTS WERE PERPETRATED ON THE WAY BACK TO WAREHOUSE (WBE.)

(77)

541. PLAINTIFF MCINTIRE AND 230 OTHER INMATES WERE MOVED LATE THAT EVENING BACK INTO BUILDING (2) AND FINALLY OFFERED BEDDING, HYGENE, SHOWERS, AND A CHANGE OF CLOTHES.

542. FOR TWO WEEKS AFTER MCINTIRE WAS BROUGHT BACK TO BUILDING (2), ALL FEEDINGS, WALKS AND COUNTS WERE CONDUCTED WITH MULTIPLE (TSU) OFFICERS POINTING GUNS AND AT LEAST (2) K-9 DOGS BARKING AND NIPPING AT INMATES.

543. DURING THE 1ST AND 2ND WEEK BACK TO BUILDING (2) MCINTIRE WAS SELECTED TO GO OUTSIDE AND PICK UP TRASH ON ALL YARDS AND THE PERIMETER OF HUALAPAI UNIT. DURING THIS TIME PLAINTIFF MCINTIRE WITNESSED, AND WAS TOLD TO EMATY AT LEAST (5) LAUNDRY CARTS OF OTHER INMATES PERSONAL PROPERTY AND MISCELLANEOUS ITEMS INTO HUALAPAI UNITS COMPACTER.

544. PLAINTIFF STILL SUFFERS FROM PHYSICAL AND MENTAL REPERCUSSIONS AS A RESULT OF THE RIOTS.

545. INCLUDING ANXIETY, LOUD NOISES ON A NEAR DAILY BASIS, AND TRUST ISSUES OF AUTHORITY FIGURES, PLUS

( 78 )

546. NIGHTMARES, LACK OF SLEEP, PAIN AND NUMBNESS IN
WRISTS AND HANDS AND OTHER MENTAL HEALTH ISSUES,
AS THE RESULT OF THE RIOTS.

547. EQUALLY, PLAINTIFF HAS BECOME A RECLUSE, NOT
WANTING TO ASSOCIATE WITH OTHERS AND DEFENSIVE
AROUND STAFF AND OTHER PRISON EMPLOYEES.

548. FEELINGS OF HOPELESSNESS AND OTHER EMOTIONAL
MANIFESTATIONS ARE OCCURING THAT PLAINTIFF DID
NOT EXPERIENCE BEFORE THE RIOTS.

549. PLAINTIFF, CANNOT ESCAPE THIS SITUATION AND AS
A RESULT, SUFFERS ON A DAILY BASIS.

550. THE 5.75 YEARS PLUS, THAT PLAINTIFF WAS AT (MTC) -
KINGMAN HUALAPAI UNIT. WERE CHARACTERIZED BY A
COMPLETE DISREGARD AND LACK OF CARE FOR THE INMATES,
WICH GREW INCREASINGLY WORSE OVER TIME.

551. MC INTIRE, RECIEVED ONLY A SMALL PORTION OF HIS
PROPERTY THAT HE HAD BEFORE THE RIOTS. MUCH OF IT
WAS DAMAGED AND USELESS. PRISONERS ONLY RECIEVED
PROPERTY WICH WAS MARKED WITH THEIR I.D NUMBER.

James Buchanan #256819

552. Plaintiff Buchanan ("Buchanan") is a 51 year old Male.

553. Who suffers from chronic preexisting health conditions of Hypertension, Neurocardiogenic Syncope (heart condition), Herniated disk and related Sciatica, fluid retention: ankles/feet, and Sleep Apnea.

554. Plaintiff takes 6 medications daily for related health issues.

555. Buchanan was moved to Kingman Hualapai Unit on October 6, 2011 and stayed through the riots of July 1st-4th, 2015, until the remainder of the general population of inmates was moved on December 15, 2015.

556. Plaintiff did not participate in the riot, But was in an unsupervised, abandoned post, riotous Dorm (2-c), for 36 hours.

557. Tensions were elevated in the dorm from the moment the riot broke out at Cerbat on July 1st, but became chaotic and riotous on the evening of July 3rd.

558. Chemical agents, to include CS Gas, were deployed, Sinks, toilets, windows, ceilings and cameras were destroyed, resulting in waste water inches thick throughout the pod.

559. Buchanan was left abandoned by defendant MTC's Staff

(80)

evacuation of Dorm 2 in a state of chaos and fear for his life, inside a dorm full of rioters who had been taking drugs for days, with masks on, and armed with weapons.

560. Inmates, as plaintiff, in the dorm who expressed an interest in not rioting were intimidated and threatened.

561. Buchanan personally packed his property and this property was left untouched by the rioters, and was intact upon said, exiting the building.

562. Defendants ADOC and MTC lost or destroyed plaintiff's property.

563. On the morning of July 4th the TSU entered Building 2-D Pod with flash bangs, rubber bullets, CS Gas, pepper spray, and attack dogs.

564. Inmates in C-Pod communicated with MTC Officer Castro that there were older inmates with health issues and that C-Pod inmates would surrender peacefully and compliantly.

565. Officer Castro stated that he would relay that to the TSU Commander.

566. Immediately, a TSU Officer yelled back, "Fuck you! It's too late. We're coming in there to fuck you off!"

(81)

567. The TSU officer then turned to two other TSU officers and said, "You Kingman TSU are a bunch of pussies!"

568. "We're gonna show you how shit gets done!", he continued.

569. He then turned and fired upon those of us communicating through the window.

570. TSU Officers began to fire into the pod from the front horseshoe windows with rubber pellets and CS Gas Canisters and flash bangs were deployed from the exterior windows.

571. Flash bang concussion grenades went off indiscriminantly along with the fire alarm and flying rubber bullets creating an atmosphere of panic and pandemonium similar to a warzone.

572. Before breaching the Pod, TSU pulled back and left the building for 2 hours.

573. During this time the dorm of approximately 59 inmates was in total chaos and turmoil.

574. Heavy clouds of CS Gas and pepper spray made it extremely difficult to breathe and see.

575. Floors were covered in waste water with chemical agent

residue which inmates were forced to lay in to avoid being shot with rubber pellets.

576. Buchanan experienced anxiety/panic attacks.

577. These were heightened because of his Neurocardiogenic Syncope condition.

578. Also from the chaos of noise, and prisoners running wild in masks and waving weapons, screaming in defiance at the pull back by TSU.

579. 2 hours later TSU massed again around Building 2.

580. C-Pod inmates once again communicated their desire to surrender compliantly and immediately.

581. This was done both verbally and by raising a broom stick with a white flag fashioned by tearing a bed sheet.

582. This was met with a chorus of "Fuck you's" and a barrage of rubber pellets and pepper spray.

583. Immediately, more flash bangs, CS Gas grenades, pepper spray was dispersed.

584. TSU entered the pod in a hail of rubber bullets and attack dogs wailing.

585. TSU officers were yelling, "On the ground, hands behind your head." TSU then began to fire upon inmates even if they were being compliant.

586. Buchanan was laying face down with his hands clasped behind his head, bearly able to breathe, heart racing from 3 days without hypertension medication.

587. Buchanan was shot twice in the back anyway.

588. When Buchanan began to voice that he was being Compliant, he was told to, "Shut the fuck UP! Say another word and this dog will take a piece of your ass!"

589. Buchanan was ripped from the ground by 2 TSU officers and violently slammed into the block wall face first.

590. Flex cuffs were put on so tight he winced in pain.

591. As a result of that movement he received a punch in the ribs and was told, "Move again and I will fuck you off good!"

592. Plaintiff's wrists were cut, bleeding and scabbed from the tortuous way he was cuffed.

593. Buchanan was forced to bend at 90°'s at the waist and a TSU Officer put his arm through Plaintiffs' cuffed arms

over his back and grabbed the back of his neck and began to lead Buchanan to the horseshoe door.

594. Upon exiting the Pod into the horseshoe area, Buchanan was forced to walk through what can only be described as a "gauntlet" of TSU Officers.

595. The first officer punched Buchanan in the jaw.

596. The second officer tased Buchanan.

597. The next officer sprayed Plaintiff with pepper spray in the face and all the way down his back.

598. The last TSU officer shot him in the back with a rubber pellet.

599. All the way through the "gauntlet", attack dogs were barking and nipping at Buchanan's clothes.

600. Plaintiff exited the building, body aching and in shock, eyes burning and barely able to breathe or see.

601. Buchanan was forced to the ground face down by TSU.

602. When he offered slight natural resistance to falling face forward,

603. The officer violently kicked out his right knee from the

(85.)

side causing immediate and severe pain.

604. It forced Buchanan face down and TSU came down heavily with his knee onto plaintiff's lower back.

605. The TSU officer punched him in the right ear and said, "Go ahead, move again and I will beat the living shit out of you!"

606. The temperature in Kingman for that day was in the mid to high 90's.

607. Plaintiff was kept face down in the dirt and gravel, exposed to the blistering sun for approximately 11 hours.

608. Buchanan was deprived of adequate water and without medication.

609. Buchanan repeatedly stated that he needed medication for a heart condition.

610. MTC staff replied, "Just be glad your not dead."

611. TSU said, "Fuck you and your heart condition."

612. After approximately 11 hours TSU removed the flex cuffs and replaced them with intertwined zip-ties with our hands in front.

(86)

613. We were allowed to use a Port-o-John and the water fountain.

614. The toilet paper and seat of the Port-o-John were saturated with pepper spray as further punishment for the riot.

615. TSU announced that we should, "make yourselves comfortable", as we would be spending the night outside in the dirt and gravel of the recreation yard, as further punishment for the riot.

616. Buchanan was forced to sleep outside, uncovered, zip-tied, in the dirt and gravel, still saturated in pepper spray and CS Gas, as further punishment for the riot.

617. Perspiration from the sweltering heat reactivated the chemical agent residue in plaintiff's clothes and on his skin, as further punishment for the riot.

618. The next afternoon and after receiving only 2 bologna meal sacks in the prior 48 hours,

619. Plaintiff was taken along with approximately 250 inmates and placed in the chow hall.

620. At this point the zip-ties were cut off.

621. The combination of the zip-ties and flex cuffs and the resulting fluid build-up and swelling caused severe and permanent damage.

(187)

622. Still 6 months later, numbness and tingling persists in wrists and hands of plaintiff.

623. During the following 7 days plaintiff remained locked in the chow hall with approximately 250 prisoners.

624. Plaintiff was subjected to hazardous and unsafe conditions.

625. No cooling, sweltering heat, no access to toilets, no running water, no sanitation and no hygiene.

626. Buchanan was denied adequate water, denied needed medication, forced to sleep on dirty concrete floors with no mattress or bedding.

627. Buchanan was deprived of fresh clothing not saturated in chemical agents.

628. Prisoners in the chow hall were forced to urinate in a 30 gal. trash can in the corner, which was filled and dumped at least 4 times by TSU, spilling onto the floor and reeking from the heat.

629. For a brief time TSU allowed inmates who had to defecate to use the toilets in the adjoining classroom hallway.

630. It took Buchanan 2½ hours to traverse the line.

631. The inmate directly ahead of plaintiff in line was shot

(88)

in the chest with a rubber bullet while on the toilet.

632. After he shot the inmate the TSU officer said, "Hurry the fuck up! You don't have all day.

633. When Buchanan reached the rest room he saw that the TSU had sprayed all the toilet paper and the toilet seat with pepper spray as further punishment for the riot.

634. Upon hearing the screams of the prisoner in the 2nd toilet who had used the tainted toilet paper, Buchanan was forced to not use the facilities.

635. Tensions began to escalate inside the chow hall.

636. The heat was unbearable, prisoners were fighting and talking about rioting again over the conditions.

637. A TSU officer smashed out the chowhall windows to allow fresh air in.

638. This act covered the floor and inmates with broken glass.

639. With no sleep, water, food and medication, plaintiff experienced severe headaches due to hypertension and several syncope related events.

640. Plaintiff's right knee was badly swollen along with his ankles and feet.                ( 89 )

641. Buchanan also experienced severe pain in his back and hips from sleeping on dirt and bare concrete.

642. After 2 days, Buchanan, along with the other inmates, was moved to the Construction trades warehouse ("WBE").

643. Here they joined inmates from building 3 for a total of approximately 400 inmates.

644. Plaintiff was warehoused by Defendant MTC in this place, without medication, bedding, mattress, hygiene, sanitation, running water, a shower or a change of clothes for 2 more days.

645. The back garage-style door of the WBE facility was left open to a small, fenced yard approximately 20' x 20'.

646. 4 porto-Johns were stationed there for inmate use.

647. The toilet paper in each Port-o-John was saturated in pepper spray as well as the seats as further punishment for the riot.

648. Buchanan witnessed a prisoner shot in the neck from close range by TSU for not walking in single file to the Port-o-John.

649. Blood poured from the inmates wound, but he received no

( 90 )

medical attention.

650. The TSU officer laughed uncontrollably and was soon reprimanded and taken away by a superior.

651. From this "backyard" vantage point, Buchanan witnessed a golf cart style vehicle pulling a trailer piled high with inmate television sets from the dorms.

652. Multiple times televisions fell from the trailer as TSU officers walking along side picked them up and threw them back onto the trailer.

653. On the 2nd day being housed in the WBE facility, TSU stuck a hose through a fence in the back yard, and allowed inmates to rinse off.

654. Inmates dangerously clammered and squeezed against the fence while standing in the mud for a chance at rinsing some of the filth off.

655. This scene was videod by TSU officers on their cell phones as they laughed and pointed at the inmates.

656. These videos were later posted to social media.

657. On each day Buchanan and the other prisoners were housed in the WBE facility one prisoner was to be released from the prison.

(91)

658. On day one in the WBE facility Buchanan witnessed a prisoner taken to the adjacent yard to the WBE yard ("Chapel Yard") and beaten repeatedly by 4 TSU Officers.

659. Buchanan clearly heard one TSU Officer say, "You think your going to pull this kind of shit and we're gonna Just let you go home!"

660. The inmate was repeatedly thrown against the block wall and punched by multiple TSU Officers.

661. When Buchanan and others in line to use the Port-o-Johns began to raise objections, TSU ordered them back into WBE and closed the garage-styled doors.

662. Similarly, on day 2 of being housed in WBE Buchanan again witnessed 3 TSU Officers beat and kick an inmate who was being released.

663. Later that day, Buchanan and 10 other prisoners were taken to the medical building for screenings.

664. The prisoners were forced to slowly walk approximately 200 yds. on blistering hot concrete in bare feet to medical.

665. The entire route was lined by TSU with guns pointed and attack dogs barking.          (92)

666. TSU were screaming, "Keep your eyes down," and "chin to chest!" and "If you step of the concrete you will be shot!"

667. The same inhumane acts were perpetrated on the way back to WBE.

668. At medical Buchanan's blood pressure reading was taken.

669. He was told, "You'll live," but given no medication.

670. Plaintiff Buchanan and 230 other inmates were moved late that evening back into Building 2 and finally offered bedding, hygiene, showers and a change of clothes.

671. For 2 weeks after Buchanan was brought back to Building 2, all feedings, walks, and counts were conducted with multiple TSU officers pointing guns and at least 2 attack dogs barking and nipping at inmates.

672. During the 1st week back in building 2, selected inmates were taken out of their dorms and interviewed.

673. Prisoners were told it was part of an investigation into the riots.

674. Buchanan was taken from B-Pod into a small room off of the horseshoe between Pods C and B by 2 armed

(93.)

TSU officers.

675. Buchanan was sat across a plastic folding table from the interviewer.

676. During the entire interview, Buchanan was flanked by the 2 TSU officers with rifles pointed directly at his head.

677. Buchanan felt extremely intimidated and feared that he would face retaliation from TSU.

678. Plaintiff was not allowed to shower or change clothes for a total of 5 days

679. Buchanan was deprived of medication for chronic health care needs for a period of 7 days as further punishment for the riots.

680. Buchanan repeatedly sought care for his right knee which was brutally injured by TSU.

681. On September 17, 2015 Buchanan's knee was x-rayed.

682. On September 22, 2015 the provider explained that the x-rays were normal and that Buchanan would be denied his request for an MRI.

683. HSA Poland wrote in Buchanan's grievance reply that

(94)

an MRI was not necessary because, she wrote, "The x-rays showed no ligament damage."

684. X-rays do not show soft tissue.

685. Buchanan never received a response to his grievance reply Dated 11-16-15.

686. Plaintiff still suffers from physical and mental repercussions as a result of the riots.

687. Including anxiety/panic attacks on a near daily basis, trust issues of authority figures.

688. Nightmares, lack of sleep, Pain and numbness in wrists and hands, Knee pain, back pain, and other mental health issues as a result of the riots.

689. Equally, Plaintiff has become a recluse, not wanting to associate with others and defensive around staff and other prison employees.

690. Feelings of hopelessness and other emotional manifestations are occuring that plaintiff did not experience before the riots.

691. Plaintiff cannot escape this situation and as a result, suffers on a daily basis.

(95)

692. The 4 years plus that plaintiff was at MTC-Kingman Hualapai Unit

693. Were characterized by a complete disregard and lack of care for the inmates, which grew increasingly worse over time

694. Buchanan received only a small portion of his property that he had before the riots.

695. Much of it was damaged and useless

696. Plaintiff also lost the majority of his legal documents, negatively effecting his Rule 32 Post-Conviction writ of Habeas Corpus.

697. Prisoners only received property which was marked with their I.D. number.

698. Most items are not so marked, so most inmates received very little of their property back.

Thomas Hiemstra #215637

699. Plaintiff Hiemstra is a 44 year old male.

700. Who suffers from high blood pressure, chronic sciatica and 4 prior back surgeries.

701. Hiemstra was moved to Kingman Hualapai unit on August 2nd, 2013 and stayed through the riots of July 1st to the 4th of 2015, until the remainder of the general population of inmate's were moved on December 15th, 2015.

702. Hiemstra did not participate in the riot, but was in an unsupervised, abandoned post, riotous Dorm 2 C-Pod, for 36 hours.

703. Tensions were elevated in the dorm from the moment the riot broke out at Cerbat on July 1st and became more chaotic and riotous on the evening of July 3rd, 2015.

704. Chemical agents, to include CS gas, were deployed. Sinks, toilets, windows, ceilings and cameras were destroyed, resulting in waste water inches thick throughout the pod.

705. Hiemstra was left abandoned by defendants MTC's staff.

706. Evacuation of Dorm 2 in a state of chaos and fear for his life.

707. Inside a dorm full of rioters who had been taking drugs for days. With masks on and armed with weapons.

(97)

708. Inmates, as plaintiff, in the dorm who expressed an interest in not rioting were intiminated and threatened.

709. Hiemstra personally packed his property and this property was left untouched by the rioters and was intact upon said, exiting the building.

710. Defendants ADOC and MTC lost or destroyed plaintiffs property.

711. On the morning of July 4th, 2015, TSU entered the building 2, D pod with flash bang's, rubber bullets, CS gas, pepper spray and attack dogs.

712. Plaintiff Hiemstra who was in C-pod communicated with MTC staff Castro.

713. That there were older inmates with heart and health issues and that C-pod inmates would surrender peacefully and compliantly.

714. Officer Castro stated that he would relay that to the TSU Commander.

715. Immediately a TSU officer yelled back, "Fuck you. It's to late. We're coming in there to fuck you off."

716. The TSU officer then turned to two other TSU officers and said, "you Kingmen TSU are pussy's."

717. "We're gonna show you how shit gets done." He stated.

718. He then turned and fired upon Hiemstra, who was trying to defuse the situation. Hiemstra turned and was struck in the back by a rubber bullet, shot through the window.

719. TSU officers began to fire into C-pod from the front horse shoe windows with rubber bullets and CS gas canisters plus flash bangs were deployed from the exteriors windows.

720. Flash bangs concussion grenades went off indiscriminantly along with the fire alarm's and flying rubber bullets creating an atmosphere of panic and pandomonium similar to a war zone.

721. Before breaching the pod, TSU pulled back and left the building for 2 hours which was filled with CS gas and pepper spray.

722. During the time the dorm 2-C of 59 inmates was in total chaos and turmoil.

723. Heavy clouds of CS gas and pepper spray made it extremely difficult to breath and see.

724. Floors were covered in waste water and chemical agents residue which inmates were forced to lay in to avoid being shot with rubber bullets.

725. Hiemstra after being shot and gased experienced anxienty/panic attacks.

726. These were heightened do to lack of oxygen due to the CS gas and pepper spray.

727. Also from the chaos of noise and prisoners running wild in masks and waving weapons, screaming in defiance at the pull back of TSU.

728. 2 hours later TSU massed again around building 2.

729. C-pod inmates once again tried communicating their desire to surrender compliantly and immediatly.

730. This was done both verbally and by Hiemstra raising a broomstick with a white flag (AKA: towel).

731. This effort was met by even more gun fire upon Hiemstra and a chorus of," Fuck yous" from TSU.

732. Immediatly more flash bang's, CS gas grenades, pepper spray was dispersed.

733. TSU entered the pod in a hail of bullets and attack dogs wailing.

734. TSU officers were yelling," on the ground, hands behind your head."/TSU then began firing upon inmates even after they did what they were told.

735. Hiemstra was laying face down with his hands clasped behind his head, barely able to breath, heart racing while TSU officers shot and kicked him.

736. 2 TSU officers approached Hiemstra, one dropped his knee in the back of Hiemstra's neck and put the muzzle of his gun to Hiemstra's temple.

737. Hiemstra voiced he didn't partake in the riot and that he had once broken his back.

738. The 2nd TSU officer said, "oh yeah? Fuck you." Then jumped and slammed his knee in Hiemstra's lower back.

739. He then cuffed Hiemstra with flex cuffs as tight as the 2nd officer could get them.

740. The officer bent Hiemstra at 90° at the waist and another TSU officer put his arm through Hiemstra's cuffed arms, over his back and grabbed the back of his neck and began to lead Hiemstra through the horse shoe.

741. Upon entering the horseshoe, Hiemstra was immediatly tased by another TSU officer for no reason. Then hit in his lower back with a baton, while another TSU officer punched Hiemstra in the side of his head. Then finally maced in the face upon leaving the horse shoe.

742. Hiemstra was thrown face first into the dirt. When Hiemstra looked up, a TSU officer kicked Hiemstra in the back of his head.

743. A     TSU officer said, "move again and I'm gonna kill you, you low life piece of shit."

744. The temperature was in the high 90's in Kingmen that day.

(101)

745. Prisoners in chow hall were forced to urinate in a 30 gallon trash can in the corner.

746. Which was filled and dumped at least 4 times by TSU, spilling onto the floor and reeking from the heat.

747. For a brief time TSU allowed inmates who had to defiacate, to use the toilet in the adjoining classroom hallway.

748. It took Hiemstra 2½ hours to traverse the line.

749. Hiemstra was shot while on toilet.

750. After Hiemstra was shot the TSU officer said "Hurry the Fuck up!"

751. TSU once again sprayed all the toilet seats and toilet paper with pepper spray, as further punishment for a riot Hiemstra and other's didn't partake in.

752. Tension's began to escalate inside the chow hall.

753. The heat was unbearable, prisoners were fighting and talking about rioting again over the conditions.

754. A TSU officer smashed out a window in the chow hall to allow air in.

755. The act covered the floor and inmates in broken glass.

756. With no sleep, water, food and medication plaintiff experienced severe anxiety, headaches and near panic attacks.

757. Plaintiff's wrists were badly swollen with open wounds in a filthy enviorment.

758. Hiemstra also experienced severe pain in his back and neck from the severe beating TSU inflicted.

759. After 2 days in the chow hall, Hiemstra along with the other inmates, were moved to the WBE Building.

760. Here they joined inmates from building 3 for a total of approximately 400 inmates.

761. Plaintiff was warehoused by defendant MTC in this place, without medication, bedding mattress, hygiene, sanitation, running water, a shower or a change of clothes for 2 more days.

762. The back garage-style door of the WBE facility was left open to a small, fenced yard 20×20.

763. 4 port-a-john's were stationed there for inmate use.

764. The next afternoon and after receiving only 2 bologny sack meals in the prior 48 hours,

765. Plaintiff was taken along with 250 inmates and placed in the chow hall.

766. At this point the zip ties were cut off.

767. The combination of the zip ties and flex cuffs and the resulting fluid build up and swelling, caused severe and permanent damage.

768. Still 6 months later, plaintiffs numbness and limited thumb mobility and tingling in wrist and hands still occure.

769. For the following 2 days, plaintiff remained locked in the chow hall with 250 inmates.

770. Plaintiff was subjected to hazardous and unsafe conditions in the chow hall.

771. No cooling, sweltering heat, no access to toilet, no running water, no sanitation or hygiene.

772. Hiemstra was denied adequate water, denied needed medical attention, forced to sleep on filthy, dirty floors and without a shower.

773. Hiemstra was deprived of fresh clothing not saturated in chemical agents.

774. Hiemstra was kept face down in the dirt and hot gravel exposed to the blistering sun for approximatly 11 hours.

775. Hiemstra was deprived of adequate water and without medical attention for the injuries TSU inflicted.

776. After approximately 11 hours TSU removed the flex cuffs and replaced them with new zip ties with our hands in front.

777. Hiemstra wrists were cut bleeding and lost total movement in both thumbs and total feeling in both thumbs as well as both pinkies.

778. We were allowed to use a port-a-john and the water fountain.

779. TSU saturated the toilet seat and the toilet paper with pepper spray as further punishment for the riot.

780. TSU announced that we should make ourselves comfortable as we would be spending the nite outside in the dirt and gravel of the rec yard.

781. Hiemstra was forced to sleep on the ground zip tied after TSU inflicted serious injuries to Hiemstra's neck and back.

782. Plaintiff was still saturated in pepper spray and CS gas as further punishment for a riot Hiemstra did not want or partake in.

(105)

783. The toilet paper in each Portarjohn was saturated in pepper spray as further punishment for the riot.

784. Hiemstra witnessed a inmate shot in the neck from close range by TSU for not walking single file to port-a-john.

785. Blood poured from the inmates wound, but he received no medical attention.

786. The TSU officer laughed uncontrollably and was soon reprimended by a supervisor.

787. From this "backyard" vantage point Hiemstra witnessed a golf cart pulling a trailer piled high with inmates televisions sets from the dorms.

788. Multiple times televisions fell from the trailer as TSU officers walking along side picked them up and threw them back onto the trailer.

789. On the 2nd day being housed in the WBE facility TSU stuck a hose through a fence in the back yard and allowed inmates to rinse off.

790. Inmate's dangerously clammered and squeezed against the fence while standing in the mud for a chance at rinsing off the chemical agent.

791. This scene was videod :by TSU officers on their cellphones again as they laughed and pointed at inmates.

792. Those video's were later posted to social media.

793. On each day Hiemstra and the other prisoners were housed in the WBE facility, one inmate was to be released from prison.

794. On day one in the WBE facility, Hiemstra witnessed a prisoner taken to a adjacent yard to  the WBE yard (chapel yard) and beaten by 4 TSU officers.

795. Hiemstra clearly heard one TSU officer say, "you think your gonna pull this kind of shit and we're gonna just let you go home".

796. The inmate was repeatedly thrown against the block wall and punched by 4 TSU officers.

797. When Hiemstra and other inmate's started objecting, TSU ordered them back into the WBE and closed the doors.

798. Similarly, on day 2 of being housed in WBE, Hiemstra again witnessed 3 TSU officers beat and kick an inmate who was being released.

799. Plaintiff Hiemstra protested the unnessicary abuse and was shot once again, in his foot.

800. Hiemstra and 230 other inmate's were moved late that evening back into building 2 and finally offered bedding, hygiene, showers and a change of clothes.

801. For 2 weeks after    Hiemstra was brought back to building 2, all feedings, walks and counts were conducted with multiple TSU officers pointing guns and at least 2 attack dog's trying to bite us at all times.

802. An investigation was being held and select inmates were taken out and interviewed.

803. Prisoners were told it was part of an investigation into the riot.

804. TSU told Hiemstra, "To Shut the Fuck Up," when Hiemstra volunteered to be interviewed.

805. Hiemstra was given the job as Captains Porter after the riot.

806. Officer Gleason was the property officer at Hualapai unit Kingman, and was Hiemstra's Direct Supervisor.

807. Hiemstra was ordered by Gleason to dispose of multiple laundry bins of inmate's sneakers.

808. Hiemstra was ordered by Gleason to dispose of multiple laundry bins of electronics, CD players, fan's, Radio's CL-20, Headphones, ect. of inmates property.

809. Hiemstra was ordered by officer Gleason to dispose of multiple laundry bins of inmates TVs.

810. Hiemstra, also personally saw Cadets in WBE facility throwing away in multiple dumpsters TV's, Fans, electronics, clothes, hygiene and commissary food, alot of food.

811. At numerous times Hiemstra heard CO4 Rygren say to Gleason, "Fuck Those Inmates, They deserve nothing and to throw it all in the dumpsters".

812. Defendant Captain Winkler also shared CO4 Rygren's attitude. He stated, "all inmate's at Hualapai Unit were pieces of shit, throw all the property away".

813. Most property was thrown away in retaliation and for their punishment for the riot.

814. Hiemstra was shot 6 times through out his body while being restrained.

815. TSU dropped a knee in Hiemstra's neck while restrained.

816. TSU dropped a knee in Hiemstra's back after Plaintiff told them of his prior surgeries, while restrained.

817. TSU tased Hiemstra while restrained.

818. TSU hit Hiemstra with a Baton while restrained.

(109.)

819. TSU        punched Hiemstra while restrained and kicked Hiemstra on multiple accasions while restrained.

820. Plaintiff still suffers from physical and mental repercussions as a result of the riot.

821. Including, but not limited to, anxiety/panic attacks on a daily basis, trust issues of authority figures and staff.

822. Plus, nightmares, lack of sleep, pain and numbness in wrists and hands, knee pain, back pain, and other mental health issues as a result of the riots.

823. Equally, Plaintiff has become a recluse, not wanting to associate with others and defensive around staff and other prison employees.

824. Feelings of hopelessness and other emotional manifestations are occuring that plaintiff did not experience before the riots.

825. Plaintiff cannot escape this situation and as a result, suffers on a daily basis.

826. The 2½ years that plaintiff was at MTC Kingman Hualapai unit were characterized by a complete disregard and lack of care for the inmates.

827. Which grew increasingly worse overtime.

(110)

828. Hiemstra recieved only a small portion of his property that he had before the riots.

829. Much of it was damaged and thrown away.

830. Plaintiff also lost most of his legal documents negativily effecting his RULE 32's.

831. Hiemstra Is suffering from back and neck injury's. Being shot multiple times, mental issues from the shear trama of the riot.

(111)

Mark A. Morris's #098247

832. Plaintiff Morris is a 42 year old male.

833. Who suffers from high blood pressure, PTSD and heel injury.

834. Morris was moved to Kingman Hualapai unit August 22nd 2014 and stayed through the riots of July 1st to the 4th of 2015, until the remainder of the general population of inmates were moved to RRCC on Dec. 15th, 2015.

835. Morris did not participate in the riot, but was in an unsupervised, abandoned post, riotous Dorm 2 C-Pod, for 36 hours.

836. Tensions were elevated in the dorm from the moment the riot broke out at Cerbat on July 1st and became more chaotic and riotous on the evening of July 3rd, 2015.

837. Chemical agents, to include CS gas, were deployed. [Sinks, toilets, windows, ceilings and cameras were destroyed, resulting in waste water inches thick throughout the pod.]

838. Morris was left abandoned by defendants MTC's staff, evacuation of Dorm 2 and in a state of chaos and fear for his life.

839. Plaintiff was inside a dorm full of rioters who had been taking drugs for days, planning with masks on and armed with weapons.

840. Inmates, as plaintiffs in the dorm who expressed an interest in not rioting were intimidated and threatened.

841. Morris personally packed his property and this property was left untouched by the rioters and was intact upon said, exiting the building.

842. Defendants ADOC and MTC lost or destroyed plaintiffs property.

843. On the morning of July 4th, 2015. TSU entered the building-2, D pod with flash bangs, rubber bullets, CS gas, pepper spray and attack dogs.

844. Plaintiff Morris who was in C-pod communicated with MTC staff Castro.

845. That there were older inmates with health issues and that C-pod inmates would surrender peacefully and compliantly.

846. Officer Castro stated "that he would relay that to the TSU Commander".

847. Upon TSU arriving back to C-pod, TSU officer yelled back, "fuck you, It's to late were coming in there to fuck you off".

848. The TSU officer then turned to two other TSU officers and said, "Fuck them they cant surrender, and you hingman officers are pussys".

849. "We're gonna show you how shit gets done." He stated.

850. Tsu officer then turned and fired upon several inmates including Hiemstra, who was trying to defuse the situation and packing his things, Hiemstra was struck at least five times in the back by rubber bullets.

851. Tsu officer began to fire into C.Pod from the front horse shoe windows with rubber bullets and cs gas cenisters, plus Flash bang's were deployed from the exteriors windows.

852. Flashbangs, concussion grenedes went off indiscriminantly along with the fire alarm's and flying rubber bullets creating an atmosphere of panic and pandemonium similar to a war zone.

853. After Tsu officers creating a panic atmosphere, pulled back and left building for at least 2 hours, which was detrimental to our safety.

854. During this time, dorm-2-C held 59 inmates and in total chaos.

855. Heavy clouds of cs gas and pepper spray made it extremely difficult to breath and see.

856. Floors were covered in waste water and chemical agents residue, which prisoners were forced to lay in to avoid being shot and to breath.

857. Morris's after being shot with gas balls experienced anxiety/panic attacks.

858. Due to cs gas and pepper spray, and lack of oxygen, the panic attacks were heightened.

859. Equally, from the chaos of noise and prisoners running wild in masks and waving weapons, screaming in defiance at the pull back of TSU.

860. 2 hours later TSU gathered around building d.

861. C-pod inmates came together again to communicate their desires to surrender compliantly and immediatly.

862. This was done both verbally and by Morris raising a white towel, to surrender.

863. This made the TSU officers become more aggressive, and fired their guns upon Morris, saying "Fuck you."

864. Immediatly, more flash bangs and pepper spray was dispersed, again.

865. TSU entered the pod in a hail of bullets and attack dogs barking.

866. Tsu officers were yelling, "on the ground", Firing upon inmates even after they did what they were told.

867. Morris was laying face down un-able to breath, heart racing while Tsu officers beat and kicked him.

868. As one Tsu officer lifted Morris, the officer began to beat Morris in the face, while walking him out the Pod, another Tsu officer Jabbed in

(115)

869. Morris was yelling he didn't partake in the riot, and the Tsu officer said "are you resisting, stop resisting".

870. The Tsu officers, while beating Morris said, "Fuck you Nigger, then slammed his head twice into the wall.

871. Morris was dragged outside, "dazed", cuffed with Flex cuffs so tight it cut of his circulation.

872. The officer then slammed Morris's Face First into the dirt. As Morris turned the Tsu officer stepped on his back and said, "you aint so tough now, are you, you black nigger.

873. Morris asked Tsu officers to please losen Flex cuffs, do to poor circulation. Tsu officers said, "if you keep yelling, we will beat you."

874. Morris began to have a panic attack again, because he cant feel his hands, and the temperature was in the high 90's in kingman that day.

875. Prisoners was zipped tied in the heat, laying on there stomachs for up to 5 hours, before allowed to roll over and sit up.

876. Prisoners were also forced to sleep with Flex cuffs on, in the dirt for over 24 hours, as Further punishment for the riot.

Case 2:16-cv-02917-GMS--BSB   Document 1-2   Filed 08/30/16   Page 117 of 196

877. After being in the heat for over 24 Hrs, "dehydrated," Morris was rushed to medical for medical attention.

878. Prisoners was then moved to chow hall, where we were forced to urinate in a 30 gallon trash can in the corner, with over 250 prisoners in chow hall.

879. Which we had to beg Tsu officers to please dump, because of the reeking of smell and spilling over.

880. Then Tsu officer, allowed inmates who had to deficate, to use the toilet in the classroom Hallway.

881. With out knowing, what the Tsu officers had done.

882. Morris was shot while entering the hallway to go into the restroom.

883. Tsu officer, yelled it's our way, and keep your head down while in there, and fired more shots at plaintiff.

884. Tsu officers intentionally sprayed all the toilets and the toilet paper with pepper spray, to punish the rioters, and which Morris and others didint have anything to do with.

885. From the heat that was unbearable, tensions began to escalate, prisoners were fighting and talking about rioting again over the conditions.

(117)

886. Then Tsu officer smashed out all the front windows to the chow hall to allow air in, and to fire there pepper spray in

887. The breaking of the windows, glass covered the entire floor.

888. With no sleep, water, food, clean clothing or showers and medication, plaintiff experienced severe anxiety attacks, migrane headaches and body pain.

889. Plaintiffs wrists were badly swollen, eye was swollen with open wounds in a very unsanitary enviorment.

890. Morris was trying to get medical attention, experiencing severe pain that Tsu inflicted.

891. The zip-ties and flex cuffs caused fluid to build up and swelling, which caused severe and permanent damage.

892. Seven months later, plaintiff has numbness and limited thumb mobility and tingling in wrist, plus his hands.

893. For the following 2 days, plaintiff remained locked in the over crowded chow hall and unsanitary with other prisoners.

894. Plaintiff was subjected to hazardous and unsafe conditions in the chow hall.

895.  No cooling, sweltering heat, Morris was denied adequate water, denied needed medical attention.

896.  Forced to sleep on filthy dirty floors, no sanitation or hygiene, no mattress, sheets, bedding and without a shower, plus still wearing soiled clothing, as further punishment for the riot.

897.  For two days Morris was deprived of fresh clothing not saturated in chemical agents.

898.  After two days in chow hall Morris along with the others inmates were moved to the already unsanitary and hazardous WBE building.

899.  Plaintiff was warehoused by defendants MTC in this place, without medication, bedding-mattress, hygiene, sanitation, running water, a shower or a change of clothes for two more days.

900.  As a result of complaining, the back garage-style door of the WBE building was left open.

901.  Four port-a-john's were stationed there for inmate use.

902.  On the 2nd day being housed in the WBE facility, Tsu stuck a hose through a fence in the backyard and allowed inmates to shower, or rinse off.

903.  Inmates dangerously clammered and squeezed against the fence while standing in the mud for a chance to finally rinse off the chemical agents.

(119)

9.04. Morris was rinsing off in his boxers and it was being videod by TSU officers on their cell phones, as they laughed and pointed.

9.05. Those videos were later posted to social media.

9.06. Morris and 230 other inmates were moved late that evening back into building 2 and finally offered bedding, hygiene, showers and change of clothes.

9.07. For several weeks later after Morris was back in building 2, all walks, feedings were conducted with multiple TSU officers pointing guns and at least 2 attack dogs trying to bite.

9.08. An investigation was being held and select inmates were taken out and interviewed.

9.09. Morris was taken out and told it was part of an investigation into the riot.

9.10. TSU officers who were at the door by the investigation room was very intimidating with there guns and words.

9.11. Morris, during the interview reported everything that took place, that TSU officers did and had done to him.

9.12. The interview was recorded an written down, for future reference.

(120)

9/13. Once in building 2, Morris could NOT sleep, from nightmares of rioting, and chaos that ensued.

9/14. Plaintiff still suffers from physical and mental repercussions as a result of the riot.

9/15. Including, but NOT limited to anxiety/panic attacks on a daily basis, and trust issues of authority figures, plus staff.

9/16. Plaintiff was feeling like staff was out to hurt him, and began fearing for his life.

9/17. At this time Morris was seen by a mental health docter for his anxiety and fears.

9/18. Today, 7 months later Plaintiff still feels hopeless and other emotional manifestations are occuring that plaintiff did not experience, before the riots.

9/19. Plaintiff cannot escape this situation and as a result, suffers on a daily basis, NOT wanting to associate with others and scared of the staff.

9/20. Morris is suffering from head and back injury's and also mental issues from the riot.

(121)

REGINALD COLVIN #260737

921. PLAINTIFF COLVIN IS A 33 YEAR OLD MALE.

922. WHO SUFFERS FROM CHRONIC BACK PAINS ANXIETY ATTACKS.

923. COLVIN WAS MOVED TO KINGMAN HUALAPAI UNIT ON AUGUST 25, 2011 AND STAYED THROUGH THE RIOTS OF JULY 1st & 4th 2015, UNTIL THE REMAINDER OF THE GENERAL POPULATION OF INMATES WAS MOVED ON DECEMBER 15, 2015.

924. PLAINTIFF DID NOT PARTICIPATE IN THE RIOT, BUT WAS IN AN UNSUPERVISED, ABANDONED POST, RIOTOUS DORM (2-D), FOR 36 HOURS.

925. TENSIONS WERE ELEVATED IN THE DORM FROM THE MOMENT THE RIOT BROKE OUT AT CERBAT ON JULY 1st BUT BECAME CHAOTIC AND RIOTOUS ON THE EVENING OF JULY 3rd.

926. CHEMICAL AGENTS, TO INCLUDE CS GAS, WERE DEPLOYED, SINKS, TOILETS, WINDOWS, CEILINGS AND CAMERAS WERE DESTROYED RESULTING IN WASTE WATER INCHES THICK THROUGHOUT THE POD.

927. COLVIN WAS LEFT ABANDONED BY DEFENDANT MTC's STAFF EVACUATION OF DORM 2 IN A STATE OF CHAOS AND FEAR FOR HIS LIFE, INSIDE A DORM FULL OF RIOTERS WHO HAD BEEN TAKING DRUGS FOR DAYS, WITH MASKS ON, AND ARMED WITH WEAPONS.

(122)

9.28. INMATES, AS PLAINTIFF IN THE DORM WHO EXPRESSED AN INTEREST IN NOT RIOTING WERE INTIMIDATED AND THREATENED.

9.29. COLVIN PERSONALLY PACKED HIS PROPERTY AND THIS PROPERTY WAS LEFT UNTOUCHED BY THE RIOTERS, AND WAS INTACT UPON SAID, EXITING THE BUILDING.

9.30. DEFENDANTS ADOC AND MTC LOST OR DESTROYED PLAINTIFF's PROPERTY.

9.31. ON THE MORNING OF JULY 4TH TSU ENTERED BUILDING 2-D POD, WHERE PLAINTIFF COLVIN RESIDED WITH FLASH BANG GRENADES, RUBBER BULLETS, CS GAS, PEPPER SPRAY, AND ATTACK DOGS.

9.32. WITHOUT WARNING, TSU BROKE THE HORSESHOE WINDOW IN FRONT OF D POD AND SHOT FLASH BANG GRENADES, THEN CS GAS INTO D POD REPEATEDLY.

9.33. INMATES BEGUN TO PANIC, RUNNING TO THE BACK OF THE POD TO TRY AND ESCAPE THE CS GAS.

9.34. WHILE INMATES WERE TRYING TO ESCAPE THE CS GAS, TSU BEGAN TO SHOOT AT PRISONERS WITH RUBBER BULLETS.

9.35. THIS INTENSIFIED THE PANIC, NOT ONLY DID PRISONERS HAVE TO WORRY ABOUT BREATHING, BUT PRISONERS HAD TO WORRY ABOUT BEING SHOT AS WELL.

9.36. PRISONERS KEPT LOW TO THE GROUND AND PROCEEDED TO THE BACK OF THE POD TO AVOID BEING SHOT AND TRYING TO BREATHE.

9.37. ALL THAT COULD BE HEARD WAS A LOUD "BOOM" "BOOM" "BOOM" CONSISTENTLY. IT SOUNDED LIKE SHOTGUNS BEING SHOT BACK TO BACK.

9.38. THE SCENARIO REMINDED THE PLAINTIFF OF A SCENE OUT OF A WAR MOVIE. THE ONLY DIFFERENCE WAS HE WAS IN A PRISON INSTEAD OF THE BATTLEFIELD.

9.39. PLAINTIFF, AS WELL AS OTHER INMATES USED WET T-SHIRTS TO HELP THEM BREATHE.

9.40. BY THIS TIME PLAINTIFF COULD BARELY SEE, OR BREATHE DUE TO THE AMOUNT OF CS GAS.

9.41. THE PLAINTIFF WITNESSED AN OLDER PRISONER, WHO LOOKED LIKE HE WAS IN HIS LATE 60's, APPEAR TO BE 'HAVING' AN ASTHMA ATTACK.

9.42. ANOTHER INMATE PANICED AND BROKE A WINDOW TO LET FRESH AIR INTO THE POD TO HELP THE OLDER PRISONER BREATHE. ONCE FRESH AIR WAS COMING IN, THE OLDER PRISONER LOOKED LIKE HE WAS ABLE TO BREATHE.

9.43. INMATES WERE STILL SCURRYING AROUND, STAYING LOW TO THE GROUND TRYING TO BREATHE.

9.44. IT GOT TO THE POINT WHERE THE WET T-SHIRTS WERE NOT HELPING PLAINTIFF TO BREATHE ANY EASIER, ACTUALLY IT GOT HARDER.

945. IT WAS SO DIFFICULT TO BREATHE THAT PLAINTIFF HAD AN ASTHMA ATTACK.

946. APPROXIMATELY 25-30 MINS. LATER, WHEN THE CHEMICAL AGENTS STARTED TO CLEAR UP, TSU CAME BACK AND SHOT MORE FLASH BANG GRENADES AND CANS OF CS GAS INTO D POD "BOOM" "BOOM" "BOOM", THE WHOLE PROCESS STARTED ALL OVER AGAIN.

947. INMATES WERE YELLING THROUGH THE WINDOW, WAVING WHITE TOWELS SAYING "WE SURRENDER!" "WE SURRENDER!", TSU RESPONDED "IT'S TOO LATE. SOME OF Y'ALL ARE GOING TO DIE TODAY." THEN TSU BEGAN TO SHOOT THE PRISONERS WITH RUBBER PELLETS.

948. AFTER APPROXIMATELY ANOTHER 20-30 MINS., TSU SHOT MORE FLASH BANG GRENADES AND CS GAS INTO D POD.

949. PLAINTIFF FELT LIKE IT WAS NEVER GONNA END. COLVIN THOUGHT AT THIS POINT HE WAS GOING TO DIE. HE BEGUN PRAYING "PLEASE DONT LET ME DIE IN HERE AWAY FROM MY FAMILY." "GOD PLEASE HELP ME.", IT WAS THAT DIFFICULT TO BREATHE.

950. THE PLAINTIFF WITNESSED ANOTHER INMATE TRYING TO TELL TSU HE NEEDED MEDICAL ATTENTION THROUGH THE WINDOW, TSU RESPONDED BY SHOOTING THE PRISONER IN THE HEAD.

951. APPROXIMATELY 30 MINS. LATER, TSU RUSHED INTO D POD WEAPONS DRAWN YELLING "DONT MOVE!", "GET THE FUCK ON THE FLOOR!", "IF YOU MOVE YOU WILL BE SHOT!".

952. TSU GRABBED PLAINTIFF AS WELL AS OTHER INMATES ONE BY ONE AND ESCORTED THEM OUTSIDE.

( 125. )

9:53. IN THE PROCESS, TSU PUNCHED AND KICKED INMATES TELLING THEM "THEY WERE A BUNCH OF PUSSIES" AND "THEY WERE PIECES OF SHIT".

9:54. TSU HAD ATTACK DOGS IN THE HORSESHOE BARKING AND RIPPING AT INMATES CLOTHES.

9:55. IN ESCORTING PLAINTIFF OUTSIDE, TSU PUNCHED AND KICKED HIM, BANGING HIS FOREHEAD INTO THE BARS IN THE HORSE SHOE.

9:56. CAUSING PLAINTIFF'S FOREHEAD TO BRUISE AND SWELL UP.

9:57. ONCE OUTSIDE, TSU STRIPPED PLAINTIFF AS WELL AS OTHER INMATES OF THEIR SHOES, THEN FLEX CUFFED THEIR HANDS TIGHTLY BEHIND THEIR BACKS.

9:58. TSU THEN SLAMMED PLAINTIFF INTO THE DIRT, (WHICH WAS PEPPER SPRAYED BY TSU, PRIOR TO BEING SLAM INTO IT) FACE DOWN WHILE PROCEEDING TO PUNCH AND KICK HIM, AS FURTHER PUNISHMENT FOR THE RIOT.

9:59. IT WAS VERY HOT OUTSIDE. IT FELT LIKE IT WAS IN THE MID 90's.

9:60. DUE TO THE HEAT AND PEPPER SPRAY, PLAINTIFF'S FACE AND EYES WERE BURNING.

9:61. THE DIRT AND GRAVEL WAS SO HOT THAT THE PLAINTIFF'S FACE WAS BURNED, DUE TO HAVING TO LAY FACE DOWN IN THE DIRT AND GRAVEL WITH HIS HANDS FLEX CUFFED BEHIND HIS BACK.

(126.)

9.62. PLAINTIFF COMPLAINED TO TSU THAT HIS HANDS WERE CUFFED TOO TIGHT, COULD THEY PLEASE LOOSEN THEM. TSU RESPONDED "SHUT THE FUCK UP AND STOP BEING A LITTLE BITCH!".

9.63. IT GOT TO THE POINT WERE THE PLAINTIFF'S HANDS BEGAN TO GO NUMB.

9.64. PLAINTIFF IN PAIN AND SHOCK BEGUN SCREAMING "PLEASE HELP, I NEED MEDICAL ATTENTION." THEN A TSU OFFICER WALKED UP TO HIM AND KICKED HIM IN HIS RIBS AND TOLD HIM "THERE GOES YOUR MEDICAL ATTENTION SCUM BAG".

9.65. THE PLAINTIFF LAID THERE IN AGONY!

9.66. PLAINTIFF AS WELL AS OTHER INMATES LAID IN THE HEAT ON THE DIRT AND GRAVEL FOR APPROXIMATELY 11 HOURS.

9.67. INMATES WEREN'T GIVING ANY WATER OR ALLOWED TO USE THE RESTROOM DURING THE DURATION OF THE 11 HOURS, AS FURTHER PUNISHMENT FOR THE RIOT.

9.68. PLAINTIFF PLEADED WITH TSU OFFICERS TO USE THE RESTROOM. TSU RESPONDED "WE DONT GIVE A FUCK, YOU COULD SHIT ON YOUR SELF FOR ALL WE CARE".

9.69. EVENTUALLY, PLAINTIFF COULDN'T HOLD HIS BLADDER ANY MORE AND WAS FORCED TO USE THE BATHROOM ON HIS SELF.

9.70. AFTER APPROXIMATELY 11 HOURS, TSU SAT INMATES UP ONE BY ONE, THEN REMOVED THE FLEX CUFFS FROM BEHIND THEIR BACKS, THEN ZIP-TIED THEIR HANDS IN FRONT OF THEM

( 127 )

971.) TSU MOVED INMATES ABOUT 30 FEET DOWN AND TOLD THEM TO SIT DOWN IN THE DIRT AND GRAVEL; AND GET COMFORTABLE.

972. AT THIS TIME PLAINTIFF WAS ALLOWED TO USE A PORT-O-JOHN AND THE WATER FOUNTAIN.

973. THE TOILET PAPER AND SEAT OF THE PORT-O-JOHN WERE SATURATED WITH PEPPER SPRAY, AS FURTHER PUNISHMENT FOR THE RIOT.

974. TSU ANNOUNCED THAT WE WOULD BE SPENDING THE NIGHT OUTSIDE IN THE DIRT AND GRAVEL OF THE RECREATION YARD, "SO MAKE YOURSELVES COMFORTABLE," AS FURTHER PUNISHMENT FOR THE RIOT.

975. COLVIN WAS FORCED TO SLEEP OUTSIDE, UNCOVERED, ZIP-TIED, IN THE DIRT AND GRAVEL, STILL SATURATED IN PEPPER SPRAY, CS GAS, AND URINE, AS FURTHER PUNISHMENT FOR THE RIOT.

976. PRESPIRATION FROM THE SWELTERING HEAT REACTIVATED THE URINE, CHEMICAL AGENTS RESIDUE IN PLAINTIFF'S CLOTHES AND ON HIS SKIN, AS FURTHER PUNISHMENT FOR THE RIOT.

977. THE NEXT AFTERNOON, AFTER RECEIVING ONLY 2 BOLOGNA MEAL SACKS IN THE PRIOR 48 HOURS.

978. PLAINTIFF, WAS TAKEN ALONG WITH APPROXIMATELY 250 OTHER INMATES AND PLACED IN THE CHOW HALL.

979. AT THIS POINT THE ZIP-TIES WERE CUT OFF.

980. THE COMBINATION OF THE ZIP-TIES, FLEX CUFFS, FLUID BUILD-UP, AND SWELLING CAUSED SEVERE AND PERMANENT DAMAGE TO PLAINTIFFS HANDS AND WRISTS.

( 128. )

9.81. STILL 6 MONTHS LATER, NUMBNESS AND TINGLING PERSISTS IN WRISTS AND HANDS OF PLAINTIFF.

9.82. DURING THE FOLLOWING 2 DAYS PLAINTIFF, REMAINED LOCKED IN THE CHOW HALL WITH APPROXIMATELY 250 PRISONERS.

9.83. PLAINTIFF WAS SUBJECTED TO HAZARDOUS AND UNSAFE CONDITIONS IN THIS ENVIRONMENT.

9.84. NO COOLING SYSTEM, SWELTERING HEAT, NO ACCESS TO TOILETS, NO RUNNING WATER, NO SANITATION AND NO HYGIENE.

9.85. COLVIN WAS DENIED ADEQUATE WATER, FORCED TO SLEEP ON DIRTY CONCRETE FLOORS WITH NO MATTRESS OR BEDDING.

9.86. COLVIN WAS DEPRIVED OF FRESH CLOTHING NOT SATURATED IN CHEMICAL AGENTS, OR URINE.

9.87. PRISONERS IN THE CHOW HALL WERE FORCED TO URINATE IN A 30 GAL. TRASH CAN IN THE CORNER, WHICH WAS FILLED AND DUMPED AT LEAST 4 TIMES BY TSU, SPILLING ON TO THE FLOOR AND REEKING FROM THE HEAT.

9.88. FOR A BRIEF TIME, TSU ALLOWED INMATES WHO HAD TO DEFICATE TO USE THE TOILETS IN THE ADJOING CLASSROOM HALLWAY.

9.89. IT TOOK COLVIN APPROXIMATELY 2 HOURS TO TRAVERSE THE LINE.

9.90. PLAINTIFF WAS TOLD BY TSU TO KEEP HIS HANDS ON HIS HEAD, LOOK STRAIGHT DOWN AT THE FLOOR, WHILE GOING TO THE RESTROOM, TSU THEN STATED IF HE DIDN'T COMPLY OR LOOKED AT TSU OFFICERS HE WOULD BE SHOT AND PEPPER SPRAYED.

(129.)

9.91. WHEN COLVIN REACHED THE RESTROOM, HE SAW THAT TSU HAD SPRAYED ALL THE TOILET PAPER AND THE TOILET SEAT WITH PEPPER SPRAY, AS FURTHER PUNISHMENT FOR THE RIOTS.

9.92. THERE WAS PISS ALL OVER THE RESTROOM FLOOR, WHICH COLVIN HAD TO STAND IN WITH ONLY SOCKS ON IN ORDER TO USE THE RESTROOM.

9.93. TENSIONS BEGAN TO ESCALATE AGAIN INSIDE THE CHOW HALL.

9.94. THE HEAT WAS UNBEARABLE, PRISONERS WERE FIGHTING AND TALKING ABOUT RIOTING AGAIN OVER THE CONDITIONS.

9.95. A TSU OFFICER SMASHED OUT THE CHOW HALL WINDOWS TO ALLOW FRESH AIR IN.

9.96. THIS ACT COVERED THE FLOOR AND INMATES WITH BROKEN GLASS.

9.97. WITH NO SLEEP, WATER, AND FOOD, PLAINTIFF EXPERIENCED SEVERE HEADACHES.

9.98. COLVIN, ALSO EXPERIENCED SEVERE PAIN IN HIS BACK FROM SLEEPING ON DIRT, GRAVEL AND BARE CONCRETE.

9.99. AFTER 2 DAYS, COLVIN, ALONG WITH THE OTHER INMATES WERE MOVED TO THE CHAPEL.

100.0. HERE THEY JOINED AN ALREADY OVERCROWDED CONDITIONS OF 100 OR SO INMATES FROM OTHER BUILDINGS.

1001. PLAINTIFF, WAS WAREHOUSED BY DEFENDANT MTC IN THIS PLACE, WITHOUT BEDDING, A MATTRESS, HYGIENE, SANITATION, RUNNING WATER, OR A SHOWER OR A CHANGE OF CLOTHES FOR 2 MORE DAYS, AS FURTHER PUNISHMENT FOR THE RIOTS.

1002. INMATES WERE ALLOWED TO USE THE BATHROOM INSIDE THE SCHOOL, BUT NOT WITHOUT BEING HARASSED BY TSU. TSU HAD INMATES SCARED TO USE THE BATHROOM, FEARING THEY WOULD BE SHOT AND PEPPER SPRAYED.

1003. COLVIN WITNESSED ANOTHER INMATE GET SHOT BY TSU MULTIPLE TIMES FOR FOLLOWING TSU ORDERS. THE TSU OFFICERS WERE LAUGHING SAYING "LOOK AT THIS BITCH SCREAMING".

1004. THROUGH THE WINDOW OF THE CHAPEL, COLVIN WITNESSED A GOLF CART STYLE VEHICLE PULLING A TRAILER PILED HIGH WITH INMATE TELEVISION SETS FROM THE DORMS.

1005. MULTIPLE TIMES TELEVISIONS FELL FROM THE TRAILER AS TSU OFFICERS WALKED ALONG SIDE, PICKED THEM UP AND THREW THEM BACK ONTO THE TRAILER.

1006. INMATE SHOES THAT WERE NOT TAKEN WERE LEFT IN ONE BIG PILE OUTSIDE IN THE RAIN, BEING DESTROYED.

1007. ON DAY ONE IN THE CHAPEL, COLVIN WITNESSED THROUGH THE CHAPEL WINDOWS A PRISONER BEATEN REPEATEDLY BY 4 TSU OFFICERS.

1008. COLVIN WITNESSED TSU SLAM ONE INMATE INTO THE BRICK WALL THEN ONTO THE GROUND FOR NO APPARENT REASON.

( 131 )

1009. SIMILARLY, ON DAY 2 OF BEING HOUSED IN THE CHAPEL, COLVIN AGAIN WITNESSED 3 TSU OFFICERS BEAT AND KICK AN INMATE.

1010. PLAINTIFF COLVIN AND APPROXIMATELY 230 OTHER INMATES WERE MOVED LATE EVENING BACK INTO BUILDING 2 AND FINALLY OFFERED BEDDING, HYGIENE, SHOWERS AND A CHANGE OF CLOTHES.

1011. FOR 2 WEEKS AFTER COLVIN WAS BROUGHT BACK TO BUILDING 2, ALL FEEDING, WALKS, AND COUNTS WERE CONDUCTED WITH MULTIPLE TSU OFFICERS POINTING GUNS AND AT LEAST 2 ATTACK DOGS BARKING AND NIPPING AT INMATES.

1012. DURING THE 1ST WEEK BACK IN BUILDING 2, SELECTED INMATES WERE TAKEN OUT OF THEIR PODS AND INTERVIEWED BY C.I.U.

1013. COLVIN WAS NOT SELECTED.

1014. PLAINTIFF, WAS NOT ALLOWED TO SHOWER OR CHANGE CLOTHES FOR A TOTAL OF 5 DAYS.

1015. PLAINTIFF STILL SUFFERS FROM PHYSICAL AND MENTAL REPERCUSSIONS, AS A RESULT OF THE RIOTS.

1016. INCLUDING, ANXIETY AND PANIC ATTACKS ON A NEAR DAILY BASIS, TRUST ISSUES OF AUTHORITY FIGURES.

1017. ALSO, NIGHTMARES, LACK OF SLEEP, PAIN AND NUMBNESS IN WRISTS AND HANDS, BACK PAIN, AND OTHER MENTAL HEALTH ISSUES, AS A RESULT OF THE RIOTS.

10.18. PLAINTIFF HAS BECOME A RECLUSE, NOT WANTING TO ASSOCIATE WITH OTHERS AND DEFENSIVE AROUND STAFF AND OTHER PRISON EMPLOYEES.

10.19. FEELINGS OF HOPELESSNESS AND OTHER EMOTIONAL MANIFESTATIONS ARE OCCURING THAT PLAINTIFF DID NOT EXPERIENCE BEFORE THE RIOTS.

10.20. PLAINTIFF CANNOT ESCAPE THIS SITUATION AN AS A RESULT, SUFFERS ON A DAILY BASIS.

10.21. THE PLUS 4 YEARS THAT PLAINTIFF WAS AT MTC-KINGMAN HVALAPAI UNIT.

10.22. WERE CHARACTERIZED BY A COMPLETE, DISREGARD AND LACK OF CARE FOR THE INMATES, WHICH GREW INCREASINGLY WORSE OVER TIME.

10.23. COLVIN RECEIVED ONLY A SMALL PORTION OF HIS PROPERTY THAT HE HAD BEFORE THE RIOTS.

10.24. MUCH OF IT WAS DAMAGED AND USELESS, INCLUDING HIS T.V.

10.25. PLAINTIFF, ALSO LOST THE MAJORITY OF HIS LEGAL DOCUMENTS, NEGATIVELY EFFECTING HIS GEORGIA, WASHINGTON, AND FEDERAL CASES.

10.26. PRISONERS ONLY RECEIVED PROPERTY, WHICH WAS MARKED WITH THEIR I.D. NUMBER.

10.27. THERE WERE A LOT OF CASES WERE INMATES HAD THEIR PROPERTY MARKED WITH THEIR I.D. NUMBER BUT STILL DID NOT GET THEIR PROPERTY BACK. (INCLUDING PLAINTIFF).

AlexOsuna #256039

10.28. PLAINTIFF OSUNA IS A 26 YEAR OLD MALE

10.29. PLAINTIFF SUFFERS FROM PRE-EXISISTING MEDICAL CONDITIONS OF CHRONIC ASTHMA, BILATERAL TIBAL TORSION AND BILATERAL FEMORAL ANTEVERSION, AND ANXIETY.

10.30. PLAINTIFF TAKES 4 MEDICATIONS FOR HEALTH RELATED ISSUES 2 DAILY AND 2 AS NEEDED.

10.31. PLAINTIFF WAS NOT A PARTICIPANT IN THE RIOTS BUT WAS IN AN UNSUPERVISED, ABANDONED POST, RIOTUS DORM (3-F).

10.32. AT APPROX 2130 HOURS RIOTUS INMATES IN DORM 3 E AND F POD BEGAN BREAKING OUTER POD WINDOWS AND PODS B AND E WERE TAKEN TO THE RECREATION YARD, PLUS F POD WAS LEFT UNSUPERVISED

10.33. PLAINTIFF WAS LEFT UNSUPERVISED IN A RIOTUS DORM FROM 2130 HRS JULY 2nd, TO APPROX 0825 HRS JULY 3rd

10.34. ON JULY 4th DEFENDANT WARDEN RIDER AND A MALE MTC STAFF MEMBER ENTERED DORM 3-F POD.

10.35. STATING SHE DID NOT WANT THINGS TO ESCALATE LIKE IN THE OTHER DORMS, WHICH WERE BEING ASSAULTED BY TSU.

10.36. AT THAT POINT INMATES BECAME AGGRAVATED BY WARDEN RIDERS THREATS, AND TOLD HER "YOU CAUSED THIS SO GET THE FUCK OUT.".

10.37. THEN WINDOWS AND CAMERAS WERE BROKEN, RIOTERS WERE MASKED UP. AND NOW NONK PARTICIPANTS WERE IN FEAR FOR THERE LIFE.

10.38. AT 1350 ALL STAFF EVAWATED THE DORM.

10.39. TSU THEN BROKE OUTER WINDOWS WITH BATONS AND ASSAULTED F-POD WITH FOGGERS, DIVERSION DEVICES, STING BALLS AND PEPPER BALLS

10.40. PLAINTIFF OSUNA HAD TO EXIT THE POD DUE TO THE ASSAULT TAKING PLACE BY TSU IN HIS POD.

10.41. BECAUSE OF CHEMICAL AGENTS BEING DEPLOYED HEAVILY IN HIS POD, PLAINTIFF HAD AN ASTHMA ATTACK AND WAS NOT IN POSSESION OF MEDICATION. (RESCUE INHALER)

10.42. AT THIS POINT PLAINTIFF OSUNA HAD A SEVERE ASTHMA ATTACK AND COULD NOT BREATH.

10.43. PLAINTIFF OSUNA FELL TO THE GROUND IN ABOUT 3 INCHES OF SEWER WATER, URINE, FECES, VOMIT, HOOCH, AND CHEMICAL AGENTS.

10.44. WHILE COVERED IN WASTE WATER ON THE GROUND AND VOMITTING DUE TO A PANIC ATTACK, AND NOT BEING ABLE TO BREATH FROM AN ASTHMA ATTACK, RIOTERS TRAMPLE OVER PLAINTIFF OSUNA.

10.45. SOMEONE PULLED OSUNA UNDER A BUNK AWAY FROM THE CHAOS AND CHEMICAL AGENTS DISPERSED IN THE AIR.

10.46. TSU DEPLOYED MORE CS GAS THROUGHOUT THE DORM.

1047. RIOTERS WERE RUNNING WILD WITH WEAPONS, ADDING CHAOS, AND MOST OF THEM WERE INTOXICATED.

1048. PLAINTIFF THEN EXITS B POD AND ENTERS D POD, PASSING C-POD   NOTICES THE DOOR IS STILL LOCKED AND PRISONERS ARE STUCK DURING A HEAVY ATTACK BY TSU.

1049. SUFFERING FROM MEDICAL COMPLICATIONS AS A RESULT OF MULTIPLE ASSAULTS BY TSU, PLAINTIFF OSUNA GOT INTO SHOWERS, TO TRY TO WASH OFF THE FILTH AND CHEMICAL AGENTS FROM BODY.

1050. PRISONERS ARE HUDDLED IN STALLS WITH WATER TURNED ON TRYING TO BLOCK THE CS GAS AND FOGGERS.

1051. TO BLOCK MORE CS GAS FROM ENTERING THE BATHROOM RIOTERS, BREAK SPRINKLER SYSTEM AND BLACK WATER COMES DISPERSING OUT.

1052 AT APPROX 1520 DORM 3 COMMUNICATES TO TSU TO STOP SPRAYING INTO THE WINDOWS AND ALL WILL CALM DOWN.

1053. PLAINTIFF OSUNA RETURNS TO E-POD TO CONTINUE TO PROPERLY SECURE AND PACK ALL HIS PROPERTY.

1054. WHILE SECURING HIS PROPERTY, PLAINTIFF WAS STILL HAVING A HARD TIME BREATHING BECAUSE OF THE CHEMICAL AGENTS IN THE AIR.

1055. PLAINTIFF OSUNA STOOD ON A STOOL IN FRONT OF THE WINDOW TO GET FRESH AIR.

10:56. TSU OFFICER YELLED "GET THE FUCK AWAY FROM THE WINDOW OR I'LL SPRAY YOUR ASS!"

10.57. PLAINTIFF OSUNA THEN INFORMED TSU STAFF OF HIS MEDICAL CONDITION

10.58. TSU OFFICER REPLIED BY STATING "I DON'T GIVE A FUCK, BACK AWAY FROM THE WINDOW NOW!."

10.59. IN FEAR OF BEING SPRAYED, PLAINTIFF BACKS AWAY FROM WINDOW, EVEN THOUGH HE IS STILL HAVING AN ASTHMA ATTACK.

10.60. PLAINTIFF OSUNA EXITS HIS POD IN SEARCH FOR A POD WITH CLEANER AIR, PASSING BY RIOTERS TOSSING WEAPONS ONTO THE GROUND.

10.61. PLAINTIFF BECAME FEARFUL AND PARANOID BECAUSE OF ALL THE RIOTERS WITH WEAPONS, ALL THE CHAOS, AND NOT BEING ABLE TO BREATH.

10.62. PLAINTIFF DID NOT HAVE ASTHMA MEDICINE DUE TO MTC MEDICAL STAFF, AND UNSUCCESFUL MEDICAL GRIEVANCE DENIED BY DIRECTOR RYAN.

10.63. PLAINTIFF WAS ULTIMATELY UNABLE TO FIND A POD WITH CLEANER AIR THEN HIS.

10.64. PLAINTIFF RETURNED TO HIS CUBICLE AND FINISHED SECURING ALL PROPERTY AND REMAINED TILL EVACUATION STARTED.

10.65. OSUNA WAS ONE OF THE LAST PRISONERS EVACUATED OUT OF DORM 3.

1066. PLAINTIFF OBSERVED PRISONERS BEING DRAGGED, KICKED, VERBALLY AND PHYSICALLY ASSAULTED ON THERE WAY OUT OF DORMS BY TSU STAFF, AND MTC STAFF.

1067. FOR FEAR OF BEING FURTHER ASSAULTED, OSUNA MADE THE CHOICE OF SUFFERING MEDICALLY VS PHYSICALLY BY TSU STAFF IN BEING LAST TO WALK OUT.

1068. WHILE EXITING BUILDING ATTEMPTING TO GET MEDICAL ASSISTANCE, OSUNA WAS TOLD "FACE FOWARD AND SHUT THE FUCK UP"!

1069. TSU OFFICER ORDERED PLAINTIFF TO "REMOVE SWEATSHIRT AND THROW IT ON THE GROUND."

1070. WHILE BEING PUT IN FLEX CUFFS BEHIND BACK, MTC SGT REMOVES PLAINTIFFS WATCH AND THROWS IT ON THE GROUND IN FRONT OF DORM 3.

1071. OSUNA INFORMED MTC SGT, "THAT IS HIS PERSONAL PROPERTY, PLEASE SECURE IT IN HIS PROPERTY.

1072. SGT REPLIED BY SAYING "WHERE YOUR GOING YOUR NOT GOING TO NEED THIS KEEP MOVING".

1073. PLAINTIFF IS DIRECTED TO RECREATION YARD PLACED ON THE GROUND ON HOT SAND AND CONCRETE.

1074. PLAINTIFF INFORMS MTC OFFICER JAROMASAC THAT CUFFS ARE CUTTING WRIST AND OF HIS INABILITY TO BREATH.

1075. OFFICER JAROMASAC REPLIES BY STATING "HE IS DEALING WITH BIGGER ISSUES."

(138)

10.76. OSUNA THAN SEES MTC OFFICER JAROMASAC (BROTHER TO FIRST MENTIONED JAROMASAC) AND ADVISES HIM OF HIS SAME MEDICAL PROBLEMS.

10.77. OFFICER JAROMASAC THEN LOOSENS AND MOVES CUFFS TO FRONT AND SAYS HELL INFORM SOMEONE OF MY MEDICAL CONDITION.

10.78. PLAINTIFF OSUNA DID NOT RECEIVE ANY MEDICAL ATTENTION WHILE ON RECREATION YARD.

10.79. PLAINTIFF WAS EXPOSED TO EXTREME HEAT, VERY MINIMAL WATER AND UNSANITARY RESTROOM (PORT-O-JOHN) CONDITIONS.

10.80. PLAINTIFF FELT THE EFFECTS AS IF CHEMICAL AGENTS HAD BEEN SPRAYED INSIDE THE PORT-O-JOHN.

1081. PLAINTIFF SLEPT ON SIDEWALK OUTSIDE WHILE BEING BIT BY ANTS AND OTHER INSECTS THROUGHOUT THE NIGHT.

10.82. OSUNA WAS NOT ABLE TO EAT ANY FOOD DUE TO SYMPTOMS ATTRIBUTED TO HIS ANXIETY.

1083. AT SOME POINT ON JULY 5TH, PLAINTIFF AND THE REST OF THE PRISONERS OUTSIDE WERE DIRECTED TO USE WAREHOUSE.

1084. IN THE WAREHOUSE OSUNA WAS EXPOSED TO MORE UNSANITARY CONDITIONS, DUE TO WAREHOUSE NOT BEING CLEANED WHEN OTHER PRISONERS LEFT.

10.85. OSUNA WAS STILL WEARING CLOTHING COVERED WITH WASTE WATER, CHEMICAL AGENTS, DIRT AND HIS OWN SWEAT

10.86. CONDITIONS IN THE WAREHOUSE WERE VERY UNCLEAN, HOT AND TENSIONS WERE BEGINNING TO RISE AMONGST PRISONERS ABOUT FANS AND WHO CONTROLLED THEM.

10.87. OSUNA WAS NERVOUS AND FEARFUL OF A CONFLICT RISING BETWEEN PRISONERS.

10.88. WHEN PORT-O-JOHNS WERE CLEANED, TSU USED INTIMIDATION METHOD THAT FELT AS IF WE WERE BEING LINED UP FOR A FIRING SQUAD, AS FURTHER PUNISHMENT FOR THE RIOT.

10.89. PLAINTIFF REQUESTED MEDICAL ASSISTANCE, TOILET PAPER, MORE FANS AND CLEANING CHEMICALS FOR TOILET SEAT.

10.90. REQUEST WERE MET WITH A COMMON RESPONSE OF "IF YOU DIDN'T RIOT YOU WOULDN'T BE HERE."

10.91. WHILE OUTSIDE WAITING ON PORT-O-JOHN TO OPEN, PLAINTIFF AND OTHER PRISONERS WITNESSED CASE MANAGER DUFRANE TRANSFERING PROPERTY, AND A TV FELL OFF TRAILER.

10.92. TSU OFFICERS WERE DISRESPECTFUL SOME BEGAN TAUNTING PRISONERS.

10.93. PRISONERS BECAME EXTREMELY AGGITATED WHEN TSU SHOT AT SOMEONE USING PORT-O-JOHN, THAT TSU OFFICER WAS REMOVED FROM POST.

10.94. AT SOMEPOINT WHILE IN THE WAREHOUSE PLAINTIFF AND OTHERS WERE ALLOWED TO RINSE OFF WITH A WATER HOSE THAT WAS STUCK THROUGH A FENCE IN BIG GROUPS.

10.95. AT THIS POINT PLAINTIFF HAD NOT SHOWERED FOR MANY DAYS, AND HAD NOT BEEN GIVEN CLEAN CLOTHES.

10.96. WHILE RINSING OFF SOME STAFF MEMBERS HAD CELL PHONES POINTED IN OUR DIRECTION AND OSUNA FELT HUMILIATED BY THAT.

10.97. THESE VIDEOS WERE LATER POSTED ON SOCIAL MEDIA.

10.98. PLAINTIFF FELT AS IF MTC/TSU STAFF WERE TRYING TO CREATE ANOTHER INCIDENT BY THERE CONSTANT HARASSMENT.

10.99. PLAINTIFF WAS LATER INFORMED BY ADW FREDRICK THAT SOME OF US WOULD BE STAYING ON COMPLEX.

11.00. IN THE WAREHOUSE PLAINTIFF OBSERVED A LAUNDRY BIN FILLED WITH SHOES BROUGHT INSIDE.

11.01. THERE WAS NO ORDER TO HOW SHOES WERE HANDED OUT.

11.02. COMMENTS WERE MADE BY PRISONERS, TO THE EXTENT OF" IF YOU TAKE SOMEONE ESES SHOES, THATS STEALING AND YOU KNOW WHATS NEXT".

11.03. PLAINTIFF EXPECTED STAFF TO STEP IN AND MAKE ORDER OF CHAOS BUT THEY DID NOT.

11.04. WHILE IN WAREHOUSE PLAINTIFF DID NOT RECEIVE MEDICAL ATTENTION FOR HIS ASTHMA ATTACKS WHICH LED TO PHYSICAL AND MENTAL ISSUES.

11.05. PLAINTIFF DID NOT RECEIVE MEDICAL ATTENTION FOR HIS INABILITY TO EAT AND WAS VERY NAUSEOUS DUE TO HIS ANXIETY AND ASTHMA.

1106. PLAINTIFF WAS SUBJECTED TO HAZARDOUS AND UNSAFE CONDITIONS INSIDE THE WBE WAREHOUSE.

1107. OSUNA WAS DEPRIVED OF FRESH CLOTHING, WHICH WAS NOT COVERED IN CHEMICAL AGENTS, AS FURTHER PUNISHMENT FOR THE RIOT.

1108. OSUNA EXPERIENCED SEVERE PAIN IN HIS KNEES, HIPS AND BACK FROM SLEEPING ON DIRT AND BARE CEMENT, FOR SEVERAL DAYS.

1109. DEFENDANT MTC NEVER ISSUED MATS, CLOTHING, BLANKETS OR SHEETS TO SLEEP ON DURING PLAINTIFFS TIME IN WAREHOUSE.

1110. ONCE PRISONERS FOUND OUT THEY WERE STAYING AT HUALAPAI SOME BECAME UNEASY WITH THAT NEWS.

1111. IN FEAR OF RETALIATION BY STAFF OR OTHER PRISONERS, MANY DID NOT WANT TO STAY AT HUALAPAI.

1112. TENSIONS AROSE BECAUSE OF GROUPS WANTING TO STAY AND GROUPS WANTING TO LEAVE.

1113. PLAINTIFF OSUNA WAS TO BE ONE OF A FEW TO STAY ON COMPLEX IN DORM 2 WHICH WAS HABITABLE

1114. OSUNA AND ABOUT 230 INMATES WERE MOVED INTO DORM 2 AND FINALLY OFFERED BEDDING, HYGIENE, SHOWERS AND CLOTHES AFTER ABOUT 4-5 DAYS.

1115. PLAINTIFF OSUNA WAS NOT ALLOWED TO SHOWER FOR 4-5 DAYS.

11.16. FOR ROUGHLY 2 WEEKS AFTER OSUNA WAS MOVED TO DORM 2 ALL FEEDINGS, SECURITY WALKS, COUNTS WERE CONDUCTED WITH MULTIPLE TSU OFFICERS POINTING GUNS AND DOGS BARKING AND TRYING TO BITE INMATES.

11.17. SOME PRISONERS WERE LATER INTERVIEWED BY SOME TYPE OF STAFF.

11.18. PRISONERS WERE TOLD INTERVIEWS WERE APART OF INVESTIGATION, PLAINTIFF OSUNA ASKED TO BE INTERVIEWED BUT WAS NOT.

11.19. WHEN PROPERTY WAS HANDED BACK PLAINTIFF WAS MISSING ALOT OF HIS PROPERTY, IN ADDITION PLAINTIFFS TV WAS BROKEN.

11.20. WHEN PLAINTIFF INQUIRED TO DEFENDANTS GLEASON, ADW FREDRICK, PLUS CO4 RYDGREN ABOUT MISSING PROPERTY THEY ALL GAVE SAME RESPONSE "MTC IS NOT LIABLE FOR PROPERTY LOST OR DAMAGED DURING INMATE INITIATED DISTURBANCE."

11.21. PLAINTIFF FILED GRIEVANCE # MS9-116-015 ON 8-17-15

11.22. WARDEN RIDER'S RESPONSE TO GRIEVANCE # MS9-116-015 ON 9-18-15 HAD SIMILAR RESPONSE AS DEFENDANT GLEASON, FREDRICK AND RYDGREN.

11.23. PLAINTIFF ASKED QUESTIONS ON THE YARD, PLAINTIFF HEARD TALKS OF PROPERTY BEING THROWN AWAY, GIVEN AWAY TO PRISONERS, AND ALLOWING INMATES WHO CLEANED UP DORMS AFTER RIOT, TO TAKE ITEMS BACK WITH THEM EVEN THOUGH MTC STAFF SUPERVISED THEM.

11.24. AT A TOWN HALL MEETING 8-31-15 PLAINTIFF ASKED ABOUT CLOTHING REPLACEMENT.

11.25. CO 4 RYDGREN AND ADW FREDRICKS RESPONDED BY STATING "PUT AN INMATE LETTER AND WELL GIVE UP WHAT WE HAVE LEFT THAT WAS SAWAGEABLE".

11.26. THE CLOTHING REPLACEMENT THAT WAS GIVEN TO PLAINTIFF HAD ANOTHER INMATES NUMBER, WHICH COULD HAVE CAUSED PLAINTIFF PROBLEMS IF OTHER INMATES THOUGHT IT WAS STOLEN.

11.27. PLAINTIFF ALSO LOST IMPORTANT LEGAL DOCUMENTS PERTAINING TO HIS ON GOING RULE 32

11.28. WHILE AT KINGMAN POST RIOT MTC STAFF WOULD COMMONLY MAKE COMMENTS ABOUT RIOT.

11.29. COMMENTS CONSISTED OF THINGS LIKE "IF YOU WOULDN'T HAVE RIOTED THINGS WOULD BE BETTER", "WHAT DID YOU EXPECT,".

11.30. PLAINTIFF FELT ANXIOUS AND HARASSED BY THESE REMARKS, HE ALREADY HAD TO SUFFER FOR ACTIONS OF OTHERS.

11.31. PLAINTIFF STILL SUFFERS PHYSICAL AND MENTAL REPER-CUSSIONS AS A RESULT OF THE RIOTS.

11.32. WHICH INCLUDE ANXIETY, PANIC ATTACKS, ESPECIALLY AROUND LARGE GROUPS, OR WHEN STAFF SPEAKS TO HIM.

11:33. PLANTIFFS FAMILY NOTICED THIS CHANGE AND ASKED HIM TO SEEK MENTAL HEALTH CARE FOR ANXIETY, AND OTHER ISSUES.

11:34. PLANTIFF ALSO SUFFERS FROM SLEEPLESSNESS, BACK PAIN, AND NOW HAS DEEPER TRUST ISSUES OF AUTHORITY FIGURES AND ANYONE IN UNIFORM.

1135. PLANTIFF SUFFERS ON A DAILY BASIS AND IS NEVER AT PEACE, ALWAYS EXPECTING SOMETHING BAD TO HAPPEN TO HIM.

11:36. PLANTIFF FOR 4 PLUS YEARS WAS AT MTC KINGMAN HUALAPAI UNIT.

11:37. THIS WAS CHARACTERIZED BY COMPLETE DISREGARD AND LACK OF CARE FOR INMATES, WHICH GREW NOTICEABLY WORSE OVER THE YEARS.

1138. PLANTIFF OSUNA WAS MOVED TO KINGMAN HUALAPAI ON OCT 14th, 2011 AND STAYED THROUGH RIOTS OF JULY 1st - 4th 2015.

11:39. UNTIL THE REMAINDER OF THE GENERAL POPULATION OF PRISONERS WERE MOVED ON DEC 15th, 2015 TO RED ROCK CC.

Jimmy Mamoth #257290

1140. Plaintiff Mamoth ("Mamoth") is a 54 year old male, who has chronic health care needs for high cholesteral and takes daily medication for his chronic health care needs.

1141. Mamoth, did not participate in the riot, but was in an unsupervised, abandoned post, riotous dorm (4-D).

1142. Where chemical agents were dispersed, sinks, toilets, windows, and ceilings were destroyed, plus waste water everywhere.

1143. Mamoth has pins and rods in his left femur, down to his left knee, and multiple special needs orders approved by medical.

1144. Mamoth, who was left abandoned by Def. MTC's staff evacuation of Dorm 4, was left in a state of chaos and fear of his life, inside a dorm full of rioters who had masks on, and armed with weapons.

1145. Mamoth was in this chaotic, riotous dorm for approximately 12 hours.

1146. Mamoth, personally packed his property and this property was left untouched by the rioters, and was intact upon said, exiting the building. Def., MTC lost plaintiffs property.

(146)

1147. Upon exiting the dorm, plaintiff was flexed cuffed so tight it cut into his wrists and cut off circulation. He was forced to the ground - face down by T.S.U.

1148. The temperature in Kingman for that day was approx. 90° plus. Plaintiff was kept on the recreation yard exposed to the sun for approximately 5 hours.

1149. Plaintiff was approved for a religious diet and denied by Def's MTC. He was forced to eat bologna sandwiches.

1150. When he asked Def. MTC staff or T.S.U for his religious diet, he was told, "Your lucky to get bread and water and you're not dead", and "They could care less about a fucking religious diet after what you just did". Indicating, this was further punishment for the riot.

1151. Plaintiff was taken to the construction trades warehouse ("WBE") with the rest of dorm 4, or approximately 360 inmates.

1152. Plaintiff was warehoused by Def. MTC in this place, without medication, religious diet, bedding, mattress, hygiene, a shower or a change of clothes for 2 plus days.

1153. In addition to these unsanitary conditions in the warehouse. Inmates were urinating, defecating and trash was thrown everywhere.    (147)

1154. This was all videotaped.

1155. Mamoth was never offered a change of clothes or shower, thus his clothes were contaminated with chemical agents and hazardous waste water materials.

1156. On 7-4-15, he was bused out to CCA = Red Rock.

1157. Plaintiff was not allowed to shower for a total of (5) days, nor given his religious diet or medications for at least (1) month, as further punishment for the riot.

1158. Mamoth, equally had a valid medical needs order for a lower bunk, due to his inability to climb up to the top bunk, which is where CCA assigned him to, without any consideration, due to the pins and rods in his femur.

1159. Plaintiff still suffers from anxiety attacks, trust issues, of authority figures, nightmares, lack of sleep, and other mental health issues as a result of the riots.

1160. Equally, Plaintiff has become a recluse, not wanting to associate with others and defensive around staff and other prison employees.

1161. Plaintiff, can not escape this situation and as a result, suffers on a daily basis.    (148.)

Benjamin Hollembeak   ADC# 215787

1162.   Plaintiff Hollembeak is a 34 year old male who suffers from a Major Depressive Disorder, but was taken off his medication by ADOC in 2007.

1163.   Also, Hollembeak suffers from pre-existing gun shot wounds to his left arm and back. A damaged section of his artery was removed from his left arm and replaced with a section from his lower left leg.

1164.   In addition he suffers from a twisted vertebra in his lower back and neck.

1165.   Hollembeak did not take part in the riot that took place in Dorm(4-0), but was trapped in a building that was unsupervised and abandoned by the Defendant MTC's staff after chemical agents and flash bang gernades were deployed.

1166.   He still suffers from ringing in his left ear from the flash bang gernade.

1167.   Hollembeak who was left abandoned by the Defendant MTC's staff's evacuation of Dorm 4, was left in a state of chaos where rioters broke all the windows, toilets, sinks and ceilings were destroyed, causeing fear for his life in a dorm of masked rioters armed with weapons.

1168.   The broken toilets and sinks in the dorm caused flooding and a hazardous waste environment. Plaintiff was forced to walk in the waste. He was left in this unsafe, unsanitary, chaotic, riotous dorm for approximately (12) hours with no security.

1169.   Plaintiff personally packed all of his property in boxes and bags with his last name and ADOC# written on them and placed on his bed during the riot.

1170.  Hollembeak was finally allowed to exit the dorm in which he was flex cuffed so tight it cut off the circulation and cut into his wrists. Then was forced face-down to the ground by TSU.

1171.  He was kept outside in approximately (90) plus degree weather and exposed to the sun for approximately (5) hours. Where he received severe sun burn and experienced the first signs of heat stroke.

1172.  Hollembeak was taken to the "WBE" warehouse with the rest of Dorm 4 and housed with approximately (360) other inmates.

1173.  As punishment Hollembeak was warehoused by MTC staff in this place with no bedding, mattress, hygiene, showers or a change of cloths for (2) plus days.

1174.  In these unsanitary conditions inmates were urinating, defecating and throwing trash within the "WBE" warehouse.

1175.  Hollembeak and his clothes were covered in chemical agents that had been dispersed by TSU inside the dorm and waste water from the flooding.

1176.  He was forced to sleep on an unsanitary, crowded concrete floor. Plaintiff now suffers from pain in his hips, back and shoulders when he is trying to sleep.

1177.  He was only feed bologna sandwichs for (2) plus days.

1178.  This all was punishment for the riot and videotapped.

1179.  On 07/04/15 Hollembeaks shoes were taken, hands and feet cuffed to his waist,

forced to walk barefoot through broken glass and placed on a bus going to CCA-Red Rock Correctional Center.

1180.   Hollembeak was not allowed to shower for a total of (5) days.

1181.   Plaintiff still suffers from anixity, depression, trust issues with authority figures, nightmares, lack of sleep and other mental health issues as a result of the riot.

Shawn W. Burns # 186086

1182.       Plaintiff Burns is a 42 year old male who has pre-exsisting medical issues. These issues include cervical disc disease and a history of hemorrhoids previously removed with surgery.

1183.       Plaintiff Burns did not participate in the riot and arrived to the MTC Unit 17 days prior to the incident.

1184.       Plaintiff was in an unsepervised riotous dorn with masked rioters for over 12 hours.

1185.       Plaintiff personally packed his property and protected it by sitting in his housing unit until leaving the building. All property was intact and accounted for when Plaintiff was forced from building.

1186.       Plaintiff's property arrived with the Television broken and over half of his belongings unaccounted for.

(152.)

1187.     Defendant, MTC, lost plaintiff's property.

1188.     Chemical agents were dispersed and Plaintiff suffered from burning eyes and lack of water for over 12 hours.

1189.     Upon entering the dorm, TSU flex cuffed him on his wrist and led him outside where he was flex cuffed around his ankles and forced to lay facedown on the sand. Plaintiff was kept in this position for Approvismately 3 hours.

1190.     Plain tiff was taken to a warehouse with over 300 other inmates from the building.

1191.     Plaintiff was housed in warehouse for 2 days without denture glue and was unable to eat.

1192.     Plaintiff was unable to eat, shower or change clothes for over 2 days.

(153.)

1193.    On July 4, 2015 Plaintiff was transferred to CCA - Red Rock.

1194.    Plaintiff suffered to from severe cramps ... and hunger pains that resulted in constipation and was unable to have a bowel movement for 7 days.

1195.    This condition aggravated the hemorrhoids and Plaintiff was later put under the CARE of the Health Care Provider at CCA - Red Rock for his condition.

1196.    Plaintiff suffered extreme aggravation to his neck and upper back due to being restrained on both his hands and feet. Plaintiff was later put under the CARE of the Health Care Provider at CCA - Red Rock for his condition.

1197.    Plaintiff is currently being prescribed two medications for his neck pain and acute hemorrhoid diagnosis.

(154.)

1198.       Plaintiff has since experienced nightmares, anxiety and is unable to sleep for more the 2 hours at a time. These conditions continue on a daily basis, yet no relief has been offered.

Clay Faccio # 114962

1199. Plaintiff Faccio is a 50 year old male, has pre-existing medical and psychological needs, which consists of.

1200. Cervical discs 4 and 5 are degenerative and arthritic, carpal tunnel and nerve damage in left hand, arthritis in fingers, wrists, elbows, hips and knees. Displaced ribs, collar bone and torn shoulder and back muscles.

1201. Hepatitis C, ulcers, stomach and bowel problems, arthritis, anxiety, depression and bi polar disorder.

1202. Plaintiff, at the outbreak of the riot, immediately put his belongings in his locker and in boxes, to keep them safe. He sat on his bunk in his cubical for 10 to 12 hours for fear of theft or damage.

1203. Plaintiff has worries about glass from broken windows and porcelain from broken toilets being thrown around.

1204. Ceiling tiles and insulation were pulled down and tossed everywhere.

1205. Electrical wires were dangling from the ceiling, and toilet water flooded the dorm.

(156.)

1206. Masked inmates ran through the dorm and from pod to pod with weapons.

1207. Fires were lit and the air became stagnate and filled with smoke because the M.T.C. CO's turned the air off. Plaintiff became dehydrated in the heat and humidity.

1208. Plaintiff was evacuated the next morning, after 10 to 12 hours in the dorm.

1209. Plaintiff was cuffed with thick hard plastic "zip" ties behind his back.

1210. Immediately he told the T.S.U. officer they were too tight and cutting his circulation off. The T.S.U. officer told him to "Deal with it" "His hands and fingers began to swell and go numb".

1211. Plaintiff was placed on the ground in the dirt in the July sun and told not to move.

1212. Plaintiff again complained about the plastic 'zip' ties being too tight and that he had back and shoulder problems and that he could not remain in that position for long because of the severity of discomfort.

1213. An hour passed before a T.S.U. officer came and

(157.)

HOISTED HIM UP BY HIS ELBOW WHICH PUT MORE PRESSURE AND STRESS ON HIS ALREADY NUMB AND SWOLLEN JOINTS.

1214. PLAINTIFF WAS TOLD TO WALK TO ANOTHER T.S.U OFFICER WHICH TOLD HIM TO GET ON HIS KNEES DIRECTLY IN FRONT OF HIM WHILE ANOTHER OFFICER STOOD OVER HIM WITH A CANISTER OF PEPPER SPRAY POINTED AT HIS FACE.

1215. THE OTHER OFFICER CUT THE ZIP TIES FROM BEHIND HIS BACK AND RE-ZIP TIED HIM WITH HIS HANDS IN FRONT OF HIM. HE WAS THEN TOLD TO RETURN TO WHERE HE WAS SITTING ON THE GROUND AND HAD TO BE HELPED DOWN.

1216. DURING THE 3 HOURS IN THE SIZZLING JULY SUN PLAINTIFF WAS ONLY ALLOWED A MINIMAL AMOUNT OF WATER.

1217 PLAINTIFF WAS THEN MOVED TO THE W.B.E BUILDING AND WAS HOUSED WITH APPROXIMATELY 360 OTHER INMATES IN ONE ROOM.

1218 PLAINTIFF HAD TO STAND FOR LONG PERIODS OF TIME, BECAUSE IT WAS DIFFICULT FOR HIM TO SIT OR LIE DIRECTLY ON THE CONCRETE FLOOR DUE TO HIS SHOULDER PROBLEMS.

1219 HE WAS ALSO UNABLE TO REST OR SLEEP DUE TO THE HIGH AMOUNT OF TENSION BETWEEN OFFICERS AND INMATES.

1220. PLAINTIFF WAS FORCED TO EAT BOLOGNA SANDWICHES FOR DAYS.

1221. AND WAS FORCED TO USE PORTA POTTY THAT BECAME FULL AND OVERFLOWED WITH URINE AND FECES DUE TO THE AMOUNT OF INMATES USING THEM.

1222. PLAINTIFF SUFFERS FROM A GREAT AMOUNT OF STRESS AND WORRY ABOUT HIS SAFETY AND THAT OF HIS BELONGINGS.

1223. THE HYGIENE NEEDS WERE NOT MET AND WAS UNABLE TO SHOWER FOR 3 DAYS.

1224. HE WAS WORRIED FOR HIS FAMILY THOUGHTS ABOUT HIM, NOT KNOWING IF HE WAS SAFE OR INJURED.

1225. PLAINTIFF HAD PAIN IN HIS HIPS FROM TRYING TO LIE ON THE CONCRETE, HIS SHOULDER CONTINUALLY 'CRACKS', HIS NECK, WRIST, AND HANDS TINGLE AND FEEL NUMB.

1226. HIS MENTAL STATE WAS ONE OF COMPLETE EXHAUSTION AND AT ONE POINT HE LITERALLY WANTED TO DIE.

1227. PLAINTIFF SUFFERED FROM DEHYDRATION FOR 2 PLUS DAYS.

1228. THE MUSCLES AND JOINTS GET INFLAMED AND CAUSE

1229. PAIN AND HE STILL HAS NUMBNESS IN HIS LEFT HAND, WRIST AND FINGERS.

1230. PLAINTIFF HAS NIGHTMARES. HIS ANXIETY LEVEL WAS HIGH FOR WEEKS. IT THEN TURNED INTO A DEEP DEPRESSION AND HE SUFFERS FROM A SEVERE SENSE OF LOSS AND DEGRADATION.

1231. HE ALSO SUFFERS CONTINUALLY FROM FEAR THAT ANOTHER INCIDENT LIKE THAT COULD HAPPEN AT ANY TIME.

1232. PLAINTIFF, IN SEPTEMBER OF 2015, HAD A LIPOMA REMOVED FROM HIS LOWER BACK, WHICH HE ONLY BECAME AWARE OF AFTER THE INCIDENT, CAUSED FROM PAIN AND INFLAMATION IN THE MUSCLES OF HIS LOWER BACK.

1233. HE HAS ANOTHER LUMP IN HIS BACK THEY WILL NOT REMOVE.

1234. HE IS UNABLE TO SIT FOR PERIODS OF TIME AND DEALS CONSTANTLY WITH MEMORIES OF THE EVENTS DURING THE RIOT.

RONNIE W. CLARK * 256820

1235   Plaintiff Clark ("Clark") is a 45 year old male, who has chronic health care needs for Hyper Tension and takes daily medication for his chronic health care needs.

1236.   Clark, did not participate in the riot, but was in an unsupervised, abandoned post, riotous Dorm (4-D).

1237.   Where chemical agents were dispersed, sinks, toilets, windows, and ceilings were destroyed, plus waste water everywhere.

1238.   Clark, who was left abandoned by Def. MTC's staff evacuation of Dorm 4, was left in a state of chaos and fear of his life, inside a dorm full of rioters who had masks on, and armed with weapons.

1239.   Clark was asleep when debri from the ceiling struck him in the head.

1240.   Clark, fighting to gain consciousness, awoke gasping for air with a masked man standing over him ripping down the intercom in the ceiling.

1241.   Clark was in this chaotic riotous dorm for approximately 12 hours suffering in a state of shock with a migrane headache.

1242. Clark, personally packed his property and this property was left untouched by the rioters, and was in tack upon said, exiting the building.

1243. Def, MTC lost plaintiff's property.

1244. Upon exiting the Dorm, plaintiff was flexed cuffed so tight it cut into his wrists and cut off circulation. He was forced to the ground-face down by TSU.

1245. The temperature in Kingman for that day was approx. 90°plus. Plaintiff was kept on the recreation yard exposed to the sun for approximately 5 hours without medication and a lack of water.

1246. When Plaintiff asked Def. MTC staff or TSU for his Hyper Tension medication, stating he had a terrible migraine headache and was dehydrated, he was told," Tuff it out you want die and if you do nobody cares." Indicating this was further punishment for the riot.

1247. Plaintiff was taken to the Construction Trades Warehouse ("WBE") with the rest of Dorm 4, or approximately 360 Inmates, without Air Conditioning or proper ventilation.

1248. Plaintiff was warehoused by Def. MTC in this place, without medication, a serious lack of water, proper sanitation, bedding, mattress, hygiene, a shower or a change of

CLOTHES FOR 2 plus DAYS.

1249. In addition to these unsanitary conditions in the warehouse. Inmates were urinating, defecating and thrash was thrown everywhere.

1250. This was all videotaped.

1251. Clark was never offered a change of clothes or shower, thus his clothes were contaminated with chemical agents and hazardous waste water materials.

1252. On 7-4-15, he was bused out to CCA-Red Rock.

1253. Plantiff was seen by Dr. Olsen of CCA-Red Rock, who diagnose Clark as being being very dehydrated with an extremely high blood pressure, water was prescribed for treatment.

1254. Plaintiff was not allowed to shower for a total of (5) days, nor given his medication or treatment for at least (1) Month, as further punishment for the riot.

1255. Plaintiff Clark still suffers from anxiety attacks, insomnia, trust issues of authority figures, nightmares, and other mental issues as a result of the riots.

1256. Plantiff Clark is having a hardtime adjusting, not wanting to associate with others and very intimidated around staff and other prison employees

( 163 )

1257. Plaintiff Clark feels like Def ADC keeps punishing him by making him take "continuous" "WBE" classes.

1258. Clark have completed 3 "WBE" classes already, ADC Policy say's 1 "WBE" class is suffice.

1259. Plaintiff Clark asked ADC. Def Diaz, "why am I subdued to so many "WBE" classes?" Def. Diaz said, "Your on a Priority Ranking List,"

1260. When Plaintiff Clark pressed Def. Diaz about the criteria of said Priority Ranking List, Def. Diaz said, "you will take as many classes as we put you in and that's, that!"

1261. That conversation took place on 1/15/16, witnessed by ADC. Ow white and one inmate.

1262. Plaintiff Clark cannot escape this situation and as a result suffers ADC retaliation on a daily basis.

## SUMMARY OF CLAIM

1263. All acts and transactions alleged herein occurred in the state of Arizona.

1264. On or about March 22, 2004, Defendant ADC awarded a contract to Defendant MTC to operate the Prison, designed and constructed for 1,100 minimum security beds and 300 medium security beds to house DUI inmates.

1265. By May, 2008, Defendant MTC's contract relating to the Prison had been amended to allow the Prison to maintain 2,000 beds in the Cerbat Unit and 1,400 beds in the Hualapai Unit, creating a 3,400 bed minimum/medium security prison.

1266. All Plaintiffs herein were classified by Defendant ADC to the Kingman prison for the events alleged and described within the Complaint.

1267. Some Plaintiffs being classified to MTC as far back as 2010.

1268. Due to the gross negligence of Defendant MTC, throughout Plaintiffs imprisonments, all were on the Hualapai Unit when the riots took place.

1269. By the very fact Defendant ADC canceled its contract with Defendant MTC at the Kingman Complex, and awarded the Kingman Complex to the GEO Company, shows that ADC found fault and liability for the riots with MTC.

1270. A 116 page review of the lax procedures, protocols implemented and incompetent management of the facilities make it clear that circumstances surrounding and leading up to the riots were shocking and egregious.

1271. The negligent and reckless management procedures at MTC with management and security now known are disturbing and numerous, and will be fully proven at trial.

1272. Every factor that could contribute to a riot was present.

1273. Staff members were insufficiently trained to respond to large disturbances.

1274. Staff were grossly under-staffed prior, during and after the riots.

1275. Staff, due to mandatory overtime, were tired from

16 hour shifts.

1276. Staff members were insufficiently trained in the use of chemical agents and other weapons.

1277. MTC's staff of DART and TSU were understaffed, so as to be able to respond to a large-scale riot.

1278. MTC's staff members of DART and TSU were grossly undertrained, so that they could respond to a large-scale riot.

1279. MTC's administration staff were not adequately trained to respond to a large-scale riot.

1280. In fact, some mandatory training classes were either, not taken or the records falsified as if they were taken.

1281. All of these shortcomings and others led to the riots.

1282. These procedures were to late to any of the plaintiffs to avoid the riots.

1283. Plaintiff re-alleges and incorporates herein all facts and allegations stated in paragraphs 1 through 1051

## FIRST CLAIM FOR RELIEF

(Negligence in Causing Riots v. Defendants MTC, Rider, Santiago, Fredrick, Winckler, Palmer, Johnston, Rain., Kemp., Elder, Matthews, Lloyd and Gleason)

1284. Defendant MTC, through the above officers, agents, and employees, were negligent, which negligence was a substantial cause of the riots which occurred on July 2-4, 2015, and which negligence consisted, inter alia, in the following:

1285. Plaintiffs re-alleges and incorporates herein all facts and allegations stated in paragraphs 1 through 1051.

1286. Defendant MTC had duties to protect prisoners from unsafe, unsanitary, overcrowded, hazardous conditions or/ and toxic environments.

1287) Defendant MTC had duties to protect prisoners in employing proper incarceration policies and procedures to assure that prisoners are not placed in unsafe, unsanitary, overcrowded, dangerous and hazardous conditions and/or toxic environments.

1288. Defendant MTC knew or in the exercise of reasonable care should have known that a failure to fulfill the aforementioned duties could have dangerous and unsafe consequences for Plaintiffs while at MTC-Kingman.

(169)

1289. The consequences of MTC's failure to employ adequate prison policies and procedures, and/or adhere to its own policies and procedures were entirely and completely forseeable to Defendant.

1290. In failing to establish adequate policies and procedures, Defendant MTC breached duties owed to Plaintiffs.

1291. In failing to implement adequate policies and procedures, Defendant MTC breached duties owed to Plaintiffs.

1292. In failing to train, instruct and/or monitor its employees properly regarding the policies and procedures, Defendant MTC breached duties owed to the plaintiffs.

1293 In failing to enforce its policies and procedures, Defendant MTC breached duties owed to the plaintiffs.

1294. As a direct and proximate result of the negligence of Defendant MTC, Plaintiffs were in a unsafe, unsanitary, overcrowded, understaffed, dangerous, and hazardous conditions and environment, that lead to conditions over a five-plus-year period, culminating in a 3-day riot and loss of Plaintiffs personal property.          (1.70)

# Inequality of Treatment

1295.  (1) Inmates felt and voiced their complaints that some inmates were given preference in the better-high-paying jobs at MTC.

1296.  (2) That there was a culture of racism by MTC staff towards minorities in their treatment, and minorities felt that they were being targeted for searches and disciplinary tickets, more than other prisoners.

1297.  (3) That prisoners were being forced to take non-mandatory classes, that they did not sign-up for, so MTC could increase its profits.

1298.  (4) These classes were taught by inmates or teachers with no experience, nor course materials.

1299.   (5) Inmates who did not attend, MTC wrote a disciplinary ticket and punished inmates.

1200.        b.   Misuse of Force

1201.   (1) MTC and ADC staff improperly used excessive force on inmates prior to the riot, which angered many inmates who became aware or saw the use of excessive force.

1202.   (2) MTC and ADC negligently trained and monitored its employees, which resulted in employees' use of excessive and improper force.

1203.   (3) MTC and ADC staff continued to use excessive force throughout the riots, even after regaining control, as further punishment for the riots.

        c.        Food Service

1204.   (1) Inmates' complaints about food quality and quantity were ignored by MTC, as were inmate complaints of treatment disparity between inmates regarding food portions.

1205.   (2) Inmate complaints of improper preparation

(172.)

of medical and religious diets by the food service staff were ignored by MTC.

1206. (3) Inmate complaints about food quality and quanity to the general population were ignored by MTC.

### d. Failure to Address Inmate Grievances and Issues

1207. (1) Minorities felt that MTC purposely discriminated against them.

1208. (2) When dorms tried to surrender peacefully during the riot, or speak to staff about surrendering. That they were purposely targeted by MTC or/and ADC TSU with chemical agents, nor would MTC or ADC try to negioate in good-faith to resolve inmate grievances, before and during the riots.

1209. (3) Plaintiffs reference previously cited violations in paragraph 1 through 1310 .

### e. MTC and ADC Ignored Prior Warnings of Potential Riots

(173.)

1310. (1) MTC was warned by members of its staff and by inmates that inmates were unhappy and could riot if the issues and grievances were not addressed. MTC negligently ignored these warnings and took no remedial action.

f. Knowledge of Prior Disturbances

1311. (1) MTC knew of prior large groups of inmates refusing directives and/or chasing MTC staff off the yard. See Cure Letter

1312. (2) From 2005 through 2010 there were 13 reported instances of these disturbances, which again resulted in a disturbance created by conditions heretofore set forth.

1313. Although Plaintiffs did not participate in the riots, ADC's and MTC's negligence, which was a cause of the riot, resulted in Plaintiffs being physically and mentally abused as set forth in Paragraphs 1 through 1312 of this Complaint. As a result, each of the Plaintiffs were injured and damaged in the following particulars:

1314. a. Injury to wrists from tight plastic

(174.)

cuffs, swollen and numb hands, and painful shoulders;

   b. Smoke and toxic substances inhalation;

   c. Skin, eye and nostril irritation from concussion grenades, teargas and pepper spray;

   d. Extreme mental anguish, fear of serious bodily injury or death, humiliation and embarrassment, and post-traumatic stress disorders;

   e. Physical pain, discomfort and depression;

   f. Having to live in unsanitary, hazardous and overcrowded conditions;

   g. Extreme discomfort by having to wear and sleep in contaminated clothing, nor being given the opportunity to shower or a change of clothes;

   h. Lack of proper nutrition as consistent with the applicable laws, statutes and departmental policies regarding general population food, and diets consistent with Plaintiffs medical and religious beliefs;

   i. Some Plaintiffs suffered aggravation to pre-existing health conditions

   j. Some suffered injuries from being shot with rubber pellets;

   k. Most of the Plaintiffs' personal property was burned in a dryer, stomped on, crushed in a trash compactor, destroyed, thrown away or vanished after the riot. Plaintiffs' property which

WAS PERSONALLY PACKED BY PLAINTIFFS, AND UNTOUCHED IN THE RIOT BY RIOTERS, WAS LEFT IN THE CUSTODY, CONTROL AND CARE OF MTC STAFF, IN VIOLATION OF A.R.S. TITLE § 31.

WHEREFORE, PLAINTIFFS SEEKS JUDGEMENT AGAINST THE DEFENDANTS AS FOLLOWS:

A. FOR PLAINTIFFS SPECIAL DAMAGES, IN AMOUNTS SUFFICIENT TO SATISFY THE JURISDICTIONAL REQUIREMENT OF THIS COURT, AND IN AMOUNTS TO BE PROVEN AT TRIALS;

B. FOR PLAINTIFFS GENERAL DAMAGES, IN AMOUNTS TO BE PROVEN AT TRIAL;

C. FOR PLAINTIFFS' REASONABLE COST INCURRED HEREIN; AND

D. FOR SUCH OTHER AND FURTHER RELIEF AS THE COURT DEEMS JUST AND PROPER.

SECOND CLAIM FOR RELIEF
(Gross Negligence / Recklessness in Not Controlling Disturbance v. Defendant MTC, Rider, Santiago, Fredrick, Winckler, Palmer, Johnston, Rain, Kemp, Elder,

(176)

Matthews, Lloyd and Gleason )

1315. Plaintiffs re-alleges and incorporates herein all facts and allegations stated in paragraphs 1 through 1314.

1316. The manner in which Defendant MTC managed Hualapai, particularly in light of its responsibilities for the control, custody and care of prisoners as Plaintiffs, demonstrated a reckless disregard for the safety of others.

1317. MTC, through it officers, agents and employees, and the above-captioned individual Defendants, were negligent in failing to control and curtail the disturbance before it became a riot, which gross negligence / recklessness consisted, inter alia, of the following:

1318. a. MTC negligently failed to develop and implement a proper plan specifying the procedures to be followed when a disturbance occurs which could threaten facility security and/or escalate into a riot.

1319. b. MTC failed to properly train its employees and security personnel on the control of an

inmate disturbance before the disturbance becomes a riot, and failed to properly train its employees and personnel on the procedures to be used to control a riot without the use of excessive force.

1320. C. It was MTC's practice to hire inexperienced staff and pay low wages, which resulted in higher employee turnover. As a result, MTC did not have an adequate number of trained CO's, DART's, TSU's and administrators on duty or available to dispel the disturbance before it degenerated into a riot.

1321. D. The individual Defendant-employees of MTC negligently failed to respond to the disturbance as quickly and effectively as possible to prevent the disturbance from developing into a riot.

1322. E. MTC negligently failed to guard and monitor the abandoned dorms and secure doors, windows, offices, chemical agents and the control room, so that these could not be used for destructive purposes in a riot.

1323. F. MTC violated its contract with Defendant ADC and State of Arizona, in failing to develop and implement an emergency plan consistent with

ADC Administrative Policy on Critical Incident Response Plan., which violated the contract section 2.9.7 et seq. which violations constitutes negligence per se.

13.24. 6. See paragraphs 185 through 283 for additional negligent actions by MTC.

13.25. H. The negligence of MTC's officers, agents and employees as heretofore set forth is imputed to MTC as a matter of law.

13.26. I. Defendant MTC recklessly breached its duties of care as follows:

13.27. 1) By failing to maintain the required number of MTC staff per shift, and/or overworking the staff by forced overtime;

13.28 2) MTC staff that was on duty the days of the riots, were not adequately trained to dispel and/or control a disturbance;

13.29 3) MTC's staff use of excessive force, in front of prisoners was the catalyst for the riots;

13.30. 4) Ordering the evacuation of dorms, thus leaving Plaintiffs in riotous dorms - unsupervised;

1331. 5. By failing to train its employees and assure employee proficieny with chemical agents and weapons;

1332. 6. Train its employees with proper care and handling of Plaintiff's personal property;

1333. 7. By failing to maintain and implement critical Incident and Emergency Response plans per policy and contract;

1334. Through its egregious failure to meet its duty of care to the Plaintiffs, Defendant MTC acted to serve its own interests while having reason to know, and consciously disregarded a substantial risk that its conduct significantly injure the rights of Plaintiffs, for which Plaintiffs are Entitled to punitive damages.

1335. Through its egregious failure to meet its duty of care to the Plaintiffs, Defendant MTC consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others, for which Plaintiffs are entitled to punitive damages.

1336. As a direct and proximate result of Defendant MTC's and employee's recklessness, Plaintiffs were subjected to a toxic and hazardous living environment for years, riotous environment and loss of personal property.

1339. As a direct and proximate result of Defendant MTC's
And employees Negligence which resulted in a toxic
And hazardous living environment for years, a riotous
ordeal for 3 days, loss of Plaintiff's personal property
, plus Plaintiffs suffering short And long term
extreme emotional, mental And physical distress,

WHEREFORE, Plaintiffs seeks Judgement against
the Defendant as follows:

A. For Plaintiff's special damages, in Amounts
sufficient to satisfy the jurisdictional
requirement of the this Court, and in amounts
to be proven at trial;
B. For Plaintiff's general damages, in Amounts
to be proven at trial;
C. For punitive damages, to deter Defendants
and others similarly situated from a like
course of conduct in the future;
D. Plaintiff's reasonable costs incurred herein;
and
E. For such other And further relief as the
court deems just and proper.

THIRD CLAIM FOR RELIEF
( Assault And Battery v. Defendants
MTC And ADC )
( 181. )

1338. The conduct of ADC's and MTC's agents and employees As described in Paragraphs 284 through 1262 of this complaint constitutes an assault and battery on Plaintiffs.

1339. In assaulting and battering the Plaintiffs, Defendant ADC's and MTC's agents and employees used more force than a reasonable person would use under the same or similar circumstances to protect ADC's and MTC's property or to protect themselves from harm.

1340. The physical force described in Paragraphs 284 through 1262 of this Complaint, which constitutes an assault and battery on the Plaintiffs, was used as punishment in violation of Departmental Policy, Arizona statutory law, and American Correctional Association standard 4-ALDF-2B-01 (Ref. 3-ALDF-3A-30 and 3A-31).

1341. At all times material hereto, the agents and employees of ADOC and MTC who assaulted and battered the Plaintiffs were Acting under the direct supervision and control of ADOC and MTC and within the scope of their employment and their conduct is imputed to ADOC and MTC as a matter of law.

(182.)

1342. As a result of the assault and batteries above-described, each of the Plaintiffs was injured and damaged as described in Paragraphs 284-1262 of this complaint.

WHEREFORE, Plaintiffs seeks Judgement against the Defendants ADOC and MTC as follows:

A. For Plaintiffs special damages, in amounts sufficient to satisfy the jurisdictional requirement of the this court, and in amounts to be proven at trial;

B. For Plaintiffs general damages, in amounts to be proven at trial;

C. For punitive damages, to deter Defendants and others similarly situated from a like course of conduct in the future;

D. For Plaintiffs reasonable costs incurred herein; and

E. For such other and further relief as the court deems just and proper.

FOURTH CLAIM FOR RELIEF
(Outrageous Conduct v. Defendants ADOC and MTC)
(ET. AL.)          (1343.)

1343. The conduct of ADOC's and MTC's agents and employees as described in Paragraphs 1 through 1262 of this Complaint constitutes the tort of extreme and outrageous conduct, which caused each of the Plaintiffs to suffer severe emotional and physical distress.

1344. The outrageous conduct of ADOC's and MTC's agents and employees is imputed to ADOC and MTC as a matter of law.

1345. As a result of the outrageous conduct, each of the Plaintiffs were also injured and damaged as described in Paragraphs 284-1262 of this Complaint.

1346. The outrageous conduct and the assault and batteries by ADOC's and MTC's agents and employees constitute willful and wanton conduct giving rise to punitive damages.

WHEREFORE, Plaintiff seeks Judgement against the Defendants ADOC and MTC et Al. as follows:

A. For Plaintiff's special damages, in amounts sufficient to satisfy the jurisdictional

(184.i)

requirement of the this court, and in amounts to be proven at trial;

B. For Plaintiff's general damages, in amounts to be proven at trial;

C. For punitive damages, to deter Defendants and others similarly situated from a like course of conduct in the future;

D. For Plaintiff's reasonable costs incurred herein; and

E. For such other and further relief as the court deems just and proper.

FIFTH CLAIM FOR RELIEF
(Negligence v. Defendants State of Arizona, Arizona Department of Corrections, Charles L. Ryan, Betty Barnes, Freeland and Tara Diaz)

1347. Plaintiffs re-alleges and incorporates herein all facts and allegations stated in paragraphs 1 through 1346.

1348. Defendants State of Arizona, Arizona Department

of Corrections, Charles L. Ryan, Betty Barnes, Freeland and Tara Diaz had duties to protect the general population prisoners from disturbances, and/or riotous situations.

1349. Defendants state of Arizona, Arizona Department of Corrections, Charles L. Ryan, Betty Barnes, Freeland and Tara Diaz had duties to protect the general population prisoners in employing proper incarceration policies and procedures to assure disturbances, and/or riotous situations did not happen.

1350. Defendants State of Arizona, Arizona Department of Corrections, Charles L. Ryan, Betty Barnes, Freeland and Tara Diaz knew or in the exercise of reasonable care should have known that a failure to fulfill the aforementioned duties could have dangerous and irreparable consequences for Plaintiffs.

1351. The consequences of Defendants State of Arizona's, Arizona Department of Corrections', Charles L. Ryan's, Betty Barne's, Freeland's and Tara Diaz's failure to formulate adequate prison policies and procedures and adhere to said policies and procedures were entirely and completely forseeable to Defendants.

(186.)

1352. In failing to establish adequate policies and procedures, Defendants State of Arizona, Arizona Department of Corrections, Charles L. Ryan, Betty Barnes, Freeland and Tara Diaz breached duties owed to Plaintiffs.

1353. In failing to implement adequate policies and procedures, Defendants State of Arizona, Arizona Department of Corrections, Charles L. Ryan, Betty Barnes, Freeland and Tara Diaz breached duties owed to Plaintiffs.

1354. In failing to train, instruct and/or monitor their employees and MTC properly regarding the policies and procedures, Defendants State of Arizona, Arizona Department of Corrections, Charles L. Ryan, Betty Barnes, Freeland and Tara Diaz breached duties owed to the Plaintiffs.

1355. In failing to enforce their policies and procedures, Defendants State of Arizona, Arizona Department of Corrections, Charles L. Ryan, Betty Barnes, Freeland and Tara Diaz breached duties owed to the Plaintiffs.

1356. In failing to monitor the Kingman - Hualapai prison and staff of MTC, Defendants State of Arizona, Arizona Department of Corrections, Charles L. Ryan, Betty Barnes, Freeland and Tara Diaz breached duties owed to the Plaintiffs.

1357. Defendants State of Arizona, Arizona Department of
Corrections, Charles L. Ryan, Betty Barnes, Freeland
and Tara Diaz have non-delegable duties to the
Plaintiffs to employ proper policies, procedures
and oversight in the housing of prisoners entrusted
to them by the courts of the State of Arizona
and elsewhere.

1358. Defendants State of Arizona, Arizona Department of
Corrections, Charles L. Ryan, Betty Barnes, Freeland
and Tara Diaz breached the aforementioned non-
delegable duties in all manners heretofore Alleged.

1359. Defendants State of Arizona, Arizona Department of
Corrections, Charles L. Ryan, Betty Barnes, Freeland
and Tara Diaz are vicariously liable for the
all negligent and reckless conduct of Defendants
MTC ET AL., regarding the issues herein.

1360. As a direct and proximate result of the negligence
of Defendants State of Arizona, Arizona Department
of Corrections, Charles L. Ryan, Betty Barnes, Freeland
and Tara Diaz, Plaintiffs were in an unsafe and
hazardous living environment for years, A 3-day
riot, and the loss of their respective personal
property.

(188.)

WHEREFORE, Plaintiffs seeks Judgement against the Defendants state of Arizona, Arizona Department of Corrections, Charles L. Ryan, Betty Barnes, Freeland and Tara Diaz as follows:

A. For Plaintiff's special damages, in amounts sufficient to satisfy the jurisdictional requirement of the this court, and in Amounts to be proven at trial;

B. For Plaintiff's general damages in amounts to be proven at trial;

C. For punitive damages, to deter Defendant and others similarly situated from a like course of conduct in the future;

D. For Plaintiff's reasonable costs incurred herein; and

E. For such other and further relief as the court deems just and proper.

## SIXTH CLAIM FOR RELIEF
(Gross Negligence / Recklessness v. Defendants State of Arizona, Arizona Department of Corrections, Charles L. Ryan, Betty Barnes, Freeland, and Tara Diaz)

c) By failing to train State and MTC employees to properly and promptly respond to Critical Incident Responses, promptly and properly set-up an ADC Emergency Operations Center;

d) By failing to train state and MTC employees to properly and promptly set-up a Unified Command center;

e) By failing to properly train state and MTC employees and assure employee proficiency with weapons;

f) By failing to maintain an adequate Emergency Response Plan;

g) By failing to monitor, inspect, support and oversee the operations at the prison to ensure compliance with the terms of the contract with Defendant MTC;

h) By failing to read and review the state's contract with MTC to enforce and understand MTC's compliance duties;

i) By failing to implement, oversee and enforce required training curriculums for MTC staff so as to ensure that the MTC staff was adequately

(190)

1361. Plaintiffs re-alleges and incorporates herein all facts and allegations stated in paragraphs 1 through 1360.

1362. The manner in which Defendants State of Arizona, Arizona Department of Corrections, Charles L. Ryan, Betty Barnes, Freeland and Tara Diaz supervised Defendants MTC and the management of the Prison, particularly in light of their responsibilities for the control and custody of violent felons, demonstrated a reckless disregard for the safety of Plaintiffs.

1363. Defendants State of Arizona, Arizona Department of Corrections, Charles L. Ryan, Betty Barnes, Freeland and Tara Diaz recklessly breached their duties of care as follows:

a) By failing to maintain and follow adequate procedures and policies for disturbances and / or riots, resulting in dorms being unmanned for extended periods of time;

b) By failing to train State and MTC employees on proper response to I.C.S.'s procedures and / or training or allowing employees to use excessive use of force or chemical agents;

(191.)

trained to operate the prison;

j.) By failing to ensure MTC was complying with the proper amount of staff as required by the contract;

K) By failing to report MTC's failures to comply with the terms and conditions of the contract;

L) By failing to reasonably forsee that over a five-year period there were repeat findings discovered in eleven (11) of the thirty-one (31) areas of non-compliance initially addressed in the 2010 Cure Notice, as resurfacing deficiencies for MTC at ASP-Kingman.

1364. It was reasonably forseeable that if MTC did not correct its deficiencies over a five-year period, it presented a clear and present danger to the Plaintiffs that a large-scale disturbance and /or riot could happen.

1365. Through their egregious failure to meet their duty of care to the Plaintiffs, Defendants State of Arizona, Arizona Department of Corrections, Charles L. Ryan, Betty Barnes, Freeland and Tara Diaz acted to serve their own interests while having reason to know, and consciously disregard a substantial risk that their conduct might significantly injure the rights of Plaintiffs,

(192.)

for which Plaintiffs are entitled to punitive damages.

1366. Through their egregious failure to meet their duty of care to the Plaintiffs, Defendants state of Arizona, Arizona Department of Corrections, Charles L. Ryan, Betty Barnes, Freeland and Tara Diaz consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to Plaintiffs, for which Plaintiffs are entitled to punitive damages.

1367. As a direct and proximate result of Defendants state of Arizona's, Arizona Department of Corrections', Charles L. Ryan's, Betty Barnes's, Freeland's and Tara Diaz's recklessness, Plaintiffs were in an unsafe and hazardous living environment for years, a 3-day riot, and the loss of their respective personal property.

1368. As a direct and proximate result of Defendants state of Arizona's, Arizona Department of Corrections', Charles L. Ryan's, Betty Barnes's, Freeland's and Tara Diaz's recklessness which resulted in the Plaintiffs living in an unsafe and hazardous environment for years, a 3-day riot and the loss of their personal property, Plaintiffs have suffered severe and extreme emotional distress.

WHEREFORE, Plaintiffs seeks Judgement against

(19 )

the Defendants state of Arizona, Arizona Department of Corrections, Charles L. Ryan, Betty Barnes, Freeland and Tara Diaz as follows:

A. For Plaintiff's special damages, in amounts sufficient to satisfy the jurisdictional requirement of the this Court, in amounts to be proven at trial;

B. For Plaintiff's general damages, in amounts to be proven at trial;

C. For punitive damages, to deter Defendants and others similarly situated from a like course of conduct in the future;

D. Plaintiff's reasonable costs incurred herein; and

E. For such other and further relief as the court deems just and proper.

## SEVENTH CLAIM FOR RELIEF
### (Civil Conspiracy v. Defendants ADC and MTC)

1369. The individual Defendants and other agents and employees of ADOC and MTC, together with unnamed members of ADOC's and MTC's DART and TSU teams, agreed, by words or conduct, to punish

(193.)

the Plaintiffs by use of excessive force and unlawful force, as further punishment of the riot.

1370. The excessive and unlawful force is described in Paragraphs 284 through 1262 of this Complaint.

1371. The excessive and unlawful force was utilized for the unlawful purpose of punishing the Plaintiffs who did not participate in the riot.

1372. Defendants MIC et al., entered into a conspiracy to violate Plaintiffs property rights and common law conspiracy, by their willful and wanton actions, agreed, to by words, orders or conduct, knowingly and willingly to further punish the Plaintiffs by the negligence, damage and/or destruction by Defendant MIC's agents and/or employees of Plaintiffs property.

1373. The conduct described in Paragraphs 1 through 1372 of this complaint constitutes a civil conspiracy and the conduct of all persons who participated in the conspiracy is imputed one to the other, giving rise to joint liability.

WHEREFORE, Plaintiffs seeks Judgement against ADC the Defendants & MIC, ET. AL., AS follows:

(194.)

A. For Plaintiff's special damages, in amounts sufficient to satisfy the jurisdictional requirement of the this court, and in amounts to be proven at trial;

B. For Plaintiff's general damages, in amounts to be proven at trial;

C. For punitive damages, to deter Defendants and others similarly situated from a like course of conduct in the future;

D. Plaintiffs reasonable costs incurred herein; and

E. Plaintiff's attorney fees and reasonable costs incurred by counsel herein; and

F. For such other and further relief as the court deems just and proper.

Dated this 3rd day of MARCH, 2016.

Respectfully submitted,

Jimmy Mamoth

Jimmy Mamoth
ET. AL.

(195.)

THE PLAINTIFFS ADDRESSES:

ARIZONA

1. JIMMY MAMOTH        # 257290
2. ADAM MILLS          # 251754
3. SHAWN BURNS         # 186086
4. WALTER J. BELCHER   # 278500
5. CLAY FACCIO         # 114962
6. RAY MC INTIRE       # 148743
7. THOMAS HIEMSTRA     # 215637
8. JAMES BUCHANAN      # 256819
9. DAVID BAXTER        # 120854
10. ANDREW FERNICOLA   # 198176
11. BENJAMIN HOLLEMBEAK # 215787
12. DAMON MACK         # 180378
13. ALEX OSUNA         # 256039
14. RONNIE W. CLARK    # 256820
15. MARK A. MORRIS     # 098247
16. REGINALD COLVIN    # 260737

ARIZONA STATE PRISON-RED ROCK CORRECTIONAL CENTER
     1752 EAST ARICA ROAD
     ELOY, ARIZONA 85131

          IN PROPRIA PERSON
               (196.)